Barry I. Levy, Esq.
Max Gershenoff, Esq.
Qasim I. Haq, Esq.
RIVKIN RADLER LLP
926 RXR Plaza,
Uniondale, NY 11553
(516) 357-3000
max.gershenoff@rivkin.com
*Counsel for Plaintiffs Government Employees Insurance*
*Company, GEICO Indemnity Company, GEICO General Insurance*
*Company, and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| GOVERNMENT EMPLOYEES INSURANCE CO., GEICO INDEMNITY CO., GEICO GENERAL INSURANCE COMPANY and GEICO CASUALTY CO.,<br><br>         Plaintiffs,<br><br> –against–<br><br>DAVID R. ADIN, D.O., SAM CHANG, D.C., SAM CHANG CHIROPRACTIC, P.C., TOM RHEE L.AC, TOM RHEE L. AC., P.C., JONATHAN WANG, DPT, JONATHAN WANG PHYSICAL THERAPY OF NY, P.C., NEW YORK SPINE & PAIN CARE, P.C., and NJ ORTHOPEDIC REHAB AND PAIN MANAGEMENT GROUP, P.C.,<br><br>         Defendants. | Docket No.: _____( )<br><br>**Plaintiffs Demand a Trial by Jury** |

## COMPLAINT

Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

## NATURE OF THE ACTION

1.      This action seeks to recover more than $4,750,000.00 that the Defendants wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent and unlawful no-fault insurance charges through Sam Chang Chiropractic, P.C. ("Sam Chang Chiro"), Tom Rhee L. AC. P.C. ("Tom Rhee LAC"), Jonathan Wang Physical Therapy Services, P.C. ("Jonathan Wang PT"), New York Spine & Pain Care, P.C. ("NY Spine"), and NJ Orthopedic Rehab and Pain Management Group, P.C. ("NJ Ortho"), for purported examinations, electrodiagnostic ("EDX") testing, pain management injections, surgical procedures, acupuncture, chiropractic, and physical therapy services (collectively the "Fraudulent Services").

2.      The Fraudulent Services were provided, to the extent that they were provided at all, to individuals ("Insureds") who claimed to have been involved in automobile accidents and were eligible for insurance coverage under GEICO no-fault insurance policies.

3.      In addition, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $75,000.00 in pending no-fault insurance claims that have been submitted by or on behalf of Sam Chang Chiro, Tom Rhee LAC, Jonathan Wang PT, NY Spine, and NJ Ortho because of the fraudulent and unlawful conduct described herein.

4.      The Defendants fall into the following categories

(i)      Defendant Sam Chang Chiro is a New York chiropractic professional corporation through which many of the Fraudulent Services purportedly were provided and were billed to insurance companies, including GEICO in New York.

(ii)     Defendant Sam Chang, D.C. ("Chang") is a chiropractor who was licensed to practice chiropractic in New York and New Jersey on or about June 16, 2016. Chang owned and controlled Sam Chang Chiro and used it as a vehicle to submit fraudulent and unlawful no-fault insurance billing for the Fraudulent Services to insurance companies, including GEICO in New York.

(iii)    Defendant Jonathan Wang PT is a New York physical therapy professional corporation through which many of the Fraudulent Services purportedly were provided and were billed to insurance companies, including GEICO in New York.

(iv)    Defendant Jonathan Wang, DPT ("Wang") is a physical therapist who was licensed to practice physical therapy in New York on or about November 19, 2015, and in New Jersey on or about August 31, 2017. Wang owned and controlled Jonathan Wang PT and used it as a vehicle to submit fraudulent and unlawful no-fault insurance billing for the Fraudulent Services to insurance companies, including GEICO in New York.

(v)     Defendant Tom Rhee LAC is a New York acupuncture professional corporation through which many of the Fraudulent Services purportedly were provided and billed to insurance companies, including GEICO in New York.

(vi)    Defendant Tom Rhee, LAc ("Rhee"), is an acupuncturist who was licensed to practice acupuncture in New York on or about June 9, 2017. Rhee owned and controlled Tom Rhee LAC and used it as a vehicle to submit fraudulent and unlawful no-fault insurance billing for the Fraudulent Services to insurance companies, including GEICO in New York.

(vii)    Defendant NY Spine is a New York medical professional corporation through which many of the Fraudulent Services purportedly were provided and billed to insurance companies, including GEICO in New York and New Jersey.

(viii)   Defendant NJ Ortho is a New Jersey medical professional corporation through which many of the Fraudulent Services purportedly were provided and billed to insurance companies, including GEICO in New York and New Jersey.

(ix)    Defendant David R. Adin, D.O. ("Adin") is a physician who was licensed to practice medicine in New York on or about May 31, 2002, and in New Jersey on or about January 19, 2006. Adin owned and controlled NY Spine and NJ Ortho, and used NY Spine and NJ Ortho as vehicles to submit fraudulent and unlawful no-fault insurance billing for the Fraudulent Services to insurance companies, including GEICO in New York and New Jersey.

5.      As discussed below, the Defendants at all relevant times have known that:

(i)     the Defendants paid and received unlawful compensation in exchange for patient referrals;

(ii)    the Defendants engaged in an unlawful self-referral scheme;

(iii)   the Fraudulent Services were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iv)   in many cases, the Fraudulent Services never were provided in the first instance;

(v)    the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO; and

(vi)   the Fraudulent Services were not provided in compliance with relevant laws and regulations governing healthcare practice and, as a result, were not eligible for no-fault reimbursement in the first instance.

6.      As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that they billed or caused to be billed to GEICO. The charts annexed hereto as Exhibits "1" – "5" set forth a large representative sample of the fraudulent claims that have been identified to-date that the Defendants submitted, or caused to be submitted, to GEICO via the mails.

7.      The Defendants' fraudulent and unlawful scheme began no later than 2017 and has continued uninterrupted since that time. As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $4,750,000.00.

## THE PARTIES

**I.      Plaintiffs**

8.      Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York and New Jersey.

## II.        **Defendants**

9.        Defendant Tom Rhee LAC is a New York acupuncture professional corporation with its principal place of business in New York. Tom Rhee LAC was incorporated in New York on or about July 26, 2017, was owned and controlled by Rhee, and was used by Rhee as a vehicle to submit fraudulent and unlawful no-fault insurance billing to GEICO and other insurers in New York.

10.        Defendant Rhee resides in and is a citizen of New York and was licensed to practice acupuncture in New York on or about June 9, 2017. Rhee owned and controlled Tom Rhee LAC, purported to perform many of the Fraudulent Services at Tom Rhee LAC, and used Tom Rhee LAC as a vehicle to submit fraudulent and unlawful no-fault insurance billing to GEICO and other insurers in New York.

11.        Defendant Sam Chang Chiro is a New York chiropractic professional corporation with its principal place of business in New York. Sam Chang Chiro was incorporated in New York on or about March 8, 2017, was owned and controlled by Chang, and was used by Chang as a vehicle to submit fraudulent and unlawful no-fault insurance billing to GEICO and other insurers in New York.

12.        Defendant Chang resides in and is a citizen of New Jersey. Chang was licensed to practice chiropractic in New York and New Jersey on or about June 16, 2016. Based upon information and belief from publicly available records and GEICO's claims records, Chang has – at all times relevant to this action – operated Sam Chang Chiro in New York, maintained an active New York driver's license, and maintained an active New York voter registration. Chang owned and controlled Sam Chang Chiro, purported to perform many of the Fraudulent Services at Sam Chang Chiro, and used Sam Chang Chiro as a vehicle to submit fraudulent and unlawful no-fault insurance billing to GEICO and other insurers in New York.

13.     Defendant Jonathan Wang PT is a New York physical therapy professional corporation with its principal place of business in New York. Jonathan Wang PT was incorporated in New York on or about January 26, 2017, was owned and controlled by Wang, and was used by Wang as a vehicle to submit fraudulent and unlawful no-fault insurance billing to GEICO and other insurers in New York.

14.     Defendant Wang resides in and is a citizen of New Jersey. Wang was licensed to practice physical therapy in New York on or about November 19, 2015, and in New Jersey on or about August 31, 2017. Wang owned and controlled Jonathan Wang PT, purported to perform many of the Fraudulent Services at Jonathan Wang PT, and used Jonathan Wang PT as a vehicle to submit fraudulent and unlawful no-fault insurance billing to GEICO and other insurers in New York.

15.     Defendant NY Spine is a New York medical professional corporation with its principal place of business in New York. NY Spine was incorporated in New York on or about November 19, 2008, was owned and controlled by Adin, and was used by Adin as a vehicle to submit fraudulent and unlawful no-fault insurance billing to GEICO and other insurers in New York and New Jersey.

16.     Defendant NJ Ortho is a New Jersey medical professional corporation with its principal place of business in New Jersey. NJ Ortho was incorporated in New Jersey on or about July 28, 2010, was owned and controlled by Adin, and was used by Adin as a vehicle to submit fraudulent and unlawful no-fault insurance billing to GEICO and other insurers in New York and New Jersey.

17.     Defendant Adin resides in and is a citizen of New Jersey. Adin was licensed to practice medicine in New York on or about May 31, 2002, and in New Jersey on or about January

19, 2006. Based upon information and belief from publicly available records and GEICO's claims records, Adin has – at all times relevant to this action – operated NY Spine and NJ Ortho in New York, and maintained an active New York driver's license. Adin owned and controlled NY Spine and NJ Ortho, purported to perform many of the Fraudulent Services at NY Spine and NJ Ortho, and used NY Spine and NJ Ortho as vehicles to submit fraudulent and unlawful no-fault insurance billing to GEICO and other insurers in New York and New Jersey.

### III.     Other Pertinent Individuals and Entities

18.     Although it is not named as a Defendant in this action, CTO Management, LLC, d/b/a Health East ASC ("Health East ASC") is relevant to understanding the Defendants' fraudulent and unlawful scheme and the claims brought in this action.

19.     Health East ASC is a New Jersey limited liability company with its principal place of business in New Jersey, is licensed as a New Jersey ambulatory care facility, and was organized in New Jersey on or about June 30, 2009. Adin owned and controlled Health East ASC in part, was a member of Health East ASC, and used Health East ASC as a vehicle to submit fraudulent and unlawful no-fault insurance billing to GEICO and other insurers.

### JURISDICTION AND VENUE

20.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interest and costs, exceeds the jurisdictional threshold of $75,000.00, and is between citizens of different states.

21.     This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).

22.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

23.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

24.     For example, the Defendants submitted or caused to be submitted a massive amount of fraudulent billing to GEICO in New York, under New York automobile insurance policies, for treatment that they purported to provide to GEICO's New York-based Insureds, typically in the Eastern District of New York. In reliance on the fraudulent and unlawful claims, personnel at a GEICO office in the Eastern District of New York issued payment on the claims.

25.     What is more, and as set forth herein, the Defendants transacted and solicited substantial business in New York, derived a substantial amount of revenue based on their fraudulent and unlawful business activities in New York, and committed tortious acts that caused injury to GEICO in New York.

## ALLEGATIONS COMMON TO ALL CLAIMS

**I.     An Overview of the Pertinent Law Governing No-Fault Insurance Reimbursement**

26.     GEICO underwrites automobile insurance in New York and New Jersey.

**A.     Pertinent New York Law Governing No-Fault Insurance Reimbursement**

27.     New York's no-fault insurance laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.

28.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.), automobile insurers are required to provide no-fault insurance benefits ("Personal Injury Protection" or "PIP Benefits") to Insureds.

29.     In New York, PIP Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for healthcare goods and services.

30.     In New York, an Insured can assign their right to PIP Benefits to healthcare goods and services providers in exchange for those services.

31.     In New York, pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3") or by using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500 form" or "CMS-1500 form").

32.     Pursuant to the New York no-fault insurance laws, healthcare services providers are not eligible to bill for or to collect PIP Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services, or if they fail to meet the applicable licensing requirements in any other states in which such services are performed.

33.     For instance, the implementing regulation adopted by the New York Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of healthcare services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

34.      Pursuant to the New York Education Law, foreign medical professional entities operating in New York must apply for authority to do business in New York and must have a certificate of authority from the New York Department of Education. See, e.g., N.Y. Educ. Law §§ 6509(8), 6530(12); N.Y. Bus. Corp. Law §§ 1503, 1514, 1530.

35.      Foreign medical professional entities that operate in New York without obtaining the requisite certificate of authority and authorization are not eligible to receive PIP Benefits.

36.      New York law prohibits licensed healthcare services providers, including licensed chiropractors and physicians, from paying or accepting compensation in exchange for patient referrals. See, e.g., New York Education Law §§ 6509-a; 6530; 6531; see also 8 N.Y.C.R.R. § 29.1. Therefore, a healthcare provider that pays or receives kickbacks or unlawful compensation in exchange for patient referrals is not eligible to receive PIP Benefits.

37.      In addition, New York law prohibits licensed healthcare services providers, including physicians, from referring patients to healthcare practices in which they have an ownership or investment interest unless: (i) the ownership or investment interest is disclosed to the patient; and (ii) the disclosure informs the patient of his or her "right to utilize a specifically identified alternative health care provider if any such alternative is reasonably available". See New York Public Health Law § 238-d.

38.      In New York, claims for PIP Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule").

39.      When a healthcare services provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent

manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

40.    Pursuant to New York Insurance Law § 403, the NF-3 and HCFA-1500 forms submitted by a healthcare services provider to GEICO, and to all other automobile insurers, must be verified by the healthcare provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

**B.    Pertinent New Jersey Law Governing No-Fault Insurance Reimbursement**

41.    Like New York, New Jersey has a comprehensive statutory system designed to ensure that motor vehicle accident victims are compensated for their injuries.  The statutory system is embodied within the Compulsory Insurance Law (N.J.S.A. 39:6B–1 to 3) and the Automobile Reparation Reform Act (N.J.S.A. 39:6A–1 et seq.), which require automobile insurers to provide PIP Benefits to Insureds.

42.    As in New York, under the New Jersey no-fault laws, an Insured can assign his or her right to PIP Benefits to healthcare services providers in exchange for those services. Pursuant to such an assignment, a healthcare services provider may submit claims directly to an insurance company in order to receive payment for medically necessary services, using the required claim forms, including the HCFA–1500 form.

43.    In order for a healthcare services provider to be eligible to receive PIP Benefits under the New Jersey no-fault laws, it must comply with all significant laws and regulations governing healthcare practice in New Jersey.

44.    Thus, a healthcare services provider is not entitled to receive PIP Benefits where it has failed to comply with all significant statutory and regulatory requirements governing healthcare practice in New Jersey, whether or not the underlying services were medically necessary or actually provided.

45.    Moreover, in order for a specific healthcare service to be eligible for PIP reimbursement, the service itself must be provided in compliance with all significant laws and regulations governing healthcare practice in New Jersey.

46.    By extension, insurers such as GEICO are not obligated to make any payments of PIP Benefits to healthcare services providers that are not in compliance with all significant statutory and regulatory requirements governing healthcare practice in New Jersey.

47.    Furthermore, insurers such as GEICO are not obligated to make any payments of PIP Benefits for healthcare services that are not rendered in compliance with all significant statutory and regulatory requirements governing healthcare practice in New Jersey.

48.    Pursuant to N.J.S.A 14A:17-5, a foreign professional corporation cannot offer professional services in the State of New Jersey without being properly incorporated under New Jersey law.

49.    Insurers are not required to pay PIP Benefits for healthcare services that are unlawfully provided in New Jersey through foreign professional corporations.

50.    Pursuant to N.J.A.C. 13:35-6.17, physicians are prohibited from paying or receiving compensation, either directly or indirectly, in exchange for patient referrals.

51.    Among other things, N.J.A.C. 13:35-6.17(c)(1) specifies that:

A licensee shall not, directly or indirectly, give to or receive from any licensed or unlicensed source a gift of more than nominal (negligible) value, or any fee, commission, rebate or bonus or other compensation however denominated, which a reasonable person would recognize as having been given or received in appreciation for or to promote conduct

<u>by a licensee including</u>: purchasing a medical product, ordering or promoting the sale or lease of a device or appliance or other prescribed item, prescribing any type of item or product for patient use or <u>making or receiving a referral to or from another for professional services</u>. For example, a licensee who refers a patient to a health care service (such as a cardiac rehabilitation service or a provider of durable medical equipment or a provider of testing services) shall not accept from nor give to the health care service a fee directly or indirectly in connection with the referral, whether denominated as a referral or prescription fee or examination or supervision fee <u>or space leasing in which to render the services (other than as permitted in (h) below)</u>, or by any other name ….

(Emphasis added).

52.     N.J.A.C. 13:35-6.17(c)(1)(ii) specifies that "[t]his section shall be construed broadly to effectuate its remedial intent."

53.     In keeping with the broad anti-kickback prohibitions in N.J.A.C. 13:35-6.17(c)(1), N.J.A.C. 13:35-6.17(h) provides, in pertinent part, that:

A Board licensee may lease space or medical equipment to or from another licensed health care professional to whom patients are referred, <u>only where rent is a fixed fee set in advance and determined by the fair market value, or less, and is for a regular term and not for sporadic use of the space or equipment.</u>

(Emphasis added).

54.     Similarly, pursuant to N.J.A.C. 13:44-E-2.6, chiropractors are prohibited from paying or receiving compensation, either directly or indirectly, in exchange for patient referrals.

55.     In keeping with the general proscription against the payment of compensation in exchange for patient referrals (see N.J.A.C. 13:35-6.17; N.J.A.C. 13:44E-2.6), and the specific provisions of N.J.A.C. 13:35-6.17 that are aimed at preventing illegal referral fees from being disguised as ostensibly-legitimate "rent" payments (see N.J.A.C. 13:35-6.17(h)), N.J.A.C. 13:44E-3.9 provides – in pertinent part – that:

A chiropractic physician requesting that another chiropractic physician or other practitioner perform any diagnostic tests shall … [n]ot refer a patient to another practitioner practicing at the same premises …, unless: … [t]hat other practitioner is a bona fide partner, fellow shareholder of a professional service corporation or other permitted practice structure, or a regularly salaried practitioner-employee of the chiropractic physician requesting the

performance of a diagnostic test ….

56.     N.J.A.C. 13:44E-3.1 defines "practitioner" as "a licensee of a professional board authorized to render health care services, including, but not limited to, chiropractic physicians, medical doctors, podiatric physicians, physical therapists and registered professional nurses."

57.     N.J.A.C. 13:44E-3.1 defines "diagnostic test" to include "a professional service utilizing biomechanical, neurological, neurodiagnostic, radiological, vascular or any means, other than bioanalysis, intended to assist in establishing a diagnosis, for the purpose of recommending a course of treatment for the tested patient to be implemented by a chiropractic physician or other treating practitioner."

58.     Thus, pursuant to N.J.A.C. 13:44E-3.9, a chiropractor may not refer a patient to a physician practicing at the same premises as the chiropractor, for any types of professional services other than bioanalysis that are aimed at establishing a diagnosis for use in recommending a course of treatment to be implemented by a chiropractor, unless the physician actually is the chiropractor's bona fide partner, fellow shareholder in a professional entity, or regularly salaried employee.

59.     Physicians, medical practices, chiropractors, and chiropractic practices that pay or receive unlawful compensation in exchange for patient referrals are not eligible to collect PIP Benefits.

60.     In New Jersey, with limited exceptions that are not applicable here, "practitioners" generally may not refer patients to a healthcare practice in which they have a "significant beneficial interest".

61.     Specifically, N.J.S.A. 45:9–22.5 (the "Codey Law") provides – in pertinent part – that:

A practitioner shall not refer a patient or direct an employee of the practitioner to refer a patient to a health care service in which the practitioner, or the practitioner's immediate

family, or the practitioner in combination with the practitioner's immediate family has a significant beneficial interest ….

62.     Pursuant to N.J.S.A. 45:9–22.4:

"Practitioner" means a physician, chiropractor or podiatrist licensed pursuant to Title 45 of the Revised Statutes.

"Health care service" means a business entity which provides on an inpatient or outpatient basis: testing for or diagnosis or treatment of human disease or dysfunction; or dispensing of drugs or medical devices for the treatment of human disease or dysfunction. Health care service includes, but is not limited to, a bioanalytical laboratory, pharmacy, home health care agency, rehabilitation facility, nursing home, hospital, or a facility which provides radiological or other diagnostic imagery services, physical therapy, ambulatory surgery, or ophthalmic services.

"Significant beneficial interest" means any financial interest; but does not include ownership of a building wherein the space is leased to a person at the prevailing rate under a straight lease agreement, or any interest held in publicly traded securities.

63.     Pursuant to N.J.S.A. 45:9–22–5(c)(1), the Codey Law's restrictions on patient

referrals do not apply to:

medical treatment or a procedure that is provided at the practitioner's medical office and for which a bill is issued directly in the name of the practitioner or the practitioner's medical office ….

64.     Pursuant to N.J.S.A. 45:9-22-5(c)(3), the Codey Law's restrictions on patient

referrals also do not apply to referrals for certain procedures performed at an ambulatory care

facility, such as an ambulatory surgery center, so long as certain conditions are met (the "ASC

Exception").

65.     In particular, and as set forth in N.J.S.A. 45:9-22-5(c)(3), prior to January 2019 the

Codey Law's restrictions did not apply to:

ambulatory surgery or procedures requiring anesthesia performed at a surgical practice registered with the Department of Health . . . or at an ambulatory care facility licensed by the Department of Health to perform surgical and related services or lithotripsy services, if the following conditions are met:

(a)     the practitioner who provided the referral personally performs the procedure;

(b)     the practitioner's remuneration as an owner of or investor in the practice or facility is directly proportional to the practitioner's ownership interest and not to the volume of patients the practitioner refers to the practice or facility;

(c)     all clinically-related decisions at a facility owned in part by non-practitioners are made by practitioners and are in the best interests of the patient; and

(d)     disclosure of the referring practitioner's significant beneficial interest in the practice or facility is made to the patient in writing, at or prior to the time that the referral is made, consistent with the provisions of section 3 of P.L. 1989, c. 19 (C.45:9-22.6).

66.    After January 2019, the Codey Law's restrictions did not apply to:

ambulatory surgery or procedures involving the use of any anesthesia performed at a surgical practice registered with the Department of Health . . . or at an ambulatory care facility licensed by the Department of Health to perform surgical and related services or lithotripsy services, if the following conditions are met:

(a)     the practitioner who provided the referral personally performs the procedure;

(b)     the practitioner's remuneration as an owner of or investor in the practice or facility is directly proportional to the practitioner's ownership interest and not to the volume of patients the practitioner refers to the practice or facility;

(c)     all clinically-related decisions at a facility owned in part by non-practitioners are made by practitioners and are in the best interests of the patient; and

(d)     disclosure of the referring practitioner's significant beneficial interest in the practice or facility is made to the patient in writing, at or prior to the time that the referral is made, consistent with the provisions of section 3 of P.L. 1989, c. 19 (C.45:9-22.6).

67.    Thus, if a physician self-referred patients for a medical procedure at an ambulatory care facility, the referrals would not qualify for the ASC Exception and therefore would violate the Codey Law unless – among other things – the physician who made the referral personally

performed the resulting procedure, and the procedure actually required (or legitimately involved the use of) anesthesia.

68. Physicians, medical practices, and ambulatory care facilities in New Jersey that engage in self-referral arrangements that violate the Codey Law are not eligible to receive PIP Benefits.

69. Pursuant to N.J.S.A. 39:6A–4, an insurer such as GEICO is only required to pay PIP Benefits for reasonable, necessary, and appropriate treatment. At the same time, a healthcare services provider is only eligible to receive PIP Benefits for medically necessary services.

70. Like New York, New Jersey has established a medical fee schedule (the "NJ Fee Schedule") that is applicable to claims for PIP Benefits.

71. When a healthcare services provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the NJ Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

## II. The Defendants' Fraudulent Scheme

72. Beginning no later than 2017, and continuing through the present day, the Defendants masterminded and implemented a fraudulent scheme in which they caused a massive amount of fraudulent and unlawful PIP billing to be submitted to GEICO for medically unnecessary, illusory, unlawful, and otherwise non-reimbursable services in New York and New Jersey.

## A. NJ Ortho's Unlawful Operations in New York

73.     As set forth above, NJ Ortho is a New Jersey medical professional corporation, not a New York medical professional corporation.

74.     As set forth above, pursuant to 11 N.Y.C.R.R. § 65-3.16(a)(12), healthcare services providers are not eligible to collect PIP Benefits if the providers fail "to meet any applicable New York State or local licensing requirement necessary to perform such service in New York …."

75.     Pursuant to the New York Education Law, medical professional corporations operating in New York must have a certificate of authority from the New York Department of Education and must be properly incorporated in New York. See, e.g., N.Y. Educ. Law §§ 6509, 6530; N.Y. Bus. Corp. Law §§ 1503, 1514.

76.     NJ Ortho never obtained a certificate of authority from the New York Education Department and was never properly incorporated in New York.

77.     For instance, searches of the New York Department of State Division of Corporations website indicate that NJ Ortho was never incorporated in New York and has never been authorized to do business in New York.

78.     Likewise, searches of the New York Education Department's Office of the Professions website indicate that NJ Ortho never received any certificate of authority from the Education Department.

79.     Even so, Adin routinely and unlawfully operated NJ Ortho as a medical practice in New York.

80.     For example:

(i)     On or about September 14, 2020, Adin and NJ Ortho billed GEICO for an EDX test purportedly provided through NJ Ortho to an Insured named PS at 153-01 Northern Boulevard, Flushing, New York, despite the fact that NJ Ortho was ineligible to receive PIP Benefits in connection with the putative EDX testing because it could not lawfully provide the service in New York.

(ii)     On or about October 9, 2020, Adin and NJ Ortho billed GEICO for facet joint injections purportedly provided through NJ Ortho to an Insured named IK at 45-64 Francis Lewis Boulevard, Ste. 200, Bayside, New York, despite the fact that NJ Ortho was ineligible to receive PIP Benefits in connection with the putative facet joint injections because it could not lawfully provide the service in New York.

(iii)    On or about November 9, 2020, Adin and NJ Ortho billed GEICO for a follow-up examination purportedly provided through NJ Ortho to an Insured named LW at 153-01 Northern Blvd, Flushing, New York, despite the fact that NJ Ortho was ineligible to receive PIP Benefits in connection with the putative examination because it could not lawfully provide the service in New York.

(iv)    On or about November 13, 2020, Adin and NJ Ortho billed GEICO for facet joint injections purportedly provided through NJ Ortho to an Insured named LW at 45-64 Francis Lewis Boulevard, Ste. 200, Bayside, New York, despite the fact that NJ Ortho was ineligible to receive PIP Benefits in connection with the putative facet joint injections because it could not lawfully provide the service in New York.

(v)     On or about November 13, 2020, Adin and NJ Ortho billed GEICO for facet joint injections purportedly provided through NJ Ortho to an Insured named YK at 45-64 Francis Lewis Boulevard, Ste. 200, Bayside, New York, despite the fact that NJ Ortho was ineligible to receive PIP Benefits in connection with the putative facet joint injections because it could not lawfully provide the service in New York.

(vi)    On or about December 4, 2020, Adin and NJ Ortho billed GEICO for facet joint injections purportedly provided through NJ Ortho to an Insured named SK at 45-64 Francis Lewis Boulevard, Ste. 200, Bayside, New York, despite the fact that NJ Ortho was ineligible to receive PIP Benefits in connection with the putative facet joint injections because it could not lawfully provide the service in New York.

(vii)   On or about January 8, 2021, Adin and NJ Ortho billed GEICO for facet joint injections purportedly provided through NJ Ortho to an Insured named PC at 45-64 Francis Lewis Boulevard, Ste. 200, Bayside, New York, despite the fact that NJ Ortho was ineligible to receive PIP Benefits in connection with the putative facet joint injections because it could not lawfully provide the service in New York.

(viii)  On or about January 18, 2021, Adin and NJ Ortho billed GEICO billed GEICO for a follow-up examination purportedly provided through NJ Ortho to an Insured named EP at 153-01 Northern Blvd, Flushing, New York, despite the fact that NJ Ortho was ineligible to receive PIP Benefits in connection with the putative examination because it could not lawfully provide the service in New York.

(ix)    On or about February 8, 2021, Adin and NJ Ortho billed GEICO billed GEICO for a follow-up examination purportedly provided through NJ Ortho to an Insured named CR at 244 Broadway, Newburgh, New York, despite the fact that NJ Ortho

was ineligible to receive PIP Benefits in connection with the putative examination because it could not lawfully provide the service in New York.

(x)     On or about March 26, 2021, Adin and NJ Ortho billed GEICO for a facet joint injection purportedly provided through NJ Ortho to an Insured named CD at 105 20 Rockaway, New York, despite the fact that NJ Ortho was ineligible to receive PIP Benefits in connection with the putative facet joint injections because it could not lawfully provide the service in New York.

(xi)    On or about May 21, 2021, Adin and NJ Ortho billed GEICO for an epidural steroid injection purportedly provided through NJ Ortho to an Insured named PS at 105 20 Rockaway, New York, despite the fact that NJ Ortho was ineligible to receive PIP Benefits in connection with the putative epidural steroid injections because it could not lawfully provide the service in New York.

(xii)   On or about June 3, 2021, Adin and NJ Ortho billed GEICO for an EDX test purportedly provided through NJ Ortho to an Insured named DY at 29-36 Union Street, Flushing, New York, despite the fact that NJ Ortho was ineligible to receive PIP Benefits in connection with the putative EDX testing because it could not lawfully provide the service in New York.

(xiii)  On or about June 23, 2021, Adin and NJ Ortho billed GEICO for a EDX test purportedly provided through NJ Ortho to an Insured named EC at 29-36 Union Street, Flushing, New York, despite the fact that NJ Ortho was ineligible to receive PIP Benefits in connection with the putative EDX testing because it could not lawfully provide the service in New York.

(xiv)   On or about August 12, 2021, Adin and NJ Ortho billed GEICO billed GEICO for an EDX test purportedly provided through NJ Ortho to an Insured named XG at 29-36 Union Street, Flushing, New York, despite the fact that NJ Ortho was ineligible to receive PIP Benefits in connection with the putative EDX testing because it could not lawfully provide the service in New York.

(xv)    On or about September 16, 2021, Adin and NJ Ortho billed GEICO billed GEICO for a follow-up examination purportedly provided through NJ Ortho to an Insured named SM at 253 Rte 211, Middletown, New York, despite the fact that NJ Ortho was ineligible to receive PIP Benefits in connection with the putative examination because it could not lawfully provide the service in New York.

(xvi)   On or about November 4, 2021, Adin and NJ Ortho billed GEICO billed GEICO for an EDX test purportedly provided through NJ Ortho to an Insured named CG at 29-36 Union Street, Flushing, New York, despite the fact that NJ Ortho was ineligible to receive PIP Benefits in connection with the putative EDX testing because it could not lawfully provide the service in New York.

(xvii)   On or about November 4, 2021, Adin and NJ Ortho billed GEICO billed GEICO for a follow-up examination purportedly provided through NJ Ortho to an Insured named XG at 153-01 Northern Blvd, Flushing, New York, despite the fact that NJ Ortho was ineligible to receive PIP Benefits in connection with the putative examination because it could not lawfully provide the service in New York.

(xviii)   On or about December 2, 2021, Adin and NJ Ortho billed GEICO billed GEICO for an EDX test purportedly provided through NJ Ortho to an Insured named KC at 29-36 Union Street, Flushing, New York, despite the fact that NJ Ortho was ineligible to receive PIP Benefits in connection with the putative EDX testing because it could not lawfully provide the service in New York.

(xix)   On or about December 16, 2021, Adin and NJ Ortho billed GEICO billed GEICO for a follow-up examination purportedly provided through NJ Ortho to an Insured named KC at 29-36 Union Street, Flushing, New York, despite the fact that NJ Ortho was ineligible to receive PIP Benefits in connection with the putative examination because it could not lawfully provide the service in New York.

(xx)   On or about December 16, 2021, Adin and NJ Ortho billed GEICO billed GEICO for an EDX test purportedly provided through NJ Ortho to an Insured named XW at 29-36 Union Street, Flushing, New York, despite the fact that NJ Ortho was ineligible to receive PIP Benefits in connection with the putative EDX testing because it could not lawfully provide the service in New York.

81.   These are only representative examples. All of the claims for Fraudulent Services identified in Exhibit "1" for services that purportedly were provided in New York were provided in violation of New York licensing laws, because NJ Ortho lacked the authority to operate as a medical practice in New York.

**B.   NY Spine's Unlawful Operations in New Jersey**

82.   As set forth above, pursuant to N.J.S.A 14A:17-5, a foreign professional corporation cannot provide professional services in the State of New Jersey without being properly incorporated under New Jersey law.

83.   As discussed above, NY Spine was a New York medical professional corporation. NY Spine was not and has never been a New Jersey medical professional corporation. NY Spine was never incorporated as a professional corporation under New Jersey law.

84.    Accordingly, NY Spine could not lawfully provide medical or other professional services in the state of New Jersey.

85.    Even so, in the claims identified in Exhibit "2", Adin routinely caused NY Spine to unlawfully provide purported medical services in New Jersey, which then were billed to GEICO.

86.    For example:

(i)    On or about June 3, 2020, Adin and NY Spine billed GEICO for pain management injections purportedly provided through NY Spine to an Insured named MP at Health East ASC, located at 54 South Dean Street, Englewood, New Jersey, despite the fact that NY Spine was ineligible to receive PIP Benefits in connection with the pain management injections, because it could not lawfully provide the service in New Jersey.

(ii)    On or about June 3, 2020, Adin and NY Spine billed GEICO for facet injections purportedly provided through NY Spine to an Insured named AL at Health East ASC, located at 54 South Dean Street, Englewood, New Jersey, despite the fact that NY Spine was ineligible to receive PIP Benefits in connection with the facet injections, because it could not lawfully provide the service in New Jersey.

(iii)    On or about June 10, 2020, Adin and NY Spine billed GEICO for facet injections purportedly provided through NY Spine to an Insured named MP at Health East ASC, located at 54 South Dean Street, Englewood, New Jersey, despite the fact that NY Spine was ineligible to receive PIP Benefits in connection with the facet injections, because it could not lawfully provide the service in New Jersey.

(iv)    On or about June 10, 2020, Adin and NY Spine billed GEICO for pain management injections purportedly provided through NY Spine to an Insured named EK at Health East ASC, located at 54 South Dean Street, Englewood, New Jersey, despite the fact that NY Spine was ineligible to receive PIP Benefits in connection with the pain management injections, because it could not lawfully provide the service in New Jersey.

(v)    On or about June 24, 2020, Adin and NY Spine billed GEICO for pain management injections purportedly provided through NY Spine to an Insured named HK at Health East ASC, located at 54 South Dean Street, Englewood, New Jersey, despite the fact that NY Spine was ineligible to receive PIP Benefits in connection with the pain management injections, because it could not lawfully provide the service in New Jersey.

(vi)    On or about June 24, 2020, Adin and NY Spine billed GEICO for pain management injections purportedly provided through NY Spine to an Insured named MC at Health East ASC, located at 54 South Dean Street, Englewood, New Jersey, despite

the fact that NY Spine was ineligible to receive PIP Benefits in connection with the pain management injections, because it could not lawfully provide the service in New Jersey.

(vii)    On or about July 29, 2020, Adin and NY Spine billed GEICO for facet injections purportedly provided through NY Spine to an Insured named YC at Health East ASC, located at 54 South Dean Street, Englewood, New Jersey, despite the fact that NY Spine was ineligible to receive PIP Benefits in connection with the facet injections, because it could not lawfully provide the service in New Jersey.

(viii)    On or about August 12, 2020, Adin and NY Spine billed GEICO for facet injections purportedly provided through NY Spine to an Insured named CL at Health East ASC, located at 54 South Dean Street, Englewood, New Jersey, despite the fact that NY Spine was ineligible to receive PIP Benefits in connection with the facet injections, because it could not lawfully provide the service in New Jersey.

(ix)    On or about August 12, 2020, Adin and NY Spine billed GEICO for facet injections purportedly provided through NY Spine to an Insured named YK at Health East ASC, located at 54 South Dean Street, Englewood, New Jersey, despite the fact that NY Spine was ineligible to receive PIP Benefits in connection with the facet injections, because it could not lawfully provide the service in New Jersey.

(x)    On or about August 12, 2020, Adin and NY Spine billed GEICO for facet injections purportedly provided through NY Spine to an Insured named MK at Health East ASC, located at 54 South Dean Street, Englewood, New Jersey, despite the fact that NY Spine was ineligible to receive PIP Benefits in connection with the facet injections, because it could not lawfully provide the service in New Jersey.

87.    These are only representative examples. Many of the claims for Fraudulent Services identified in Exhibit "2" for services that purportedly were provided in New Jersey were provided in violation of New Jersey law, because NY Spine lacked the ability to lawfully operate as a medical practice in New Jersey.

## C.    The Payment and Receipt of Unlawful Compensation Between and Among the Defendants in Exchange for Patient Referrals

88.    In order to bill GEICO and other automobile insurers for initial examinations, follow up examinations, EDX testing, pain management injections, and surgical procedures, NY Spine and Adin needed to obtain patient referrals from other healthcare providers.

89.    At the same time Chang, Sam Chang Chiro, Wang, Jonathan Wang PT, Rhee, and

Tom Rhee LAC (collectively the "Referring Defendants") wanted to submit as much chiropractic, physical therapy, and acupuncture billing as possible to GEICO and other insurers, without regard for whether the underlying chiropractic, physical therapy, and acupuncture services were medically necessary.

90.     However, to the extent that the Insureds in the claims set forth in Exhibits "2" – "5" suffered any injuries at all in their automobile accidents, they virtually always were minor soft tissue injuries such as sprains or strains.

91.     Because ordinary soft tissue injuries such as sprains or strains almost always resolve after a short course of conservative treatment, or no treatment at all, the Referring Defendants knew that their ability to submit and obtain payment on large amounts of chiropractic, physical therapy, acupuncture, and related billing to GEICO and other automobile insurers would be limited, inasmuch as they would not be able to demonstrate that the Insureds required additional chiropractic, physical therapy, acupuncture, and/or related services beyond an initial short course of conservative treatment.

92.     The Referring Defendants also knew that it would be much easier for them to obtain payment on large amounts of PIP insurance billing for medically unnecessary chiropractic, physical therapy, and/or acupuncture if a licensed physician or physicians were to generate reports and diagnoses that purported to reflect injuries more serious than ordinary strains and sprains.

93.     Accordingly, the Referring Defendants entered into secret agreements with Adin and NY Spine, whereby the Referring Defendants agreed to refer Insureds to NY Spine for expensive and medically unnecessary examinations, EDX testing, injections, and/or surgical procedures, despite the Insureds' lack of any genuine presenting problems that would warrant the examinations, EDX testing, injections, and surgical procedures.

94.     In exchange for the medically unnecessary referrals, NY Spine and Adin paid unlawful compensation to the Referring Defendants.

95.     The unlawful compensation was provided in the form of: (i) ostensibly legitimate payments to "lease" space at the Referring Defendants' offices – located at 141-41 Northern Blvd., Flushing, New York, 11354 and  29-36 Union Street Ground Floor, Flushing, New York, 11354 –, which actually were disguised kickbacks paid in exchange for patient referrals; and/or (ii) return referrals back from NY Spine and Adin to the Referring Defendants for the continued provision of medically unnecessary chiropractic, acupuncture, and physical therapy treatment.

96.     In reality, these were "pay–to–play" arrangements that caused the Referring Defendants to provide access to Insureds and to refer Insureds to NY Spine for medically unnecessary examinations, EDX testing, pain-management injections, and/or surgical procedures.

97.     In keeping with the fact that their ostensibly legitimate "rent" payments to the Referring Defendants actually were disguised kickbacks in exchange for patient referrals, NY Spine and Adin operated from the Referring Defendants' offices on only a sporadic basis.

98.     For example, NY Spine and Adin did not maintain regular office hours at the Referring Defendants' offices. Rather, he appeared at the Referring Defendants' offices sporadically, on different days each month, only when the Referring Defendants had patients to refer to NY Spine pursuant to the unlawful referral scheme.

99.     In further keeping with the fact that the putative "rent" payments were not for fixed fees set in advance, and did not cover any regular lease terms, the Referring Defendants' offices did not contain any external signage or other indicia of NY Spine and Adin's ongoing presence at the offices.

100.    Furthermore, when NY Spine and Adin would operate from the Referring

Defendants' offices, the only patients they saw at the offices were patients who were referred to them by the Referring Defendants.

101.    In addition to the phony "lease" payments, NY Spine and Adin's false contentions that Insureds continued to suffer from significant levels of pain, functional deficits, and radiculopathies as the result of their minor automobile accidents, and return referrals of the Insureds by NY Spine and Adin back to the Referring Defendants, constituted unlawful compensation to the Referring Defendants for their initial referrals of Insureds to NY Spine and Adin, as these contentions, diagnoses, and referrals provided a false justification for the Referring Defendants to continue to provide medically unnecessary chiropractic, physical therapy, and acupuncture services to the Insureds.

102.    In keeping with the fact that NY Spine and Adin's return referrals to the Referring Defendants were not predicated on medical necessity, and in fact constituted unlawful compensation to the Referring Defendants for the initial referrals of the Insureds, NY Spine, Adin, and the Referring Defendants' own records indicated that the prior chiropractic, physical therapy, and acupuncture services had not been effective in resolving the Insureds' supposed complaints.

103.    For example:

(i)     On June 21, 2017, an Insured named SV was involved in an automobile accident. Thereafter, SV sought treatment from Chang and Sam Chang Chiro, who provided SV with chiropractic treatment between July 2017 and February 2018. In February 2018, Chang and Sam Chang Chiro caused SV to be referred to NY Spine in exchange for unlawful compensation that Adin and NY Spine provided to Chang and Sam Chang Chiro. Thereafter, on February 15, 2018, Adin purported to examine SV on behalf of NY Spine. In the February 15, 2018, examination report, Adin falsely contended that SV continued to suffer from high levels of pain as the result of the accident, despite the fact that – by that point – SV had received over seven months of chiropractic services from Chang and Sam Chang Chiro. Though the chiropractic treatment that Chang and Sam Chang Chiro purportedly had provided supposedly had been ineffective in resolving SV's putative symptoms, Adin nonetheless referred SV back to Chang and Sam Chang Chiro for continued chiropractic treatment at the conclusion of the February 15, 2018, examination –

over seven months after the accident, and long after any legitimate symptoms SV may have experienced had resolved. The medically unnecessary return referral to Chang and Sam Chang Chiro was unlawful compensation for the initial, medically unnecessary referral to NY Spine.

(ii)     On June 21, 2017, an Insured named VV was involved in an automobile accident. Thereafter, VV sought treatment from Chang and Sam Chang Chiro, who provided VV with chiropractic treatment between August 2017 and February 2018. In February 2018, Chang and Sam Chang Chiro caused VV to be referred to NY Spine in exchange for unlawful compensation that Adin and NY Spine provided to Chang and Sam Chang Chiro. Thereafter, on February 15, 2018, Adin purported to examine VV on behalf of NY Spine. In the February 15, 2018, examination report, Adin falsely contended that VV continued to suffer from high levels of pain as the result of the accident, despite the fact that – by that point – VV had received over six months of chiropractic services from Chang and Sam Chang Chiro. Though the chiropractic treatment that Chang and Sam Chang Chiro purportedly had provided supposedly had been ineffective in resolving VV's putative symptoms, Adin nonetheless referred VV back to Chang and Sam Chang Chiro for continued chiropractic treatment at the conclusion of the February 15, 2018, examination – over six months after the accident, and long after any legitimate symptoms VV may have experienced had resolved. The medically unnecessary return referral to Chang and Sam Chang Chiro was unlawful compensation for the initial, medically unnecessary referral to NY Spine.

(iii)     On June 21, 2017, an Insured named SV was involved in an automobile accident. Thereafter, SV sought treatment from Wang and Jonathan Wang PT, who provided SV with physical therapy treatment between July 2017 and February 2018. In February 2018, Wang and Jonathan Wang PT caused SV to be referred to NY Spine in exchange for unlawful compensation that Adin and NY Spine provided to Wang and Jonathan Wang PT. Thereafter, on February 15, 2018, Adin purported to examine SV on behalf of NY Spine. In the February 15, 2018, examination report, Adin falsely contended that SV continued to suffer from high levels of pain as the result of the accident, despite the fact that – by that point – SV had received over seven months of physical therapy services from Wang and Jonathan Wang PT. Though the physical therapy treatment that Wang and Jonathan Wang PT purportedly had provided supposedly had been ineffective in resolving SV's putative symptoms, Adin nonetheless referred SV back to Wang and Jonathan Wang PT for continued physical therapy treatment at the conclusion of the February 15, 2018, examination – over seven months after the accident, and long after any legitimate symptoms SV may have experienced had resolved. The medically unnecessary return referral to Wang and Jonathan Wang PT was unlawful compensation for the initial, medically unnecessary referral to NY Spine.

(iv)     On June 21, 2017, an Insured named VV was involved in an automobile accident. Thereafter, VV sought treatment from Wang and Jonathan Wang PT, who provided VV with physical therapy treatment between August 2017 and February 2018. In

February 2018, Wang and Jonathan Wang PT caused VV to be referred to NY Spine in exchange for unlawful compensation that Adin and NY Spine provided to Wang and Jonathan Wang PT. Thereafter, on February 15, 2018, Adin purported to examine VV on behalf of NY Spine. In the February 15, 2018, examination report, Adin falsely contended that VV continued to suffer from high levels of pain as the result of the accident, despite the fact that – by that point – VV had received over six months of physical therapy services from Wang and Jonathan Wang PT. Though the physical therapy treatment that Wang and Jonathan Wang PT purportedly had provided supposedly had been ineffective in resolving VV's putative symptoms, Adin nonetheless referred VV back to Wang and Jonathan Wang PT for continued physical therapy treatment at the conclusion of the February 15, 2018, examination – over six months after the accident, and long after any legitimate symptoms VV may have experienced had resolved. The medically unnecessary return referral to Wang and Jonathan Wang PT was unlawful compensation for the initial, medically unnecessary referral to NY Spine.

(v)    On August 7, 2017, an Insured named JX was involved in an automobile accident. Thereafter, JX sought treatment from Chang and Sam Chang Chiro, who provided MC with chiropractic treatment between August 2017 and April 2018. In April 2018, Chang and Sam Chang Chiro caused JX to be referred to NY Spine in exchange for unlawful compensation that Adin and NY Spine provided to Chang and Sam Chang Chiro. Thereafter, on April 26, 2018, Adin purported to examine JX on behalf of NY Spine. In the April 26, 2018, examination report, Adin falsely contended that JX continued to suffer from high levels of pain as the result of the accident, despite the fact that – by that point – JX had received over eight months of chiropractic services from Chang and Sam Chang Chiro. Though the chiropractic treatment that Chang and Sam Chang Chiro purportedly had provided supposedly had been ineffective in resolving JX's putative symptoms, Adin nonetheless referred JX back to Chang and Sam Chang Chiro for continued chiropractic treatment at the conclusion of the April 26, 2018, examination – over eight months after the accident, and long after any legitimate symptoms JX may have experienced had resolved. The medically unnecessary return referral to Chang and Sam Chang Chiro was unlawful compensation for the initial, medically unnecessary referral to NY Spine.

(vi)    On August 7, 2017, an Insured named JX was involved in an automobile accident. Thereafter, sought treatment from Rhee and Tom Rhee LAC Chiro, who provided JX with acupuncture treatment between October 2017 and September 2018. In September 2018, Rhee and Tom Rhee LAC caused JX to be referred to NY Spine in exchange for unlawful compensation that Adin and NY Spine provided to Rhee and Tom Rhee LAC. Thereafter, on September 20, 2018, Adin purported to examine JX on behalf of NY Spine. In the September 20, 2018, examination report, Adin falsely contended that JX continued to suffer from high levels of pain as the result of the accident, despite the fact that – by that point – JX had received over eleven months of acupuncture services from Rhee and Tom Rhee LAC. Though the acupuncture treatment that Rhee and Tom Rhee LAC purportedly had provided

supposedly had been ineffective in resolving JX's putative symptoms, Adin nonetheless referred JX back to Rhee and Tom Rhee LAC for continued acupuncture treatment at the conclusion of the September 20, 2018, examination – over eleven months after the accident, and long after any legitimate symptoms JX may have experienced had resolved. The medically unnecessary return referral to Rhee and Tom Rhee LAC was unlawful compensation for the initial, medically unnecessary referral to NY Spine.

(vii)     On August 7, 2017, an Insured named YZ was involved in an automobile accident. Thereafter, sought treatment from Rhee and Tom Rhee LAC Chiro, who provided YZ with acupuncture treatment between October 2017 and September 2018. In September 2018, Rhee and Tom Rhee LAC caused YZ to be referred to NY Spine in exchange for unlawful compensation that Adin and NY Spine provided to Rhee and Tom Rhee LAC. Thereafter, on September 20, 2018, Adin purported to examine YZ on behalf of NY Spine. In the September 20, 2018, examination report, Adin falsely contended that YZ continued to suffer from high levels of pain as the result of the accident, despite the fact that – by that point – YZ had received over eleven months of acupuncture services from Rhee and Tom Rhee LAC. Though the acupuncture treatment that Rhee and Tom Rhee LAC purportedly had provided supposedly had been ineffective in resolving YZ's putative symptoms, Adin nonetheless referred YZ back to Rhee and Tom Rhee LAC for continued acupuncture treatment at the conclusion of the September 20, 2018, examination – over eleven months after the accident, and long after any legitimate symptoms YZ may have experienced had resolved. The medically unnecessary return referral to Rhee and Tom Rhee LAC was unlawful compensation for the initial, medically unnecessary referral to NY Spine.

(viii)    On August 14, 2018, an Insured named LV was involved in an automobile accident. Thereafter, LV sought treatment from Rhee and Tom Rhee LAC, who provided LV with acupuncture treatment between August 2018 and November 2018. In November 2018, Rhee and Tom Rhee LAC caused LV to be referred to NY Spine in exchange for unlawful compensation that Adin and NY Spine provided to Rhee and Tom Rhee LAC. Thereafter, on November 8, 2018, Adin purported to examine LV on behalf of NY Spine. In the November 8, 2018, examination report, Adin falsely contended that LV continued to suffer from high levels of pain as the result of the accident, despite the fact that – by that point – LV had received nearly three months of acupuncture services from Rhee and Tom Rhee LAC. Though the acupuncture treatment that Rhee and Tom Rhee LAC purportedly had provided supposedly had been ineffective in resolving LV's putative symptoms, Adin nonetheless referred LV back to Rhee and Tom Rhee LAC for continued acupuncture treatment at the conclusion of the November 8, 2018, examination – Nearly three months after the accident, and long after any legitimate symptoms LV may have experienced had resolved. The medically unnecessary return referral to Rhee and Tom Rhee LAC was unlawful compensation for the initial, medically unnecessary referral to NY Spine.

(ix)    On August 14, 2018, an Insured named LV was involved in an automobile accident. Thereafter, LV sought treatment from Wang and Jonathan Wang PT, who provided LV with physical therapy treatment between August 2018 and November 2018. In November 2018, Wang and Jonathan Wang PT caused LV to be referred to NY Spine in exchange for unlawful compensation that Adin and NY Spine provided to Wang and Jonathan Wang PT. Thereafter, on November 8, 2018, Adin purported to examine LV on behalf of NY Spine. In the November 8, 2018, examination report, Adin falsely contended that LV continued to suffer from high levels of pain as the result of the accident, despite the fact that – by that point – LV had received nearly three months of physical therapy services from Wang and Jonathan Wang PT. Though the physical therapy treatment that Wang and Jonathan Wang PT purportedly had provided supposedly had been ineffective in resolving LV's putative symptoms, Adin nonetheless referred LV back to Wang and Jonathan Wang PT for continued physical therapy treatment at the conclusion of the November 8, 2018, examination – Nearly three months after the accident, and long after any legitimate symptoms LV may have experienced had resolved. The medically unnecessary return referral to Wang and Jonathan Wang PT was unlawful compensation for the initial, medically unnecessary referral to NY Spine.

(x)    On September 7, 2018, an Insured named ZR was involved in an automobile accident. Thereafter, ZR sought treatment from Rhee and Tom Rhee LAC, who provided ZR with acupuncture treatment between October 2018 and January 2019. In January 2019, Rhee and Tom Rhee LAC caused ZR to be referred to NY Spine in exchange for unlawful compensation that Adin and NY Spine provided to Rhee and Tom Rhee LAC. Thereafter, on January 17, 2019, Adin purported to examine ZR on behalf of NY Spine. In the January 17, 2019, examination report, Adin falsely contended that ZR continued to suffer from high levels of pain as the result of the accident, despite the fact that – by that point – ZR had received nearly three months of acupuncture services from Rhee and Tom Rhee LAC. Though the acupuncture treatment that Rhee and Tom Rhee LAC purportedly had provided supposedly had been ineffective in resolving ZR's putative symptoms, Adin nonetheless referred ZR back to Rhee and Tom Rhee LAC for continued acupuncture treatment at the conclusion of the January 17, 2019, examination – Nearly three months after the accident, and long after any legitimate symptoms ZR may have experienced had resolved. The medically unnecessary return referral to Rhee and Tom Rhee LAC was unlawful compensation for the initial, medically unnecessary referral to NY Spine.

(xi)    On December 5, 2019, an Insured named AL was involved in an automobile accident. Thereafter, AL sought treatment from Chang and Sam Chang Chiro, who provided MP with chiropractic treatment between February 2020 and April 2020. In April 2020, Chang and Sam Chang Chiro caused AL to be referred to NY Spine in exchange for unlawful compensation that Adin and NY Spine provided to Chang and Sam Chang Chiro. Thereafter, on April 30, 2020, Adin purported to examine AL on behalf of NY Spine. In the April 30, 2020, examination report, Adin falsely contended that AL continued to suffer from high levels of pain as the result of the

accident, despite the fact that – by that point – AL had received nearly three months of chiropractic services from Chang and Sam Chang Chiro. Though the chiropractic treatment that Chang and Sam Chang Chiro purportedly had provided supposedly had been ineffective in resolving AL's putative symptoms, Adin nonetheless referred AL back to Chang and Sam Chang Chiro for continued chiropractic treatment at the conclusion of the April 30, 2020, examination – nearly three months after the accident, and long after any legitimate symptoms AL may have experienced had resolved. The medically unnecessary return referral to Chang and Sam Chang Chiro was unlawful compensation for the initial, medically unnecessary referral to NY Spine.

(xii)   On December 5, 2019, an Insured named AL was involved in an automobile accident. Thereafter, AL sought treatment from Wang and Jonathan Wang PT, who provided AL with physical therapy treatment between February 2020 and July 2020. In July 2020, Wang and Jonathan Wang PT caused AL to be referred to NY Spine in exchange for unlawful compensation that Adin and NY Spine provided to Wang and Jonathan Wang PT. Thereafter, on July 9, 2020, Adin purported to examine AL on behalf of NY Spine. In the July 9, 2020, examination report, Adin falsely contended that AL continued to suffer from high levels of pain as the result of the accident, despite the fact that – by that point – AL had received nearly five months of physical therapy services from Wang and Jonathan Wang PT. Though the physical therapy treatment that Wang and Jonathan Wang PT purportedly had provided supposedly had been ineffective in resolving AL's putative symptoms, Adin nonetheless referred AL back to Wang and Jonathan Wang PT for continued physical therapy treatment at the conclusion of the July 9, 2020, examination – Nearly five months after the accident, and long after any legitimate symptoms AL may have experienced had resolved. The medically unnecessary return referral to Wang and Jonathan Wang PT was unlawful compensation for the initial, medically unnecessary referral to NY Spine.

(xiii)   On January 18, 2020, an Insured named MP was involved in an automobile accident. Thereafter, MP sought treatment from Chang and Sam Chang Chiro, who provided MP with chiropractic treatment between January 2020 and June 2020. In June 2020, Chang and Sam Chang Chiro caused MP to be referred to NY Spine in exchange for unlawful compensation that Adin and NY Spine provided to Chang and Sam Chang Chiro. Thereafter, on June 25, 2020, Adin purported to examine MP on behalf of NY Spine. In the June 25, 2020, examination report, Adin falsely contended that MP continued to suffer from high levels of pain as the result of the accident, despite the fact that – by that point – MP had received over five months of chiropractic services from Chang and Sam Chang Chiro. Though the chiropractic treatment that Chang and Sam Chang Chiro purportedly had provided supposedly had been ineffective in resolving MP's putative symptoms, Adin nonetheless referred MP back to Chang and Sam Chang Chiro for continued chiropractic treatment at the conclusion of the June 25, 2020, examination – over five months after the accident, and long after any legitimate symptoms MP may have experienced had resolved. The medically unnecessary return referral to Chang and

Sam Chang Chiro was unlawful compensation for the initial, medically unnecessary referral to NY Spine.

(xiv)  On January 18, 2020, an Insured named MP was involved in an automobile accident. Thereafter, MP sought treatment from Wang and Jonathan Wang PT, who provided MP with physical therapy treatment between February 2020 and June 2020. In June 2020, Wang and Jonathan Wang PT caused MP to be referred to NY Spine in exchange for unlawful compensation that Adin and NY Spine provided to Wang and Jonathan Wang PT. Thereafter, on June 25, 2020, Adin purported to examine MP on behalf of NY Spine. In the June 25, 2020, examination report, Adin falsely contended that MP continued to suffer from high levels of pain as the result of the accident, despite the fact that – by that point – MP had received over four months of physical therapy services from Wang and Jonathan Wang PT. Though the physical therapy treatment that Wang and Jonathan Wang PT purportedly had provided supposedly had been ineffective in resolving MP's putative symptoms, Adin nonetheless referred MP back to Wang and Jonathan Wang PT for continued physical therapy treatment at the conclusion of the June 25, 2020, examination – over four months after the accident, and long after any legitimate symptoms MP may have experienced had resolved. The medically unnecessary return referral to Wang and Jonathan Wang PT was unlawful compensation for the initial, medically unnecessary referral to NY Spine.

104.    These are only representative examples. In the claims identified in Exhibits "2" – "5", the Referring Defendants referred Insureds to NY Spine, or caused them to be referred, in exchange for unlawful compensation from NY Spine and Adin.

**D.    The Fraudulent Charges for Initial Examinations by NY Spine, Adin, Sam Chang Chiro, Chang, Tom Rhee LAC, and Rhee**

105.    Upon receiving a referral pursuant to the unlawful compensation that NY Spine and Adin paid to the Referring Defendants, or from one of their other referral sources, NY Spine and Adin purported to provide virtually every Insured in the claims identified in Exhibit "2" with an initial examination.

106.    Similarly, prior to referring an Insured to NY Spine and Adin pursuant to their unlawful referral scheme, Sam Chang Chiro, Chang, Tom Rhee LAC, and Rhee also provided virtually every Insured in the claims identified in exhibits "3" – "4" with an initial examination.

107.    As set forth in Exhibit "2", Adin purported to perform virtually all of the putative initial examinations on behalf of NY Spine, which were then billed through NY Spine to GEICO under CPT code 99204, typically resulting in a charge of between $148.63 and $250.00 for each purported initial examination.

108.    As set forth in Exhibit "3", Chang purported to perform virtually all of the putative initial examinations at Sam Chang Chiro, which were then billed through Sam Chang Chiro to GEICO under CPT code 99203, typically resulting in a charge of $75.00 for each purported initial examination.

109.    As set forth in Exhibit "4", Rhee purported to perform virtually all of the putative initial examinations on behalf of Tom Rhee LAC, which were then billed through Tom Rhee LAC to GEICO under CPT code 99203, typically resulting in a charge of $75.00 for each purported initial examination.

110.    In the claims for initial examinations identified in Exhibits "2" and "3" – "4" the charges for the initial examinations were fraudulent in that they misrepresented NY Spine, Adin, Sam Chang Chiro, Chang, Tom Rhee LAC, and Rhee's eligibility to collect PIP Benefits in the first instance.

111.    In fact, NY Spine, Adin, Sam Chang Chiro, Chang, Tom Rhee LAC, and Rhee were not eligible to collect PIP Benefits in the claims for initial examinations that are identified in Exhibit "2" and "4-5", because – as a result of the fraudulent scheme described herein – neither NY Spine, Sam Chang Chiro, Tom Rhee LAC nor the examinations were in compliance with all significant laws and regulations or licensing laws governing healthcare practice.

112.    Moreover, and as set forth below, the charges for the initial examinations also were fraudulent in that they misrepresented the extent, nature, and results of the initial examinations.

1.      **Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

113.    For instance, in the claims for initial examinations under CPT code 99204 that are identified in Exhibit "2", NY Spine and Adin routinely misrepresented the severity of the Insureds' presenting problems.

114.    At all relevant times, pursuant to the American Medical Association's CPT Assistant, which is incorporated by reference into the NY and NJ Fee Schedule, the use of CPT code 99204 to bill for an initial patient examination typically required that the patient present with problems of moderate to high severity.

115.    The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately to highly severe, and thereby justify the use of CPT code 99204 to bill for an initial patient examination.

116.    For example, the CPT Assistant provides the following clinical examples of presenting problems that might support the use of CPT code 99204 to bill for an initial patient examination:

(i)     Office visit for initial evaluation of a 63-year-old male with chest pain on exertion. (Cardiology/Internal Medicine)

(ii)    Initial office visit of a 50-year-old female with progressive solid food dysphagia. (Gastroenterology)

(iii)   Initial office evaluation of a 70-year-old patient with recent onset of episodic confusion. (Internal Medicine)

(iv)    Initial office visit for 34-year-old patient with primary infertility, including counseling. (Obstetrics/Gynecology)

(v)     Initial office visit for 7-year-old female with juvenile diabetes mellitus, new to area, past history of hospitalization times three. (Pediatrics)

(vi)    Initial office evaluation of 70-year-old female with polyarthralgia. (Rheumatology)

(vii)    Initial office evaluation of a 50-year-old male with an aortic aneurysm with respect to recommendation for surgery. (Thoracic Surgery)

117.    Accordingly, pursuant to the CPT Assistant, the moderately to highly severe presenting problems that could support the use of CPT code 99204 to bill for an initial patient examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

118.    By contrast, to the extent that the Insureds in the claims identified in Exhibit "2" had any presenting problems at all as the result of their relatively minor automobile accidents, the problems virtually always were low or minimal severity soft tissue injuries such as sprains and strains.

119.    Even so, in the claims for initial examinations identified in Exhibit "2", NY Spine and Adin routinely billed for their putative initial examinations using CPT code 99204, and thereby falsely represented that the Insureds presented with problems of moderate to high severity.

120.    For instance, and in keeping with the fact that the Insureds in the claims identified in Exhibit "2" either had no presenting problems at all as the result of their minor automobile accidents, or else problems of low or minimal severity, in the majority of the claims identified in Exhibit "2" the Insureds did not seek treatment at any hospital as the result of their accidents.

121.    To the limited extent that the Insureds did report to a hospital after their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way after a few hours with, at most, a minor sprain or strain and/or similar soft-tissue injury diagnosis.

122.    Furthermore, in many cases, contemporaneous police reports indicated that the underlying accidents involved low-speed, low-impact collisions, that the Insureds' vehicles were drivable following the accidents, and that no one was seriously injured in the underlying accidents or injured at all.

123.    Even so, in the claims for initial examinations identified in Exhibit "2", NY Spine and Adin routinely billed for their putative initial examinations using CPT code 99204, and thereby falsely represented that the Insureds presented with problems of moderate to high severity.

124.    For example:

(i)    On September 13, 2016, an Insured named YJ was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that YJ's vehicle was drivable following the accident. The police report further indicated that YJ was not injured, did not complain of any pain, and further was able to pursue and stop the operator of the other vehicle involved in the accident after the driver of said vehicle purportedly attempted to flee the scene. In keeping with the fact that YJ was not seriously injured, YJ did not visit any hospital emergency room following the accident. To the extent that YJ experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of YJ on September 15, 2016, Adin and NY Spine billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(ii)    On May 23, 2017, an Insured named PM was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that PM's vehicle was drivable following the accident. The police report further indicated that PM was not injured and did not complain of any pain. In keeping with the fact that PM was not seriously injured, PM did not visit any hospital emergency room following the accident. To the extent that PM experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of PM on November 20, 2017, Adin and NY Spine billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(iii)    On June 2, 2017, an Insured named YL was involved in a minor automobile accident. The contemporaneous police report indicated that YL's vehicle was drivable following the accident and that YL drove his vehicle away from the scene of the accident. The police report further indicated that YL was not injured and did not complain of any pain. In keeping with the fact that YL was not seriously injured, YL did not visit any hospital emergency room following the accident. To the extent that YL experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of YL on June 22, 2017, Adin and NY Spine billed GEICO for the initial examination using CPT code 99204, and thereby

falsely represented that the initial examination involved presenting problems of moderate to high severity.

(iv)     On May 21, 2019, an Insured named JH was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JH's vehicle was drivable following the accident. The police report further indicated that JH was not injured and did not complain of any pain. In keeping with the fact that JH was not seriously injured, JH did not visit any hospital emergency room following the accident. To the extent that JH experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of JH on October 10, 2019, Adin and NY Spine billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(v)      On December 3, 2019, an Insured named YC was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that YC's vehicle was drivable following the accident. The police report further indicated that YC was not injured and did not complain of any pain. In keeping with the fact that YC was not seriously injured, YC did not visit any hospital emergency room following the accident. To the extent that YC experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of YC on February 20, 2020, Adin and NY Spine billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(vi)     On January 18, 2020, an Insured named MP was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MP's vehicle was drivable following the accident. The police report further indicated that MP was not injured and did not complain of any pain. In keeping with the fact that MP was not seriously injured, MP did not visit any hospital emergency room following the accident. To the extent that MP experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of MP on February 10, 2020, Adin and NY Spine billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(vii)    On June 21, 2020, an Insured named MK was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MK's vehicle was drivable following the accident. The police report further indicated that MK was not injured and did not

complain of any pain. In keeping with the fact that MK was not seriously injured, MK did not visit any hospital emergency room following the accident. To the extent that MK experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of MK on June 25, 2020, Adin and NY Spine billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(viii)    On July 19, 2020, an Insured named HP was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that HP's vehicle was drivable following the accident. The police report further indicated that HP was not injured and did not complain of any pain. In keeping with the fact that HP was not seriously injured, HP did not visit any hospital emergency room following the accident. To the extent that HP experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of HP on June 25, 2020, Adin and NY Spine billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(ix)    On July 19, 2020, an Insured named PS was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that PS's vehicle was drivable following the accident. The police report further indicated that PS was not injured and did not complain of any pain. In keeping with the fact that PS was not seriously injured, PS did not visit any hospital emergency room following the accident. To the extent that PS experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of PS on August 3, 2020, Adin and NY Spine billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(x)    On July 27, 2020, an Insured named JK was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JK's vehicle was drivable following the accident. The police report further indicated that JK was not injured and did not complain of any pain. In keeping with the fact that JK was not seriously injured, JK did not visit any hospital emergency room following the accident. To the extent that JK experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of JK on August 13, 2020, Adin and NY Spine billed GEICO for the initial examination using CPT code 99204, and thereby

falsely represented that the initial examination involved presenting problems of moderate to high severity.

125.    These are only representative examples. In virtually all of the claims for initial examinations identified in Exhibit "2", NY Spine and Adin falsely represented that the Insureds presented with problems of moderate to high severity, when in fact the Insureds' problems were low or minimal-severity soft tissue injuries such as sprains and strains, to the extent that they had any presenting problems at all at the time of the putative examinations.

126.    In the claims for initial examinations identified in Exhibit "2", NY Spine and Adin routinely falsely represented that the Insureds presented with problems of moderate to high severity in order to create a false basis for their charges for the putative examinations under CPT code 99204, because examinations billable under CPT code 99204 are reimbursable at a higher rate than examinations involving presenting problems of low severity, minimal severity, or no severity.

127.    In the claims for initial examinations identified in Exhibit "2", NY Spine and Adin also routinely falsely represented that the Insureds presented with problems of moderate to high severity in order to create a false basis for the laundry list of other Fraudulent Services that the Defendants purported to provide to the Insureds.

128.    Additionally, Sam Chang Chiro, Chang, Tom Rhee LAC, and Rhee also fraudulently misrepresented the severity of the Insureds' presenting problems in order to bill for their putative initial examinations under CPT Code 99203.

129.    Pursuant to the CPT Assistant, at all relevant times the use of CPT code 99203 to bill for an initial patient examination typically required that the Insured present with problems of moderate severity.

130.    The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately severe, and thereby justify the use of CPT code 99203 to bill for an initial patient examination.

131.    For example, the CPT Assistant provides the following clinical examples of presenting problems that might support the use of CPT code 99203 to bill for an initial patient examination:

(i)    Office visit for initial evaluation of a 48-year-old man with recurrent low back pain radiating to the leg. (General Surgery)

(ii)   Initial office evaluation of 49-year-old male with nasal obstruction. Detailed exam with topical anesthesia. (Plastic Surgery)

(iii)  Initial office evaluation for diagnosis and management of painless gross hematuria in new patient, without cystoscopy. (Internal Medicine)

(iv)   Initial office visit for evaluation of 13-year-old female with progressive scoliosis. (Physical Medicine and Rehabilitation)

(v)    Initial office visit with couple for counseling concerning voluntary vasectomy for sterility. Spent 30 minutes discussing procedure, risks and benefits, and answering questions. (Urology)

132.    Thus, pursuant to the CPT Assistant, the moderately severe presenting problems that could support the use of CPT code 99203 to bill for an initial patient examination typically are either chronic and relatively serious problems, acute problems requiring immediate invasive treatment, or issues that legitimately require physician counseling.

133.    By contrast, to the extent that the Insureds in the claims identified in Exhibits "4-5" had any presenting problems at all as the result of their relatively minor automobile accidents, the problems virtually always were low or minimal severity soft tissue injuries such as sprains and strains.

134.    For instance, and in keeping with the fact that the Insureds in the claims identified in Exhibits "3" – "4", either had no presenting problems at all as the result of their relatively minor automobile accidents, or else problems of low or minimal severity, in many of the claims identified in Exhibits "3" – "4", the Insureds did not seek treatment at any hospital as the result of their accidents.

135.    To the limited extent that the Insureds did report to a hospital after their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way after a few hours with, at most, a minor sprain, strain, or similar soft tissue injury diagnosis.

136.    Furthermore, in many cases, contemporaneous police reports indicated that the underlying accidents involved relatively low-impact collisions, that the Insureds' vehicles were drivable following the accidents, and that no one was seriously injured in the underlying accidents or injured at all.

137.    Even so, in the claims for initial examinations identified in Exhibits "3" – "4", Sam Chang Chiro, Chang, Tom Rhee LAC, and Rhee routinely billed for their putative initial examinations using CPT code 99203, and thereby falsely represented that the Insureds presented with problems of moderate severity.

138.    For example:

(i)    On September 18, 2017, an Insured named PE was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that PE's vehicle was drivable following the accident. The police report further indicated that PE was not injured and did not complain of any pain. In keeping with the fact that PE was not seriously injured, PE did not visit any hospital emergency room following the accident. To the extent that PE experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of PE on September 20, 2017, Chang and Sam Chang Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(ii)     On September 18, 2017, an Insured named PE was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that PE's vehicle was drivable following the accident. The police report further indicated that PE was not injured and did not complain of any pain. In keeping with the fact that PE was not seriously injured, PE did not visit any hospital emergency room following the accident. To the extent that PE experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of PE on September 20, 2017, Rhee and Tom Rhee LAC billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(iii)     On September 18, 2017, an Insured named LC was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that LC's vehicle was drivable following the accident. The police report further indicated that LC was not injured and did not complain of any pain. In keeping with the fact that LC was not seriously injured, LC did not visit any hospital emergency room following the accident. To the extent that LC experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of LC on September 20, 2017, Chang and Sam Chang Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(iv)     On September 18, 2017, an Insured named LC was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that LC's vehicle was drivable following the accident. The police report further indicated that LC was not injured and did not complain of any pain. In keeping with the fact that LC was not seriously injured, LC did not visit any hospital emergency room following the accident. To the extent that LC experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of LC on September 20, 2017, Rhee and Tom Rhee LAC billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(v)     On September 27, 2017, an Insured named XZ was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that XZ's vehicle was drivable following the accident. The police report further indicated that XZ was not injured and did not complain of any pain. In keeping with the fact that XZ was not seriously injured, XZ did not visit any hospital emergency room following the accident. To the extent

that XZ experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of XZ on September 29, 2017, Rhee and Tom Rhee LAC billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(vi)     On July 10, 2018, an Insured named OC was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that OC's vehicle was drivable following the accident. The police report further indicated that OC was not injured and did not complain of any pain. In keeping with the fact that OC was not seriously injured, OC did not visit any hospital emergency room following the accident. To the extent that OC experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of OC on July 12, 2018, Rhee and Tom Rhee LAC billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(vii)    On September 7, 2018, an Insured named ZR was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that ZR's vehicle was drivable following the accident. The police report further indicated that ZR was not injured and did not complain of any pain. In keeping with the fact that ZR was not seriously injured, ZR did not visit any hospital emergency room following the accident. To the extent that ZR experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of ZR on October 4, 2018, Chang and Sam Chang Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(viii)   On September 7, 2018, an Insured named ZR was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that ZR's vehicle was drivable following the accident. The police report further indicated that ZR was not injured and did not complain of any pain. In keeping with the fact that ZR was not seriously injured, ZR did not visit any hospital emergency room following the accident. To the extent that ZR experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of ZR on October 4, 2018, Rhee and Tom Rhee LAC billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(ix)    On December 3, 2019, an Insured named YC was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that YC's vehicle was drivable following the accident. The police report further indicated that YC was not injured and did not complain of any pain. In keeping with the fact that YC was not seriously injured, YC did not visit any hospital emergency room following the accident. To the extent that YC experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of YC on February 3, 2020, Chang and Sam Chang Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(x)    On January 18, 2020, an Insured named MP was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MP's vehicle was drivable following the accident. The police report further indicated that MP was not injured and did not complain of any pain. In keeping with the fact that MP was not seriously injured, MP did not visit any hospital emergency room following the accident. To the extent that MP experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of MP on January 20, 2020, Chang and Sam Chang Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

139.    These are only representative examples. In virtually all of the claims for initial examinations identified in Exhibits "3" – "4", Chang, Sam Chang Chiro, Rhee, and Tom Rhee LAC falsely represented that the Insureds presented with problems of moderate severity, when in fact the Insureds' problems were low or minimal-severity soft tissue injuries such as sprains and strains, to the extent that they had any presenting problems at all at the time of the putative examinations.

140.    In the claims for initial examinations identified in Exhibits "3" – "4", Chang, Sam Chang Chiro, Rhee, and Tom Rhee LAC routinely falsely represented that the Insureds presented with problems of moderate severity in order to create a false basis for their charges for the putative examinations under CPT code 99203, because examinations billable under CPT code 99203 are

reimbursable at a higher rate than examinations involving presenting problems of low severity, minimal severity, or no severity.

141.    In the claims for initial examinations identified in Exhibits "3" – "4", Chang, Sam Chang Chiro, Rhee, and Tom Rhee LAC also routinely falsely represented that the Insureds presented with problems of moderate severity in order to create a false basis for the laundry list of other Fraudulent Services that the Defendants purported to provide to the Insureds.

## 2.    Misrepresentations Regarding the Amount of Time Spent on the Purported Examinations

142.    Pursuant to the NY and NJ Fee Schedule, the use of CPT codes 99203 and 99204 to bill for an initial examination represents that the physician or other health care provider who performed the examination spent at least 30 minutes of face-to-face time with the patient or the patient's family when the examination was billed under CPT Code 99203, and 45 minutes of face-to-face time with the patient or the patient's family when billed under CPT Code 99204.

143.    As set forth in Exhibit "2" NY Spine and Adin submitted the vast majority of their bills for initial examinations under code 99204, and thereby represented that the physician who purported to perform the initial examinations – namely Adin – spent 45 minutes of face-to-face time with the Insureds or the Insureds' families during the putative examinations.

144.    As set forth in Exhibits "3" – "4", Sam Chang Chiro, Chang, Tom Rhee LAC, and Rhee submitted the vast majority of their bills for initial examinations under code 99203, and thereby represented that the individuals who purported to perform the initial examinations – namely Chang and Rhee – spent 30 minutes of face-to-face time with the Insureds or the Insureds' families during the putative examinations.

145.    In fact, in the claims for initial examinations identified in Exhibit "2", neither Adin nor any other physician associated with NY Spine ever spent 45 minutes of face-to-face time with the Insureds or their families when conducting the examinations.

146.    Similarly, in the claims for initial examinations identified in Exhibits "3" – "4", neither Rhee, Chang nor any other health care provider associated with Sam Chang Chiro or Tom Rhee LAC ever spent 30 minutes of face-to-face time with the Insureds or their families when conducting the examinations.

147.    Rather, in the claims for initial examinations identified in Exhibits "2", "3" – "4", the initial examinations did not entail more than 15 minutes of face-to-face time between the examining health care provider and the Insureds or their families, to the extent that the examinations actually were performed in the first instance.

148.    For instance, and in keeping with the fact that the initial examinations allegedly provided by Adin, Chang, and Rhee did not entail more than 15 minutes of face-to-face time with the Insureds or their families, Adin, Chang, and Rhee used template forms in purporting to conduct the initial examinations.

149.    The template forms that Adin, Chang, and Rhee used to document the putative examinations set forth a very limited range of potential patient complaints, examination/diagnostic testing options, potential diagnoses, and treatment recommendations.

150.    All that was required to complete the template forms was a brief patient interview and a brief physical examination of the Insureds, consisting of a check of some of the Insureds' vital signs, basic range of motion and muscle strength testing, and other limited examinations of the Insureds' musculoskeletal systems.

151.    These interviews and examinations did not require any physician or health care provider associated with NY Spine, Sam Chang Chiro, and Tom Rhee LAC to spend more than 15 minutes of face-to-face time with the Insureds during the putative initial examinations.

152.    In the claims for initial examinations identified in Exhibit "2", NY Spine and Adin falsely represented that the examinations involved 45 minutes of face-to-face time with the Insureds or their families in order to create a false basis for their charges under CPT code 99204 because examinations and consultations billable under CPT code 99204 are reimbursable at a higher rate than examinations that require less time to perform.

153.    Similarly, in the claims for initial examinations identified in Exhibits "3" – "4", Sam Chang Chiro, Chang, Tom Rhee LAC, and Rhee falsely represented that the examinations involved 30 minutes of face-to-face time with the Insureds or their families in order to create a false basis for their charges under CPT code 99203 because examinations and consultations billable under CPT code 99203 are reimbursable at a higher rate than examinations that require less time to perform.

**3.    Misrepresentations Regarding "Detailed" or "Comprehensive" Physical Examinations**

154.    Moreover, in the claims identified in Exhibit "3" – "4" for initial examinations under CPT code 99203, Sam Chang Chiro, Chang, Tom Rhee LAC, and Rhee routinely falsely represented the nature and extent of the underlying physical examinations.

155.    Pursuant to the CPT Assistant, at all relevant times the use of CPT code 99203 to bill for a patient examination represented that the physician, chiropractor, or other healthcare practitioner who performed the examination conducted a "detailed" physical examination.

156.    Pursuant to the CPT Assistant, a "detailed" physical examination requires – among other things – that the physician, chiropractor, or other healthcare practitioner performing the

examination conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

157.   To the extent that the Insureds in the claims identified in Exhibits "3" – "4" had any actual complaints at all as the result of their relatively minor automobile accidents, the complaints were limited to minor musculoskeletal complaints, such as sprains and strains.

158.   Pursuant to the CPT Assistant, in the context of patient examinations, a physician, chiropractor, or other healthcare practitioner has not conducted an extended examination of a patient's musculoskeletal organ system unless the practitioner has documented findings with respect to the following:

    (i)      measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

    (ii)     general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

    (iii)    examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

    (iv)    palpation of lymph nodes in neck, axillae, groin and/or other location;

    (v)     brief assessment of mental status;

    (vi)    examination of gait and station;

    (vii)   inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

    (viii)  coordination;

    (ix)    examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and

    (x)     examination of sensation.

159.    In the claims for initial examinations identified in Exhibits "3" – "4", when Sam Chang Chiro, Chang, Tom Rhee LAC, and Rhee billed for the initial examinations under CPT code 99203, they falsely represented that the physician, chiropractor, or other healthcare practitioner who purported to perform the examinations performed "detailed" patient examinations on the Insureds they purported to treat during the initial examinations.

160.    In fact, with respect to the claims for initial examinations under CPT code 99203 that are identified in Exhibits "3" – "4", neither Chang, Rhee, nor any other health care practitioner associated with Sam Chang Chiro or Tom Rhee LAC conducted extended examinations of the Insureds' musculoskeletal systems.

161.    For instance, neither Chang, Rhee, nor any other health care practitioner associated with Sam Chang Chiro or Tom Rhee LAC conducted extended examinations of the Insureds' musculoskeletal systems, inasmuch as they did not document findings with respect to the following:

(i)     measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii)    general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

(iii)   examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin and/or other location;

(v)     brief assessment of mental status;

(vi)    examination of gait and station;

(vii)   inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii)  coordination;

(ix)  examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and/or

(x)  examination of sensation.

162.  For example:

(i)  On or about September 20, 2017, Sam Chang Chiro and Chang billed GEICO under CPT code 99203 for an initial examination that they purported to provide to an Insured named PE and thereby represented that they had provided a "detailed" physical examination to PE. However, no health care practitioner associated with Sam Chang Chiro documented an extended examination of PE's musculoskeletal system, despite the fact that – to the extent PE had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(ii)  On or about September 20, 2017, Tom Rhee LAC and Rhee billed GEICO under CPT code 99203 for an initial examination that they purported to provide to an Insured named PE and thereby represented that they had provided a "detailed" physical examination to PE. However, no health care practitioner associated with Tom Rhee LAC documented an extended examination of PE's musculoskeletal system, despite the fact that – to the extent PE had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(iii)  On or about September 20, 2017, Tom Rhee LAC and Rhee billed GEICO under CPT code 99203 for an initial examination that they purported to provide to an Insured named CR and thereby represented that they had provided a "detailed" physical examination to CR. However, no health care practitioner associated with Tom Rhee LAC documented an extended examination of CR's musculoskeletal system, despite the fact that – to the extent CR had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(iv)  On or about September 20, 2017, Sam Chang Chiro and Chang billed GEICO under CPT code 99203 for an initial examination that they purported to provide to an Insured named CR and thereby represented that they had provided a "detailed" physical examination to CR. However, no health care practitioner associated with Sam Chang Chiro documented an extended examination of CR's musculoskeletal system, despite the fact that – to the extent CR had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(v)  On or about September 20, 2017, Tom Rhee LAC and Rhee billed GEICO under CPT code 99203 for an initial examination that they purported to provide to an

Insured named LC and thereby represented that they had provided a "detailed" physical examination to LC. However, no health care practitioner associated with Tom Rhee LAC documented an extended examination of LC's musculoskeletal system, despite the fact that – to the extent LC had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(vi)    On or about September 20, 2017, Sam Chang Chiro and Chang billed GEICO under CPT code 99203 for an initial examination that they purported to provide to an Insured named LC and thereby represented that they had provided a "detailed" physical examination to LC. However, no health care practitioner associated with Sam Chang Chiro documented an extended examination of LC's musculoskeletal system, despite the fact that – to the extent LC had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(vii)    On or about September 29, 2017, Tom Rhee LAC and Rhee billed GEICO under CPT code 99203 for an initial examination that they purported to provide to an Insured named XZ and thereby represented that they had provided a "detailed" physical examination to XZ. However, no health care practitioner associated with Tom Rhee LAC documented an extended examination of XZ's musculoskeletal system, despite the fact that – to the extent XZ had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(viii)    On or about October 4, 2018, Sam Chang Chiro and Chang billed GEICO under CPT code 99203 for an initial examination that they purported to provide to an Insured named ZR and thereby represented that they had provided a "detailed" physical examination to ZR. However, no health care practitioner associated with Sam Chang Chiro documented an extended examination of ZR's musculoskeletal system, despite the fact that – to the extent ZR had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(ix)    On or about October 4, 2018, Tom Rhee LAC and Rhee billed GEICO under CPT code 99203 for an initial examination that they purported to provide to an Insured named ZR and thereby represented that they had provided a "detailed" physical examination to ZR. However, no health care practitioner associated with Tom Rhee LAC documented an extended examination of ZR's musculoskeletal system, despite the fact that – to the extent ZR had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(x)    On or about July 6, 2020, Sam Chang Chiro and Chang billed GEICO under CPT code 99203 for an initial examination that they purported to provide to an Insured named CL and thereby represented that they had provided a "detailed" physical examination to CL. However, no health care practitioner associated with Sam Chang Chiro documented an extended examination of CL's musculoskeletal system, despite the fact that – to the extent CL had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

163.    These are only representative examples. In the claims for initial examinations under CPT code 99203 that are identified in Exhibits "3" – "4", Sam Chang Chiro, Chang, Tom Rhee LAC, and Rhee routinely falsely represented that they had provided "detailed" physical examinations. In fact, they had not provided detailed physical examinations because the examining chiropractors or other healthcare providers had not documented an extended examination of the Insureds' affected body areas and other symptomatic or related organ systems.

164.    In the claims for initial examinations under CPT code 99203 that are identified in Exhibits "3" – "4", Sam Chang Chiro, Chang, Tom Rhee LAC, and Rhee routinely falsely represented that they had provided "detailed" physical examinations to the Insureds in order to create a false basis for their charges for the examinations under CPT code 99203, because examinations billable under CPT code 99203 are reimbursable at higher rates than examinations that do not require the examining chiropractor or other healthcare practitioner to provide "detailed" physical examinations.

165.    At all relevant times, pursuant to the CPT Assistant, the use of CPT code 99204 to bill for a patient examination represented that the physician who performed the examination conducted a "comprehensive" physical examination.

166.    A physical examination does not qualify as "comprehensive" unless the examining physician either: (i) conducts a general examination of multiple patient organ systems; or (ii) conducts a complete examination of a single patient organ system.

167.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a general examination of multiple patient organ systems unless the physician has documented findings with respect to at least eight organ systems.

168.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a complete examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to:

(i)    at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)    the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)    examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)    examination of gait and station;

(vi)    examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)    inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)    coordination, deep tendon reflexes, and sensation; and

(ix)    mental status, including orientation to time, place and person, as well as mood and affect.

169.    In the claims for initial examinations identified in Exhibit "2", when NY Spine and Adin billed for the initial examinations under CPT code 99204, they falsely represented that Adin or some other health care practitioner associated with NY Spine performed "comprehensive" patient examinations on the Insureds they purported to treat during the initial examinations.

170.    In fact, with respect to the claims for initial examinations under CPT code 99204 that are identified in Exhibit "2", neither Adin nor any other health care practitioner associated

with NY Spine actually conducted a general examination of multiple patient organ systems, or conducted a complete examination of a single patient organ system.

171. For instance, in the claims under CPT code 99204 identified in Exhibit "2", neither Adin nor any other health care practitioner associated with NY Spine conducted any general examination of multiple patient organ systems, inasmuch as they did not document findings with respect to at least eight organ systems.

172. Furthermore, although Adin typically purported to provide an examination of the Insureds' musculoskeletal systems in many of the claims for initial examinations identified in Exhibit "2", the musculoskeletal examinations did not qualify as "complete", because they failed to document:

(i) at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii) the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii) examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv) palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v) examination of gait and station;

(vi) examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii) inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii) coordination, deep tendon reflexes, and sensation; and/or

(ix)     mental status, including orientation to time, place and person, as well as mood and affect.

173.   For example:

(i)      On June 22, 2017, NY Spine, Adin, or some other healthcare practitioner acting at Adin's direction billed GEICO under CPT code 99204 for an initial examination of an Insured YL, and thereby represented that they had provided a "comprehensive" physical examination to YL.  However, neither Adin nor any other health care practitioner associated with NY Spine documented findings with respect to at least eight of the Insured's organ systems, nor did they document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(ii)     On November 20, 2017, NY Spine, Adin, or some other healthcare practitioner acting at Adin's direction billed GEICO under CPT code 99204 for an initial examination of an Insured PM, and thereby represented that they had provided a "comprehensive" physical examination to PM.  However, neither Adin nor any other health care practitioner associated with NY Spine documented findings with respect to at least eight of the Insured's organ systems, nor did they document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(iii)    On October 4, 2018, NY Spine and Adin, or some other healthcare practitioner acting at Adin's direction billed GEICO under CPT code 99204 for an initial examination of an Insured ZR, and thereby represented that they had provided a "comprehensive" physical examination to ZR.  However, neither Adin nor any other health care practitioner associated with NY Spine documented findings with respect to at least eight of the Insured's organ systems, nor did they document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(iv)    On October 10, 2019, NY Spine, Adin, or some other healthcare practitioner acting at Adin's direction billed GEICO under CPT code 99204 for an initial examination of an Insured JH, and thereby represented that they had provided a "comprehensive" physical examination to JH.  However, neither Adin nor any other health care practitioner associated with NY Spine documented findings with respect to at least eight of the Insured's organ systems, nor did they document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(v)     On February 10, 2020, NY Spine, Adin, or some other healthcare practitioner acting at Adin's direction billed GEICO under CPT code 99204 for an initial examination of an Insured MP, and thereby represented that they had provided a "comprehensive" physical examination to MP.  However, neither Adin nor any other health care practitioner associated with NY Spine documented findings with

respect to at least eight of the Insured's organ systems, nor did they document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(vi)     On February 20, 2020, NY Spine, Adin, or some other healthcare practitioner acting at Adin's direction billed GEICO under CPT code 99204 for an initial examination of an Insured YC, and thereby represented that they had provided a "comprehensive" physical examination to YC.  However, neither Adin nor any other health care practitioner associated with NY Spine documented findings with respect to at least eight of the Insured's organ systems, nor did they document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(vii)    On June 25, 2020, NY Spine, Adin, or some other healthcare practitioner acting at Adin's direction billed GEICO under CPT code 99204 for an initial examination of an Insured MK, and thereby represented that they had provided a "comprehensive" physical examination to MK.  However, neither Adin nor any other health care practitioner associated with NY Spine documented findings with respect to at least eight of the Insured's organ systems, nor did they document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(viii)   On July 9, 2020, NY Spine, Adin, or some other healthcare practitioner acting at Adin's direction billed GEICO under CPT code 99204 for an initial examination of an Insured CL, and thereby represented that they had provided a "comprehensive" physical examination to CL.  However, neither Adin nor any other health care practitioner associated with NY Spine documented findings with respect to at least eight of the Insured's organ systems, nor did they document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(ix)     On August 3, 2020, NY Spine, Adin, or some other healthcare practitioner acting at Adin's direction billed GEICO under CPT code 99204 for an initial examination of an Insured PS, and thereby represented that they had provided a "comprehensive" physical examination to PS.  However, neither Adin nor any other health care practitioner associated with NY Spine documented findings with respect to at least eight of the Insured's organ systems, nor did they document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(x)      On August 13, 2020, NY Spine, Adin, or some other healthcare practitioner acting at Adin's direction billed GEICO under CPT code 99204 for an initial examination of an Insured JK, and thereby represented that they had provided a "comprehensive" physical examination to JK.  However, neither Adin nor any other health care practitioner associated with NY Spine documented findings with respect to at least eight of the Insured's organ systems, nor did they document a "complete"

examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

174.    These are only representative examples. In the claims for initial examinations under CPT code 99204 that are identified in Exhibit "2", NY Spine and Adin routinely falsely represented that they had provided "comprehensive" physical examinations. In fact, they had not provided comprehensive physical examinations because the examining physician had not documented: (i) a general examination of multiple patient organ systems; or (ii) a complete examination of a single patient organ system.

**4.    Misrepresentations Regarding the Extent of Medical Decision-Making**

175.    Moreover, pursuant to the Fee Schedule, the use of CPT code 99204 to bill for a patient examination represents that the physician who performed the examination engaged in legitimate, "moderate complexity" medical decision-making.

176.    Similarly, pursuant to the Fee Schedule, the use of CPT code 99203 to bill for a patient examination represents that the physician or other health care practitioner who performed the examination engaged in legitimate, "low complexity" medical decision-making.

177.    Pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

178.    As set forth above, pursuant to the CPT Assistant, the presenting problems that could require legitimate moderate complexity medical decision-making, and therefore support the

use of CPT code 99204 to bill for an initial examination, typically are problems that pose a serious threat to the patient's health, or even the patient's life.

179.    Similarly, as set forth above, pursuant to the CPT Assistant, the presenting problems that could require legitimate low complexity medical decision-making, and therefore support the use of CPT code 99203 to bill for an initial examination, typically are either chronic and relatively serious problems, acute problems requiring immediate invasive treatment, or issues that legitimately require physician counseling.

180.    By contrast, to the extent that the Insureds in the claims identified in Exhibits "2", "4-5", had any presenting problems at all as the result of their minor automobile accidents, the problems virtually always were minor soft tissue injuries such as sprains and strains.

181.    The diagnosis and treatment of these minor soft tissue injuries did not require any legitimate, low or moderate complexity medical decision-making.

182.    First, in NY Spine's claims for initial examinations identified in Exhibit "2", the initial examinations did not involve the retrieval, review, or analysis of any significant amount of medical records, diagnostic tests, or other information.

183.    Similarly, in Sam Chang Chiro and Tom Rhee LAC's claims for initial examinations identified in Exhibits "3" – "4", the initial examinations did not involve the retrieval, review, or analysis of any significant amount of medical records, diagnostic tests, or other information.

184.    When the Insureds in the claims identified in Exhibits "2", "4", "5" presented to NY Spine, Adin, Sam Chang Chiro, Chang, Tom Rhee LAC, and Rhee for "treatment", NY Spine, Adin, Sam Chang Chiro, Chang, Tom Rhee LAC did not review any significant amount of the Insureds' preexisting medical records.

185.    Furthermore, prior to the initial examinations, NY Spine, Adin, Sam Chang Chiro, Chang, Tom Rhee LAC, and Rhee did not request any medical records from any other providers.

186.    Second, in NY Spine, Adin, Sam Chang Chiro, Chang, Tom Rhee LAC, and Rhee's claims for initial examinations identified in Exhibits "2", "4", "5", there was no risk of significant complications or morbidity – much less mortality – from the Insureds' relatively minor soft tissue injury complaints, to the extent that they ever had any complaints arising from automobile accidents at all.

187.    Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by NY Spine, Adin, Sam Chang Chiro, Chang, Tom Rhee LAC, and Rhee, to the extent that they provided any such diagnostic procedures or treatment options in the first instance.

188.    In almost every instance, any "treatments" that NY Spine, Adin, Sam Chang Chiro, Chang, Tom Rhee LAC, and Rhee actually provided were limited to the Fraudulent Services, none of which was health or life threatening if properly performed.

189.    Third, in NY Spine, Adin, Sam Chang Chiro, Chang, Tom Rhee LAC, and Rhee's claims for initial examinations identified in Exhibits "2", "4", 5", NY Spine, Adin, Sam Chang Chiro, Chang, Tom Rhee LAC, and Rhee did not consider any significant number of diagnoses or treatment options for the Insureds during the initial examinations.

190.    Specifically, in the vast majority of claims identified in Exhibits "2", "4", 5", during the initial examinations the Insureds did not present with any significant continuing medical problems that legitimately could be traced to an underlying automobile accident.

191.     Even so, NY Spine, Adin, Sam Chang Chiro, Chang, Tom Rhee LAC, and Rhee prepared initial examination reports in which they provided a phony series of objectively unverifiable soft tissue injury "diagnoses" to virtually every Insured.

192.     Then, based upon these phony "diagnoses", NY Spine and Adin directed Insureds: (i) to continue to receive medically unnecessary chiropractic, physical therapy, and acupuncture treatment – often from Sam Chang Chiro, Chang, Tom Rhee LAC, and Rhee as unlawful compensation for their initial referrals of the Insureds – despite the fact that the Insureds typically had already received months of chiropractic, physical therapy, and acupuncture treatment that supposedly had not remediated their purported symptoms; and (ii) to receive medically unwarranted EDX testing and interventional pain management injections from NY Spine as well as Adin's other entities in New Jersey, NJ Ortho and Health East ASC, regardless of their individual circumstances.

193.     For example:

(i)     On September 13, 2016, an Insured named YJ was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that YJ's vehicle was drivable following the accident. The police report further indicated that YJ was not injured and did not complain of any pain. In keeping with the fact that YJ was not seriously injured, YJ did not visit any hospital emergency room following the accident. To the extent that YJ experienced any health problems at all as the result of the accident, they were of low or minimal severity. On September 15, 2016, Adin purported to conduct an initial examination of YJ. Adin did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Adin did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Adin provided YJ with substantially the same, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither YJ's presenting problems, nor the treatment plan provided to YJ by NY Spine and Adin, presented any risk of significant complications, morbidity, or mortality. To the contrary, YJ did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by NY Spine and Adin consisted of medically unnecessary EDX testing and interventional pain management services, which did not pose the least bit of risk to YJ. Even so, NY

Spine and Adin billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Adin engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(ii) On September 18, 2017, an Insured named LC was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that LC's vehicle was drivable following the accident. The police report further indicated that LC was not injured and did not complain of any pain. In keeping with the fact that LC was not seriously injured, LC did not visit any hospital emergency room following the accident. To the extent that LC experienced any health problems at all as the result of the accident, they were of low or minimal severity. On September 20, 2017, Rhee purported to conduct an initial examination of LC. Rhee did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Rhee did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Rhee provided LC with substantially the same, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither LC's presenting problems, nor the treatment plan provided to LC by Tom Rhee LAC and Rhee, presented any risk of significant complications, morbidity, or mortality. To the contrary, LC did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Tom Rhee LAC and Rhee consisted of medically unnecessary acupuncture services, which did not pose the least bit of risk to LC. Even so, Tom Rhee LAC and Rhee billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Rhee engaged in some legitimate, low complexity medical decision-making during the purported examination.

(iii) On September 18, 2017, an Insured named LC was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that LC's vehicle was drivable following the accident. The police report further indicated that LC was not injured and did not complain of any pain. In keeping with the fact that LC was not seriously injured, LC did not visit any hospital emergency room following the accident. To the extent that LC experienced any health problems at all as the result of the accident, they were of low or minimal severity. On September 20, 2017, Chang purported to conduct an initial examination of LC. Chang did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Chang did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Chang provided LC with substantially the same, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither LC's presenting problems, nor the treatment plan provided to LC by Sam Chang Chiro and Chang, presented any risk of significant complications, morbidity, or mortality. To the contrary, LC did not need any extensive treatment at all as a result of the accident, and the treatment plan provided

by Chang and Sam Chang Chiro consisted of medically unnecessary chiropractic and physical therapy services, which did not pose the least bit of risk to LC. Even so, Sam Chang Chiro and Chang billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Chang engaged in some legitimate, low complexity medical decision-making during the purported examination.

(iv)    On September 18, 2017, an Insured named PE was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that PE's vehicle was drivable following the accident. The police report further indicated that PE was not injured and did not complain of any pain. In keeping with the fact that PE was not seriously injured, PE did not visit any hospital emergency room following the accident. To the extent that PE experienced any health problems at all as the result of the accident, they were of low or minimal severity. On September 20, 2017, Chang purported to conduct an initial examination of PE. Chang did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Chang did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Chang provided PE with substantially the same, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither PE's presenting problems, nor the treatment plan provided to PE by Sam Chang Chiro and Chang, presented any risk of significant complications, morbidity, or mortality. To the contrary, PE did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Chang and Sam Chang Chiro consisted of medically unnecessary chiropractic and physical therapy services, which did not pose the least bit of risk to PE. Even so, Sam Chang Chiro and Chang billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Chang engaged in some legitimate, low complexity medical decision-making during the purported examination.

(v)    On September 27, 2017, an Insured named XZ was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that XZ's vehicle was drivable following the accident. The police report further indicated that XZ was not injured and did not complain of any pain. In keeping with the fact that XZ was not seriously injured, XZ did not visit any hospital emergency room following the accident. To the extent that XZ experienced any health problems at all as the result of the accident, they were of low or minimal severity. On September 20, 2017, Rhee purported to conduct an initial examination of XZ. Rhee did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Rhee did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Rhee provided XZ with substantially the same, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other

Insured. Furthermore, neither XZ's presenting problems, nor the treatment plan provided to XZ by Tom Rhee LAC and Rhee, presented any risk of significant complications, morbidity, or mortality. To the contrary, XZ did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Tom Rhee LAC and Rhee consisted of medically unnecessary acupuncture services, which did not pose the least bit of risk to XZ. Even so, Tom Rhee LAC and Rhee billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Rhee engaged in some legitimate, low complexity medical decision-making during the purported examination.

(vi) On July 10, 2018, an Insured named OC was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that OC's vehicle was drivable following the accident. The police report further indicated that OC was not injured and did not complain of any pain. In keeping with the fact that OC was not seriously injured, OC did not visit any hospital emergency room following the accident. To the extent that OC experienced any health problems at all as the result of the accident, they were of low or minimal severity. On September 20, 2017, Rhee purported to conduct an initial examination of OC. Rhee did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Rhee did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Rhee provided OC with substantially the same, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither OC's presenting problems, nor the treatment plan provided to OC by Tom Rhee LAC and Rhee, presented any risk of significant complications, morbidity, or mortality. To the contrary, OC did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Tom Rhee LAC and Rhee consisted of medically unnecessary acupuncture services, which did not pose the least bit of risk to OC. Even so, Tom Rhee LAC and Rhee billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Rhee engaged in some legitimate, low complexity medical decision-making during the purported examination.

(vii) On September 7, 2018, an Insured named ZR was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that ZR's vehicle was drivable following the accident. The police report further indicated that ZR was not injured and did not complain of any pain. In keeping with the fact that ZR was not seriously injured, ZR did not visit any hospital emergency room following the accident. To the extent that ZR experienced any health problems at all as the result of the accident, they were of low or minimal severity. On October 4, 2018, Chang purported to conduct an initial examination of ZR. Chang did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Chang did not consider any significant number of diagnoses or management options in connection with the examination.

Instead, Chang provided ZR with substantially the same, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither ZR's presenting problems, nor the treatment plan provided to ZR by Sam Chang Chiro and Chang, presented any risk of significant complications, morbidity, or mortality. To the contrary, ZR did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Chang and Sam Chang Chiro consisted of medically unnecessary chiropractic and physical therapy services, which did not pose the least bit of risk to ZR. Even so, Sam Chang Chiro and Chang billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Chang engaged in some legitimate, low complexity medical decision-making during the purported examination.

(viii)    On September 7, 2018, an Insured named ZR was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that ZR's vehicle was drivable following the accident. The police report further indicated that ZR was not injured and did not complain of any pain. In keeping with the fact that ZR was not seriously injured, ZR did not visit any hospital emergency room following the accident. To the extent that ZR experienced any health problems at all as the result of the accident, they were of low or minimal severity. On October 4, 2018, Rhee purported to conduct an initial examination of ZR. Rhee did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Rhee did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Rhee provided ZR with substantially the same, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither ZR's presenting problems, nor the treatment plan provided to ZR by Tom Rhee LAC and Rhee, presented any risk of significant complications, morbidity, or mortality. To the contrary, ZR did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Tom Rhee LAC and Rhee consisted of medically unnecessary acupuncture services, which did not pose the least bit of risk to ZR. Even so, Tom Rhee LAC and Rhee billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Rhee engaged in some legitimate, low complexity medical decision-making during the purported examination.

(ix)    On September 7, 2018, an Insured named PE was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that PE's vehicle was drivable following the accident. The police report further indicated that PE was not injured and did not complain of any pain. In keeping with the fact that PE was not seriously injured, PE did not visit any hospital emergency room following the accident. To the extent that PE experienced any health problems at all as the result of the accident, they were of low or minimal severity. On September 20, 2017, Rhee purported to conduct an initial examination of PE. Rhee did not retrieve, review, or analyze any

significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Rhee did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Rhee provided PE with substantially the same, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither PE's presenting problems, nor the treatment plan provided to PE by Tom Rhee LAC and Rhee, presented any risk of significant complications, morbidity, or mortality. To the contrary, PE did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Tom Rhee LAC and Rhee consisted of medically unnecessary acupuncture services, which did not pose the least bit of risk to PE. Even so, Tom Rhee LAC and Rhee billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Rhee engaged in some legitimate, low complexity medical decision-making during the purported examination.

(x)     On May 21, 2019, an Insured named JH was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JH's vehicle was drivable following the accident. The police report further indicated that JH was not injured and did not complain of any pain. In keeping with the fact that JH was not seriously injured, JH did not visit any hospital emergency room following the accident. To the extent that JH experienced any health problems at all as the result of the accident, they were of low or minimal severity. On October 10, 2019, Adin purported to conduct an initial examination of JH. Adin did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Adin did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Adin provided JH with substantially the same, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither JH's presenting problems, nor the treatment plan provided to JH by NY Spine and Adin, presented any risk of significant complications, morbidity, or mortality. To the contrary, JH did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by NY Spine and Adin consisted of medically unnecessary EDX testing, and interventional pain management services, which did not pose the least bit of risk to JH. Even so, NY Spine and Adin billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Adin engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xi)    On December 3, 2019, an Insured named YC was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that YC's vehicle was drivable following the accident. The police report further indicated that YC was not injured and did not complain of any pain. In keeping with the fact that YC was not seriously injured, YC did not visit any hospital emergency room following the accident. To the extent that YC experienced any health problems at all as the result of the accident, they

were of low or minimal severity. On February 3, 2020, Chang purported to conduct an initial examination of YC. Chang did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Chang did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Chang provided YC with substantially the same, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither YC's presenting problems, nor the treatment plan provided to YC by Sam Chang Chiro and Chang, presented any risk of significant complications, morbidity, or mortality. To the contrary, YC did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Sam Chang Chiro and Chang consisted of medically unnecessary chiropractic/physical therapy services, which did not pose the least bit of risk to YC. Even so, Sam Chang Chiro and Chang billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Adin engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xii)    On December 3, 2019, an Insured named YC was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that YC's vehicle was drivable following the accident. The police report further indicated that YC was not injured and did not complain of any pain. In keeping with the fact that YC was not seriously injured, YC did not visit any hospital emergency room following the accident. To the extent that YC experienced any health problems at all as the result of the accident, they were of low or minimal severity. On February 20, 2020, Adin purported to conduct an initial examination of YC. Adin did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Adin did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Adin provided YC with substantially the same, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither YC's presenting problems, nor the treatment plan provided to YC by NY Spine and Adin, presented any risk of significant complications, morbidity, or mortality. To the contrary, YC did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by NY Spine and Adin consisted of medically unnecessary EDX testing and interventional pain management services, which did not pose the least bit of risk to YC. Even so, NY Spine and Adin billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Adin engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xiii)    On January 18, 2020, an Insured named MP was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MP's vehicle was drivable following the

accident. The police report further indicated that MP was not injured and did not complain of any pain. In keeping with the fact that MP was not seriously injured, MP did not visit any hospital emergency room following the accident. To the extent that MP experienced any health problems at all as the result of the accident, they were of low or minimal severity. On February 10, 2020, Adin purported to conduct an initial examination of MP. Adin did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Adin did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Adin provided MP with substantially the same, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither MP's presenting problems, nor the treatment plan provided to MP by NY Spine and Adin, presented any risk of significant complications, morbidity, or mortality. To the contrary, MP did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by NY Spine and Adin consisted of medically unnecessary EDX testing and interventional pain management services, which did not pose the least bit of risk to MP. Even so, NY Spine and Adin billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Adin engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xiv)  On January 18, 2020, an Insured named MP was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MP's vehicle was drivable following the accident. The police report further indicated that MP was not injured and did not complain of any pain. In keeping with the fact that MP was not seriously injured, MP did not visit any hospital emergency room following the accident. To the extent that MP experienced any health problems at all as the result of the accident, they were of low or minimal severity. On July 6, 2018, Chang purported to conduct an initial examination of MP. Chang did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Chang did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Chang provided MP with substantially the same, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither MP's presenting problems, nor the treatment plan provided to MP by Sam Chang Chiro and Chang, presented any risk of significant complications, morbidity, or mortality. To the contrary, MP did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Chang and Sam Chang Chiro consisted of medically unnecessary chiropractic and physical therapy services, which did not pose the least bit of risk to MP. Even so, Sam Chang Chiro and Chang billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Chang engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xv)    On July 27, 2020, an Insured named JK was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JK's vehicle was drivable following the accident. The police report further indicated that JK was not injured and did not complain of any pain. In keeping with the fact that JK was not seriously injured, JK did not visit any hospital emergency room following the accident. To the extent that JK experienced any health problems at all as the result of the accident, they were of low or minimal severity. On August 13, 2020, Adin purported to conduct an initial examination of JK. Adin did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Adin did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Adin provided JK with substantially the same, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither JK's presenting problems, nor the treatment plan provided to JK by NY Spine and Adin, presented any risk of significant complications, morbidity, or mortality. To the contrary, JK did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by NY Spine and Adin consisted of medically unnecessary EDX testing and interventional pain management services, which did not pose the least bit of risk to JK. Even so, NY Spine and Adin billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Adin engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

194.    There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

195.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

196.    As set forth above, virtually all of the Insureds whom NY Spine, Adin, Sam Chang Chiro, Chang, Tom Rhee LAC, and Rhee purported to treat were involved in relatively minor accidents.

197.    It is extremely improbable that any two Insureds involved in any one of these minor automobile accidents would suffer substantially identical injuries as the result of their accidents or require a substantially identical course of treatment.

198.    It is even more improbable – to the point of impossibility – that this would occur repeatedly, often with the Insureds presenting at NY Spine, Sam Chang Chiro, and Tom Rhee LAC, with substantially identical injuries on or about the exact same dates days, weeks, or even months after their accidents.

199.    Even so, and in keeping with the fact that NY Spine, Adin, Sam Chang Chiro, Chang, Tom Rhee LAC, and Rhee's putative "diagnoses" were phony, and in keeping with the fact that their putative initial examinations involved no actual medical decision-making at all, NY Spine, Adin, Sam Chang Chiro, Chang, Tom Rhee LAC, and Rhee frequently issued substantially identical, phony "diagnoses", on or about the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds, despite the fact that they were differently situated.

200.    For example:

(i)      On June 21, 2017, two Insureds – VV and LV – were involved in the same automobile accident. Over seven months later, VV and LV presented – incredibly – on the exact same date, January 25, 2018, to NY Spine for initial examinations. VV and LV were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that VV and LV suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Adin provided VV and LV with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(ii)     On August 7, 2017, two Insureds – YZ and JZ – were involved in the same automobile accident. Four days later, YZ and JZ presented – incredibly – on the exact same date, August 11, 2017, to Sam Chang Chiro for initial examinations. YZ and JZ were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that YZ and JZ suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Chang provided YZ and JZ with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(iii)    On August 7, 2017, two Insureds – YZ and JZ – were involved in the same automobile accident. Over a month later, YZ and JZ presented – incredibly – on the

<u>exact same date</u>, October 12, 2017, to NY Spine for initial examinations. YZ and JZ were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that YZ and JZ suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Adin provided YZ and JZ with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(iv)    On September 18, 2017, three Insureds – CR, LC and PE – were involved in the same automobile accident. Three days later, CR, LC and PE presented – incredibly – <u>on the exact same date</u>, September 20, 2017, to Sam Chang Chiro for initial examinations. CR, LC and PE were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that CR, LC and PE suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Chang provided CR, LC and PE with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for all three of them.

(v)     On September 18, 2017, three Insureds – CR, LC and PE – were involved in the same automobile accident. Three days later, CR, LC and PE presented – incredibly – <u>on the exact same date</u>, September 21, 2017, to Tom Rhee LAC for initial examinations. CR, LC and PE were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that CR, LC and PE suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Rhee provided CR, LC and PE with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for all three of them.

(vi)    On February 25, 2020, two Insureds – LQ and YY – were involved in the same automobile accident. On day later, LQ and YY presented – incredibly – <u>on the exact same date</u>, February 26, 2020, to Sam Chang Chiro for initial examinations. LQ and YY were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that LQ and YY suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Chang provided LQ and YY with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(vii)   On April 30, 2020, two Insureds – BK and YL – were involved in the same automobile accident. Five months later, BK and YL presented – incredibly – <u>on the exact same date</u>, September 30, 2020, to Tom Rhee LAC for initial examinations. BK and YL were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that BK and YL suffered any injuries at all in their minor accident, the injuries were different. Even

so, at the conclusion of the putative initial examinations, Rhee provided BK and YL with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(viii)   On July 1, 2020, two Insureds – HD and CD – were involved in the same automobile accident. Approximately two months later, HD and CD presented – incredibly – <u>on the exact same date</u>, July 20, 2020, to NY Spine for initial examinations. HD and CD were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that HD and CD suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Adin provided HD and CD with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(ix)   On July 19, 2020, two Insureds – HP and PS – were involved in the same automobile accident. Two weeks later, HP and PS presented – incredibly – <u>on the exact same date</u>, August 3, 2020, to NY Spine for initial examinations. HP and PS were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that HP and PS suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Adin provided HP and PS with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(x)   On August 3, 2020, two Insureds – MT and LC – were involved in the same automobile accident. Over one week later, MT and LC presented – incredibly – <u>on the exact same date</u>, August 12, 2020, to Sam Chang Chiro for initial examinations. MT and LC were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that MT and LC suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Chang provided MT and LC with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(xi)   On August 6, 2020, two Insureds – DK and MA – were involved in the same automobile accident. One week later, DK and MA presented – incredibly – <u>on the exact same date</u>, August 13, 2020, to NY Spine for initial examinations. DK and MA were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that DK and MA suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Adin provided DK and MA with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(xii)   On September 30, 2020, two Insureds – XW and CL – were involved in the same

automobile accident. One day later, XW and CL presented – incredibly – <u>on the exact same date</u>, October 1, 2020, to Tom Rhee LAC for initial examinations. XW and CL were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that XW and CL suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Rhee provided XW and CL with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(xiii)  On November 4, 2020, two Insureds – KY and YC – were involved in the same automobile accident. Thirteen days later, KY and YC presented – incredibly – <u>on the exact same date</u>, November 17, 2020, to Tom Rhee LAC for initial examinations. KY and YC were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that KY and YC suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Rhee provided KY and YC with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(xiv)  On February 15, 2022, two Insureds – WH and YS – were involved in the same automobile accident. Over two months later, WH and YS presented – incredibly – <u>on the exact same date</u>, April 18, 2022, to Sam Chang Chiro for initial examinations. WH and YS were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that WH and YS suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Chang provided WH and YS with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

201.  These are only representative examples. In the claims for initial examinations that are identified in Exhibits "2", "3" – "4", NY Spine, Adin, Sam Chang Chiro, Chang, Tom Rhee LAC, and Rhee frequently issued substantially identical "diagnoses", on or about the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds, despite the fact that the Insureds were differently situated and, in any case, did not require the treatment.

202.  NY Spine, Adin, Sam Chang Chiro, Chang, Tom Rhee LAC, and Rhee routinely inserted these false "diagnoses" in their initial examination reports in order to create the false

impression that the initial examinations required some legitimate medical decision-making, and in order to create a false justification for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

203.    In the claims for initial examinations identified in Exhibits "2", "3" – "4", NY Spine, Adin, Sam Chang Chiro, Chang, Tom Rhee LAC, and Rhee routinely falsely represented that the putative examinations involved medical decision making of low to moderate complexity in order to provide a false basis to bill for the initial examinations under CPT codes 99203 and 99204, because examinations billable under CPT codes 99203 and 99204 are reimbursable at a higher rate than examinations or examinations that do not require any complex medical decision-making at all.

**E.    The Fraudulent Charges for Follow-Up Examinations by NY Spine, NJ Ortho, and Adin**

204.    NY Spine, NJ Ortho, and Adin typically purported to subject the Insureds in the claims identified in Exhibits "1" – "2" to multiple fraudulent follow-up examinations during the course of the Defendants' fraudulent treatment and billing protocol.

205.    As set forth in Exhibits "1" – "2", Adin purported to perform virtually all of the putative follow-up examinations at NY Spine and NJ Ortho, which were then billed to GEICO under CPT code 99214, typically resulting in a charge of between $92.94 and $150.00 for each purported follow-up examination.

206.    All of NY Spine, NJ Ortho, and Adin's billing for their purported follow-up examinations was fraudulent because it misrepresented NY Spine, NJ Ortho, and Adin's eligibility to collect PIP Benefits in the first instance.

207.    In fact, NY Spine, NJ Ortho, and Adin never were eligible to collect PIP Benefits in the claims for follow-up examinations that are identified in Exhibits "1" – "2", because they engaged in unlawful and fraudulent conduct as described herein.

208.    For instance, in the case of NJ Ortho, the vast majority of claims for follow-up examinations identified in Exhibit "1" were unlawful because they were provided in New York in violation of New York law, as NJ Ortho lacked the authority to operate as a medical practice in New York

209.    Moreover, and as set forth below, NY Spine, NJ Ortho, and Adin's charges for the putative follow-up examinations identified in Exhibits "1" – "2" were fraudulent in that they misrepresented the nature, extent, and results of the purported examinations.

**1.      Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

210.    For instance, in the claims for follow-up examinations that are identified in Exhibits "1" – "2", NY Spine, NJ Ortho, and Adin routinely misrepresented the severity of the Insureds' presenting problems.

211.    Pursuant to the CPT Assistant, at all relevant times the use of CPT code 99214 to bill for a follow-up examination typically requires that the patient present with problems of moderate to high severity.

212.    The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately to highly severe, and thereby justify the use of CPT code 99214 to bill for a follow-up patient examination.

213.    For example, the CPT Assistant provides the following clinical examples of presenting problems that might support the use of CPT code 99214 to bill for a follow-up patient examination:

(i)     Office visit for a 68-year-old male with stable angina, two months post myocardial infarction, who is not tolerating one of his medications. (Cardiology)

(ii)    Office evaluation of 28-year-old patient with regional enteritis, diarrhea and low-grade fever, established patient. (Family Medicine/Internal Medicine)

(iii)   Weekly office visit for 5FU therapy for an ambulatory established patient with metastatic colon cancer and increasing shortness of breath. (Hematology/Oncology)

(iv)    Office visit with 50-year-old female, established patient, diabetic, blood sugar controlled by diet. She now complains of frequency of urination and weight loss, blood sugar of 320 and negative ketones on dipstick. (Internal Medicine)

(v)     Follow-up visit for a 60-year-old male whose post-traumatic seizures have disappeared on medication, and who now raises the question of stopping the medication. (Neurology)

(vi)    Follow-up office visit for a 45-year-old patient with rheumatoid arthritis on gold, methotrexate, or immunosuppressive therapy. (Rheumatology)

(vii)   Office evaluation on new onset RLQ pain in a 32-year-old woman, established patient. (Urology/General Surgery/ Internal Medicine/Family Medicine)

(viii)  Office visit with 63-year-old female, established patient, with familial polyposis, after a previous colectomy and sphincter sparing procedure, now with tenesmus, mucus, and increased stool frequency. (Colon and Rectal Surgery)

214.    Accordingly, pursuant to the CPT Assistant, the moderately to highly severe presenting problems that could support the use of CPT code 99214 to bill for a follow-up patient examination typically are problems that pose a serious threat to a patient's health, or even the patient's life.

215.    By contrast, and as set forth above, to the extent that the Insureds in the claims identified in Exhibits "1" – "2" suffered any injuries at all in their minor automobile accidents, the injuries virtually always were minor soft tissue injuries such as sprains and strains, which were of minimal severity at the outset and improved over time.

216. By the time the Insureds in the claims identified in Exhibits "1" – "2" presented to NY Spine and/or NJ Ortho for the putative follow-up examinations, the Insureds either did not have any genuine presenting problems at all as the result of their minor automobile accidents, or their presenting problems were minimal.

217. Even so, in the claims for follow-up examinations identified in Exhibits "1" – "2", NY Spine, NJ Ortho, and Adin routinely billed for their putative follow-up examinations under CPT code 99214, and thereby falsely represented that the Insureds continued to suffer from presenting problems of moderate to high severity, despite the fact that the purported examinations were provided many months after the Insureds' minor automobile accidents, and long after any soft tissue injury pain or other symptoms attendant to the minor automobile accidents would have resolved.

218. For example:

(i) On May 23, 2017, an Insured named PM was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that PM's vehicle was drivable following the accident. The police report further indicated that that PM was not injured and did not complain of any pain. In keeping with the fact that PM was not seriously injured, PM did not visit any hospital emergency room following the accident. To the extent that PM experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of PM by Adin, or some other healthcare provider acting on his behalf, on January 29, 2018 – more than eight months after the accident – Adin and NY Spine billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that PM presented with problems of moderate to high severity.

(ii) On June 2, 2017, an Insured named YL was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that YL's vehicle was drivable following the accident. The police report further indicated that that YL was not injured and did not complain of any pain. In keeping with the fact that YL was not seriously injured, YL did not visit any hospital emergency room following the accident. To the extent that YL experienced any health problems at all as the result of the accident, they

were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of YL by Adin on February 1, 2018 – nearly eight months after the accident – Adin and NY Spine billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that YL presented with problems of moderate to high severity.

(iii)    On September 18, 2017, an Insured named PE was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that PE's vehicle was drivable following the accident. The police report further indicated that that PE was not injured and did not complain of any pain. In keeping with the fact that PE was not seriously injured, PE did not visit any hospital emergency room following the accident. To the extent that PE experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of PE by Adin on May 31, 2018 – over eight months after the accident – Adin and NY Spine billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that PE presented with problems of moderate to high severity.

(iv)    On September 7, 2018, an Insured named ZR was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that ZR's vehicle was drivable following the accident. The police report further indicated that that ZR was not injured and did not complain of any pain. In keeping with the fact that ZR was not seriously injured, ZR did not visit any hospital emergency room following the accident. To the extent that ZR experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of ZR by Adin on January 17, 2019 – over four months after the accident – Adin and NY Spine billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that ZR presented with problems of moderate to high severity.

(v)    On May 21, 2019, an Insured named JH was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JH's vehicle was drivable following the accident. The police report further indicated that that JH was not injured and did not complain of any pain. In keeping with the fact that JH was not seriously injured, JH did not visit any hospital emergency room following the accident. To the extent that JH experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of JH by Adin on August 17, 2020 – nearly fifteen months after the accident – Adin and NY Spine billed GEICO for the follow-up examination using

CPT code 99214, and thereby falsely represented that JH presented with problems of moderate to high severity.

(vi)     On May 21, 2019, an Insured named JH was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JH's vehicle was drivable following the accident. The police report further indicated that that JH was not injured and did not complain of any pain. In keeping with the fact that JH was not seriously injured, JH did not visit any hospital emergency room following the accident. To the extent that JH experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of JH by Adin on January 4, 2021 – nearly twenty months after the accident – Adin and NJ Ortho billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that JH presented with problems of moderate to high severity. Additionally, NJ Ortho billed GEICO for the follow-up exam which was purportedly provided at 153-01 Northern Blvd., Flushing, New York, despite the fact that NJ Ortho was ineligible to receive PIP Benefits in connection with the putative examination.

(vii)    On December 3, 2019, an Insured named YC was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that YC's vehicle was drivable following the accident. The police report further indicated that that YC was not injured and did not complain of any pain. In keeping with the fact that YC was not seriously injured, YC did not visit any hospital emergency room following the accident. To the extent that YC experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of YC by Adin on November 5, 2020 – over eleven months after the accident – Adin and NJ Ortho billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that YC presented with problems of moderate to high severity. Additionally, NJ Ortho billed GEICO for the follow-up exam which was purportedly provided at 29-36 Union St., Flushing, New York, despite the fact that NJ Ortho was ineligible to receive PIP Benefits in connection with the putative examination.

(viii)   On January 18, 2020, an Insured named MP was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MP's vehicle was drivable following the accident. The police report further indicated that MP was not injured and did not complain of any pain. In keeping with the fact that MP was not seriously injured, MP did not visit any hospital emergency room following the accident. To the extent that MP experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up

examination of MP by Adin on December 31, 2020 – over eleven months after the accident – Adin and NJ Ortho billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that MP presented with problems of moderate to high severity. Additionally, NJ Ortho billed GEICO for the follow-up exam which was purportedly provided at 153-01 Northern Blvd., Flushing, New York, despite the fact that NJ Ortho was ineligible to receive PIP Benefits in connection with the putative examination.

(ix)     On July 19, 2020, an Insured named PS was involved in a minor automobile accident. The contemporaneous police report indicated that PS's vehicle was drivable following the accident and that PS drove his vehicle away from the scene of the accident. The police report further indicated that PS was not injured and did not complain of any pain. In keeping with the fact that PS was not seriously injured, PS did not visit any hospital emergency room following the accident. To the extent that PS experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of PS by Adin on July 12, 2021 – nearly one year after the accident – Adin and NJ Ortho billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that PS presented with problems of moderate to high severity. Additionally, NJ Ortho billed GEICO for the follow-up exam which was purportedly provided at 153-01 Northern Blvd., Flushing, New York, despite the fact that NJ Ortho was ineligible to receive PIP Benefits in connection with the putative examination.

(x)     On July 27, 2020, an Insured named JK was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JK's vehicle was drivable following the accident. The police report further indicated that JK was not injured and did not complain of any pain. In keeping with the fact that JK was not seriously injured, JK did not visit any hospital emergency room following the accident. To the extent that JK experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of JK by Adin on October 29, 2020 – over three months after the accident – Adin and NJ Ortho billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that JK presented with problems of moderate to high severity. Additionally, NJ Ortho billed GEICO for the follow-up exam which was purportedly provided at 29-36 Union St., Flushing, New York, despite the fact that NJ Ortho was ineligible to receive PIP Benefits in connection with the putative examination.

219.     These are only representative examples. In virtually all of the claims for follow-up examinations identified in Exhibits "1" – "2", NY Spine, NJ Ortho, and Adin falsely represented

that the Insureds presented with problems of moderate to high severity, when in fact the Insureds either did not have any genuine presenting problems at all as the result of their minor automobile accidents at the time of the follow-up examinations – which often were many months after the minor accidents – or else their presenting problems were minimal.

220.    In the claims for follow-up examinations identified in Exhibits "1" – "2", NY Spine, NJ Ortho, and Adin routinely falsely represented that the Insureds presented with problems of moderate to high severity in order to create a false basis for their charges for the putative examinations under CPT code 99214, because examinations billable under CPT code 99214 are reimbursable at higher rates than examinations involving presenting problems of minimal severity, or no severity.

221.    In the claims for follow-up examinations identified in Exhibits "1" – "2", NY Spine, NJ Ortho, and Adin also routinely falsely represented that the Insureds presented with problems of moderate to high severity in order to create a false basis for the laundry list of other Fraudulent Services that the Defendants purported to provide to the Insureds, including additional, medically unnecessary chiropractic, EDX testing, acupuncture, and pain management injections.

**2.    Misrepresentations Regarding the Results of the Follow-Up Examinations**

222.    Moreover, pursuant to the NY and NJ Fee Schedule, when NY Spine, NJ Ortho, and Adin submitted charges for the follow-up examinations under CPT code 99214, they represented that they performed at least two of the following three components: (i) took a "detailed" patient history; (ii) conducted a "detailed" physical examination; and (iii) engaged in medical decision-making of "moderate complexity".

223.    In actuality, however, in the claims for follow-up examinations identified in in Exhibits "1" – "2", NY Spine, NJ Ortho, and Adin did not take any legitimate patient histories,

conduct any legitimate physical examinations, or engage in any legitimate medical decision-making at all.

224.    Rather, following their purported follow-up examinations, NY Spine, NJ Ortho, and Adin simply reiterated the false, boilerplate "diagnoses" from the Insureds' initial examinations and recommended that the Insureds continue to receive additional, medically unnecessary chiropractic, physical therapy, electrodiagnostic testing, and pain management injections.

225.    In keeping with the fact that the putative "results" of the follow-up examinations were phony, and were falsified to support continued, medically unnecessary treatments by the Defendants, and to provide a false justification for the medically unnecessary treatments that the Defendants already had purported to provide, NY Spine, NJ Ortho, and Adin routinely falsely purported to diagnose continuing effects of soft tissue injuries in the Insureds long after the minor underlying automobile accidents occurred, and long after any attendant soft tissue injury pain or other symptoms attendant to the minor automobile accidents would have resolved.

226.    For example:

(i)    On May 23, 2017, an Insured named PM was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that PM's vehicle was drivable following the accident. The police report further indicated that PM was not injured and did not complain of any pain. In keeping with the fact that PM was not seriously injured, PM did not visit any hospital emergency room following the accident. To the extent that PM experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of PM by Adin on January 29, 2018 – over eight months after the accident – Adin falsely reported that PM continued to suffer from high levels of pain and range of motion deficits as the result of the minor accident, and recommended that PM return to NY Spine for the continued provision of the Fraudulent Services.

(ii)     On June 2, 2017, an Insured named YL was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that YL's vehicle was drivable following the accident. The police report further indicated that YL was not injured and did not complain of any pain. In keeping with the fact that YL was not seriously injured, YL did not visit any hospital emergency room following the accident. To the extent that YL experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of YL by Adin on February 1, 2018 – nearly eight months after the accident – Adin falsely reported that YL continued to suffer from high levels of pain and range of motion deficits as the result of the minor accident, and recommended that YL return to NY Spine for the continued provision of the Fraudulent Services.

(iii)    On September 18, 2017, an Insured named PE was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that PE's vehicle was drivable following the accident. The police report further indicated that PE was not injured and did not complain of any pain. In keeping with the fact that PE was not seriously injured, PE did not visit any hospital emergency room following the accident. To the extent that PE experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of PE by Adin on May 31, 2018 – over eleven months after the accident – Adin falsely reported that PE continued to suffer from high levels of pain and range of motion deficits as the result of the minor accident, and recommended that PE return to NY Spine for the continued provision of the Fraudulent Services.

(iv)    On September 7, 2018, an Insured named ZR was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that ZR's vehicle was drivable following the accident. The police report further indicated that ZR was not injured and did not complain of any pain. In keeping with the fact that ZR was not seriously injured, ZR did not visit any hospital emergency room following the accident. To the extent that ZR experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of ZR by Adin on January 3, 2019 – over four months after the accident – Adin falsely reported that ZR continued to suffer from high levels of pain and range of motion deficits as the result of the minor accident, and recommended that ZR return to NY Spine for the continued provision of the Fraudulent Services.

(v)     On May 21, 2019, an Insured named JH was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JH's vehicle was drivable following the

accident. The police report further indicated that JH was not injured and did not complain of any pain. In keeping with the fact that JH was not seriously injured, JH did not visit any hospital emergency room following the accident. To the extent that JH experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of JH by Adin on August 17, 2020 – nearly fifteen months after the accident – Adin falsely reported that JH continued to suffer from high levels of pain and range of motion deficits as the result of the minor accident, and recommended that JH return to NY Spine for the continued provision of the Fraudulent Services.

(vi)     On May 21, 2019, an Insured named JH was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JH's vehicle was drivable following the accident. The police report further indicated that JH was not injured and did not complain of any pain. In keeping with the fact that JH was not seriously injured, JH did not visit any hospital emergency room following the accident. To the extent that JH experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of JH by Adin on January 4, 2021 – nearly twenty months after the accident – Adin falsely reported that JH continued to suffer from high levels of pain and range of motion deficits as the result of the minor accident, and recommended that JH return to NJ Ortho for the continued provision of the Fraudulent Services.

(vii)    On December 3, 2019, an Insured named YC was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that YC's vehicle was drivable following the accident. The police report further indicated that YC was not injured and did not complain of any pain. In keeping with the fact that YC was not seriously injured, YC did not visit any hospital emergency room following the accident. To the extent that YC experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of YC by Adin on November 5, 2020 – over eleven months after the accident – Adin falsely reported that YC continued to suffer from high levels of pain and range of motion deficits as the result of the minor accident, and recommended that YC return to NJ Ortho for the continued provision of the Fraudulent Services.

(viii)   On January 18, 2020, an Insured named MP was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MP's vehicle was drivable following the accident. The police report further indicated that MP was not injured and did not complain of any pain. In keeping with the fact that MP was not seriously injured, MP did not visit any hospital emergency room following the accident. To the extent

that MP experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of MP by Adin on December 31, 2020 – over eleven months after the accident – Adin falsely reported that MP continued to suffer from high levels of pain and range of motion deficits as the result of the minor accident, and recommended that MP return to NJ Ortho for the continued provision of the Fraudulent Services on an "as needed" basis.

(ix)    On July 19, 2020, an Insured named PS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that PS's vehicle was drivable following the accident. The police report further indicated that PS was not injured and did not complain of any pain. In keeping with the fact that PS was not seriously injured, PS did not visit any hospital emergency room following the accident. To the extent that PS experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of PS by Adin on July 12, 2021 – nearly one year after the accident – Adin falsely reported that PS continued to suffer from high levels of pain and range of motion deficits as the result of the minor accident, and recommended that PS return to NJ Ortho for the continued provision of the Fraudulent Services on an "as needed" basis.

(x)    On July 27, 2020, an Insured named JK was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JK's vehicle was drivable following the accident. The police report further indicated that JK was not injured and did not complain of any pain. In keeping with the fact that JK was not seriously injured, JK did not visit any hospital emergency room following the accident. To the extent that JK experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of JK by Adin on October 29, 2020 – over three months after the accident – Adin falsely reported that JK continued to suffer from high levels of pain and range of motion deficits as the result of the minor accident, and recommended that JK return to NJ Ortho for the continued provision of the Fraudulent Services.

227.    These are only representative examples. In the claims for follow-up examinations identified in Exhibits "1" – "2", NY Spine, NJ Ortho, and Adin routinely falsely represented that the Insureds continued to suffer from pain and other symptoms as the result of their minor automobile accidents, often long after the minor accidents occurred.

228.    In the claims for follow-up examinations identified in in Exhibits "1" – "2", NY Spine, NJ Ortho, and Adin routinely falsely represented that the Insureds continued to suffer pain and other symptoms as the result of minor soft tissue injuries, long after the underlying accidents occurred, because these phony diagnoses provided a false basis for the laundry list of other Fraudulent Services that the Defendants purported to provide to the Insureds, including additional follow-up examinations and continued referrals for long-term, medically unnecessary chiropractic and/or physical therapy services, EDX testing, acupuncture, pain management injections, and surgical procedures.

**F.    The Fraudulent Charges for Electrodiagnostic Testing by NY Spine, NJ Ortho, and Adin**

229.    Based upon the fraudulent, pre-determined findings and diagnoses provided during the Defendants' initial and follow-up examinations, and the Defendants' unlawful referral scheme, NY Spine, NJ Ortho, and Adin purported to subject many of the Insureds in the claims identified in Exhibits "1" – "2" to a series of medically unnecessary EDX tests, specifically nerve conduction velocity ("NCV") tests and electromyography ("EMG") tests.

230.    As set forth in Exhibits "1" – "2", NY Spine, NJ Ortho, and Adin then billed the EDX tests to GEICO under CPT codes 95864, 95885, 95886, 95903, 95904, and/or 95910.

231.    In the claims for EDX tests identified in Exhibits "1" – "2", the charges for the EDX tests were fraudulent in that the EDX tests were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the phony boilerplate "findings" and "diagnoses" that the Defendants purported to provide during their phony initial and follow-up examinations, and the Defendants' unlawful referral scheme.

232.    Moreover, in the claims for EDX tests identified in Exhibits ""1" – "2", the charges for the EDX tests were fraudulent in that they misrepresented NY Spine, NJ Ortho, and Adin's eligibility to collect PIP Benefits in the first instance.

233.    In fact, NY Spine, NJ Ortho, and Adin never were eligible to collect PIP Benefits in connection with the claims identified in Exhibits "1" – "2", because – as a result of the fraudulent and unlawful conduct described herein – NY Spine, NJ Ortho, and Adin, and the EDX tests, were not in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws in New York and New Jersey.

1.    **The Human Nervous System and Electrodiagnostic Testing**

234.    The human nervous system is composed of the brain, spinal cord, spinal nerve roots, and peripheral nerves that extend throughout the body, including through the arms and legs and into the hands and feet. Two primary functions of the nervous system are to collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain, and to transmit signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body.

235.    The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves, and the nerves responsible for transmitting signals from the brain to initiate muscle activity throughout the body are called motor nerves. The peripheral nervous system consists of both sensory and motor nerves. They carry electrical impulses throughout the body, from the spinal cord and extending, for example, into the hands and feet through the arms and legs.

236.    The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots. A "pinched" nerve

root is called a radiculopathy, and can cause various symptoms including pain, altered sensation, altered reflexes on examination, and loss of muscle control.

237.    EMG and NCV tests are forms of electrodiagnostic tests, and purportedly were provided by NY Spine, NJ Ortho, and Adin because they were medically necessary to determine whether the Insureds had radiculopathies.

238.    The American Association of Neuromuscular Electrodiagnostic Medicine ("AANEM"), which consists of thousands of neurologists and physiatrists and is dedicated solely to the scientific advancement of neuromuscular medicine, has adopted a recommended policy (the "Recommended Policy") regarding the optimal use of electrodiagnostic medicine in the diagnosis of various forms of neuropathies, including radiculopathies.

239.    The Recommended Policy accurately reflects the demonstrated utility of various forms of electrodiagnostic tests, and has been endorsed by two other premier professional medical organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation.

**2.    The Fraudulent NCV Tests**

240.    NCV tests are non-invasive tests in which peripheral nerves in the arms and legs are stimulated with an electrical impulse to cause the nerve to depolarize. The depolarization, or "firing," of the nerve is transmitted, measured and recorded with electrodes attached to the surface of the skin. An EMG/NCV machine then documents the timing of the nerve response (the "latency"), the magnitude of the response (the "amplitude"), and the speed at which the nerve conducts the impulse over a measured distance from one stimulus location to another (the "conduction velocity").

241.    In addition, the EMG/NCV machine displays the changes in amplitude over time as a "waveform." The amplitude, latency, velocity, and shape of the response then should be compared with well-defined normal values to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and motor nerve fibers.

242.    There are several motor and sensory peripheral nerves in the arms and legs that can be tested with NCV tests. Moreover, most of these peripheral nerves have both sensory and motor nerve fibers, either or both of which can be tested with NCV tests.

243.    F-wave and H-reflex studies are additional types of NCV tests that may be conducted in addition to the sensory and motor nerve NCV tests. F-wave and H-reflex studies generally are used to derive the time required for an electrical impulse to travel from a stimulus site on a nerve in the peripheral part of a limb, up to the spinal cord, and then back again. The motor and sensory NCV studies are designed to evaluate nerve conduction in nerves within a limb.

244.    According to the Recommended Policy, the maximum number of NCV tests necessary to diagnose a radiculopathy in 90 percent of all patients is: (i) NCV tests of three motor nerves; (ii) NCV tests of two sensory nerves; and (iii) two H-reflex studies.

245.    In an attempt to extract the maximum billing out of each Insured who supposedly received NCV tests, NY Spine, NJ Ortho, and Adin routinely purported to test far more nerves per patient than recommended by the Recommended Policy. Specifically, to maximize the fraudulent charges that they could submit to GEICO and other insurers NY Spine, NJ Ortho, and Adin routinely purported to perform and/or provide: (i) NCV tests of 4-8 motor nerves; (ii) NCV tests of 6-10 sensory nerves; as well as (iii) multiple F-wave studies.

246.    For example:

(i)      On March 6, 2020, NY Spine and Adin purported to provide 4 motor nerve NCV tests, 6 sensory nerve NCV tests, and multiple F-wave studies to an Insured named MP, supposedly to determine whether MP suffered from a radiculopathy.

(ii)     On April 23, 2020, NY Spine and Adin purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, and multiple F-wave studies and H-reflex studies to an Insured named YC, supposedly to determine whether YC suffered from a radiculopathy.

(iii)    On June 22, 2020, NY Spine and Adin purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, and multiple F-wave studies and H-reflex studies to an Insured named LQ, supposedly to determine whether LQ suffered from a radiculopathy.

(iv)     On July 6, 2020, NY Spine and Adin purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, and multiple F-wave studies to an Insured named IK, supposedly to determine whether IK suffered from a radiculopathy.

(v)      On April 22, 2021, NJ Ortho and Adin purported to provide 4 motor nerve NCV tests, 4 sensory nerve NCV tests, and multiple F-wave studies and H-reflex studies to an Insured named CA, supposedly to determine whether CA suffered from a radiculopathy.

(vi)     On September 9, 2021, NJ Ortho and Adin purported to provide 4 motor nerve NCV tests, 6 sensory nerve NCV tests, and multiple F-wave studies to an Insured named AW, supposedly to determine whether AW suffered from a radiculopathy.

(vii)    On September 23, 2021, NJ Ortho and Adin purported to provide 4 motor nerve NCV tests, 4 sensory nerve NCV tests, and multiple F-wave studies and H-reflex studies to an Insured named AW, supposedly to determine whether AW suffered from a radiculopathy.

(viii)   On October 21, 2021, NJ Ortho and Adin purported to provide 4 motor nerve NCV tests, 4 sensory nerve NCV tests, and multiple F-wave studies and H-reflex studies to an Insured named PA, supposedly to determine whether PA suffered from a radiculopathy.

(ix)     On December 16, 2021, NJ Ortho and Adin purported to provide 4 motor nerve NCV tests, 4 sensory nerve NCV tests, and multiple F-wave studies and H-reflex studies to an Insured named JZ, supposedly to determine whether JZ suffered from a radiculopathy.

(x)      On February 20, 2022, NY Spine and Adin purported to provide 4 motor nerve NCV tests, 6 sensory nerve NCV tests, and multiple F-wave studies to an Insured named SP, supposedly to determine whether SP suffered from a radiculopathy.

247.    These are only representative examples. In the substantial majority of the claims for NCV tests identified in Exhibits "1" – "2", NY Spine, NJ Ortho, and Adin routinely purported to perform and/or provide an excessive number of NCV tests to the Insureds, ostensibly to determine whether the Insureds suffered from radiculopathies.

248.    NY Spine, NJ Ortho, and Adin routinely purported to provide and/or perform NCVs on far more nerves than recommended by the Recommended Policy so as to maximize the fraudulent charges that they could submit to GEICO and other insurers, not because the NCVs were medically necessary to determine whether the Insureds had radiculopathies.

249.    Furthermore, the decision of which peripheral nerves to test in each limb and whether to test the sensory fibers, motor fibers, or both sensory and motor fibers in any such peripheral nerve must be tailored to each patient's unique circumstances.

250.    In a legitimate clinical setting, this decision is determined based upon a history and physical examination of the individual patient, as well as the real-time results obtained as the NCV tests are performed on particular peripheral nerves and their sensory and/or motor fibers. As a result, the nature and number of the peripheral nerves and the type of nerve fibers tested with NCV tests should vary from patient-to-patient.

251.    This concept is emphasized in the Recommended Policy, which states that:

EDX studies [such as NCVs] are individually designed by the electrodiagnostic consultant for each patient. The examination design is dynamic and often changes during the course of the study in response to new information obtained.

252.    This concept also is emphasized in the CPT Assistant, which states that "Pre-set protocols automatically testing a large number of nerves are not appropriate."

253.    NY Spine, NJ Ortho, and Adin did not tailor the NCVs they purported to perform and/or provide to the unique circumstances of each individual Insured.

254.     Instead, NY Spine, NJ Ortho, and Adin applied a fraudulent "protocol" and purported to perform and/or provide NCVs on the same peripheral nerves and nerve fibers in virtually all of the claims identified in Exhibits "1" – "2".

255.     Specifically, in virtually every claim for NCV testing identified in Exhibits "1" – "2", NY Spine, NJ Ortho, and Adin purported to test some combination of the following peripheral nerves and nerve fibers – and, in many cases, all of them – for each Insured to whom they purported to provide NCV tests:

(i)      left and right median motor nerves;

(ii)     left and right peroneal motor nerves;

(iii)    left and right tibial motor nerves;

(iv)     left and right ulnar motor nerves;

(v)      left and right median sensory nerves;

(vi)     left and right radial sensory nerves;

(vii)    left and right superficial peroneal sensory nerves;

(viii)   left and right sural sensory nerves; and

(ix)     left and right ulnar sensory nerves

256.     The cookie-cutter approach to the NCVs that NY Spine, NJ Ortho, and Adin purported to provide to Insureds clearly was not based on medical necessity. Instead, the cookie-cutter approach to the NCVs was designed solely to maximize the charges that NY Spine, NJ Ortho, and Adin could submit to GEICO and other insurers, and to maximize their ill-gotten profits.

**3.     The Fraudulent EMG Tests**

257.    EMGs involve insertion of a needle into various muscles in the spinal area ("paraspinal muscles") and in the arms and/or legs to measure electrical activity in each such muscle. The electrical activity in each muscle tested is compared with well-defined norms to identify the existence, nature, extent, and specific location of any abnormalities in the muscles, peripheral nerves, and nerve roots.

258.    There are many different muscles in the arms and legs that can be tested using EMGs. The decision of how many limbs and which muscles to test in each limb should be tailored to each patient's unique circumstances. In a legitimate clinical setting, this decision is based upon a history and physical examination of each individual patient, as well as the real-time results obtained from the EMGs as they are performed on each specific muscle. As a result, the number of limbs as well as the nature and number of the muscles tested through EMGs should vary from patient-to-patient.

259.    NY Spine and Adin did not tailor the EMGs they purported to provide and/or perform to the unique circumstances of each patient. Instead, they routinely tested the same muscles in the same limbs repeatedly, without regard for individual patient presentation.

260.    According to the Recommended Policy, the maximum number of EMG tests necessary to diagnose a radiculopathy in 90 percent of all patients is EMG tests of two limbs.

261.    Even if there were any need for the EMG tests that NY Spine and Adin purported to provide, and there was not, the nature and number of the EMGs that NY Spine and Adin purported to provide frequently grossly exceeded the maximum number of such tests – i.e., EMGs of two limbs – that should have been necessary in at least 90 percent of all patients with a suspected diagnosis of radiculopathy.

262.    For example:

(i)      On March 2, 2020, NY Spine and Adin purported to provide a four-limb EMG to an Insured named CK, supposedly to determine whether CK suffered from a radiculopathy.

(ii)     On March 30, 2020, NY Spine and Adin purported to provide a four-limb EMG to an Insured named MC, supposedly to determine whether MC suffered from a radiculopathy.

(iii)    On April 23, 2020, NY Spine and Adin purported to provide a four-limb EMG to an Insured named YC, supposedly to determine whether YC suffered from a radiculopathy.

(iv)    On June 22, 2020, NY Spine and Adin purported to provide a four-limb EMG to an Insured named LQ, supposedly to determine whether LQ suffered from a radiculopathy.

(v)     On June 22, 2020, NY Spine and Adin purported to provide a four-limb EMG to an Insured named SM, supposedly to determine whether SM suffered from a radiculopathy.

(vi)    On July 6, 2020, NY Spine and Adin purported to provide a four-limb EMG to an Insured named IK, supposedly to determine whether IK suffered from a radiculopathy.

(vii)   On August 3, 2020, NY Spine and Adin purported to provide a four-limb EMG to an Insured named YY, supposedly to determine whether YY suffered from a radiculopathy.

(viii)  On August 3, 2020, NY Spine and Adin purported to provide a four-limb EMG to an Insured named FC, supposedly to determine whether FC suffered from a radiculopathy.

(ix)    On August 17, 2020, NY Spine and Adin purported to provide a four-limb EMG to an Insured named DL, supposedly to determine whether DL suffered from a radiculopathy.

(x)     On August 17, 2020, NY Spine and Adin purported to provide a four-limb EMG to an Insured named HD, supposedly to determine whether HD suffered from a radiculopathy.

263.    In the substantial majority of the EMG claims identified in Exhibit "2", NY Spine and Adin purported to provide and/or perform EMGs on muscles in all four limbs of the Insureds solely to maximize the profits that they could reap from each such Insured.

4.    **The Fraudulent Radiculopathy Diagnoses**

264.    Radiculopathies are relatively rare in motor vehicle accident victims, occurring in – at most – only 19 percent of accident victims according to a large-scale, peer-reviewed 2009 study conducted by Randall L. Braddom, M.D., Michael H. Rivner, M.D., and Lawrence Spitz, M.D. and published in Muscle & Nerve, the official journal of the AANEM.

265.    Furthermore, the cohort of accident victims considered in the study by Drs. Braddom, Rivner, and Spitz had been referred to a tertiary EDX testing laboratory at a major university teaching hospital, and therefore represented a more severely injured group of patients than the Insureds whom NY Spine, NJ Ortho, and Adin purported to treat.

266.    As a result, the frequency of radiculopathy in all motor vehicle accident victims – not only those who have relatively serious injuries that require referral to a major hospital EDX laboratory – is significantly lower than 19 percent.

267.    As set forth above, the substantial majority of the Insureds whom NY Spine, NJ Ortho, and Adin purportedly treated did not suffer any serious medical problems as the result of any automobile accident, much less any radiculopathies.

268.    Even so, in the EMG and NCV claims identified in Exhibits "1-2", NY Spine, NJ Ortho, and Adin falsely purported to identify radiculopathies in the substantial majority of the Insureds to whom they purported to provide EMG and NCV testing.

269.    NY Spine, NJ Ortho, and Adin purported to arrive at their pre-determined radiculopathy "diagnoses" in order to create the appearance of severe injuries and thereby provide a false justification for the laundry-list of medically unnecessary Fraudulent Services that the Defendants purported to provide.

G.    **The Fraudulent Charges for Pain Management Injections by NJ Ortho and Adin**

270. As set forth in Exhibit "1", pursuant to the Defendants' unlawful referral scheme, and based upon the phony, boilerplate "diagnoses" that NY Spine and Adin provided during their fraudulent examinations and EDX tests, NJ Ortho and Adin purported to subject many Insureds to a series of medically unnecessary pain management injections, including but not limited to epidural injections and medial branch blocks, often purportedly performed under fluoroscopic guidance or with epidurography.

271. As set forth in Exhibit "1", NJ Ortho and Adin then billed the pain management injections to GEICO under CPT codes 62321, 62323, 64483, 64490, 64491, 64492, 64493, 64494, 64495, 64635, 64636, and 64999.

272. Adin purported to personally administer virtually all of the pain management injections in the claims identified in Exhibit "1".

273. Like the charges for the other Fraudulent Services, the charges for the pain management injections identified in Exhibit "1" were fraudulent in that the injections were medically unnecessary, and were performed – to the extent that they were performed at all – pursuant to the Defendants' unlawful referral scheme, and the phony, boilerplate "diagnoses" that NY Spine and Adin provided to the Insureds at the conclusion of the putative examinations and before their eventual self-referral to NJ Ortho.

274. Moreover, in the claims for pain management injections identified in Exhibit "1", the charges for the pain management injections were fraudulent in that they misrepresented NJ Ortho and Adin's eligibility to collect PIP Benefits in the first instance.

275. As set forth above NJ Ortho and Adin never were eligible to collect PIP Benefits in connection with the claims identified in Exhibit "1", because – as a result of the fraudulent scheme described herein – neither they nor the injections were in compliance with all significant laws and

regulations governing healthcare practice in New Jersey.

### 1.    Basic, Legitimate Use of Pain Management Injections

276.    Generally, when a patient presents with a soft tissue injury such as a sprain or strain secondary to an automobile accident, the initial standard of care is conservative treatment comprised of rest, ice, compression, and – if applicable – elevation of the affected body part.

277.    If that sort of conservative treatment does not resolve the patient's symptoms, the standard of care can include other conservative treatment modalities such as chiropractic treatment, physical therapy, and the use of pain management medication.

278.    The substantial majority of soft tissue injuries such as sprains and strains will resolve over a period of weeks through this sort of conservative treatment, or no treatment at all.

### 2.    The Medically Unnecessary Pain Management Injections

279.    As set forth above, virtually all of the Insureds in the claims identified in Exhibit "1" were involved in relatively minor accidents.

280.    To the limited extent that the Insureds in the claims identified in Exhibit "1" experienced any injuries at all in their minor accidents, the injuries virtually always were minor soft tissue injuries such as sprains and strains.

281.    By the time the Insureds in the claims identified in Exhibit "1" presented to NJ Ortho and Adin for treatment, they either had no presenting problems at all or their presenting problems consisted of minor sprains and strains that were in the process of being resolved through conservative treatment, or without any treatment at all.

282.    Even so, in the claims for pain management injections identified in Exhibit "1", NJ Ortho and Adin routinely provided pain management injections to Insureds who did not have any serious symptoms secondary to any automobile accident that legitimately would warrant the

injections.

283.    For example:

(i)    On May 23, 2017, an Insured named PM was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that PM's vehicle was drivable following the accident. The police report further indicated that PM was not injured and did not complain of any pain. In keeping with the fact that PM was not seriously injured, PM did not visit any hospital emergency room following the accident. To the extent that PM experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, NJ Ortho and Adin purported to provide PM with medically unnecessary facet injections on December 27, 2017, and additional facet injections on January 5, 2018 and February 28, 2018. The medically unnecessary injections were administered over nine months after PM's accident, long after any legitimate symptoms PM may have experienced as the result of the accident had resolved.

(ii)    On June 2, 2017, an Insured named YL was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that YL's vehicle was drivable following the accident. The police report further indicated that YL was not injured and did not complain of any pain. In keeping with the fact that YL was not seriously injured, YL did not visit any hospital emergency room following the accident. To the extent that YL experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, NJ Ortho and Adin purported to provide YL with a medically unnecessary epidural injection on August 23, 2017. The medically unnecessary injection was administered nearly two months after YL's accident, long after any legitimate symptoms YL may have experienced as the result of the accident had resolved.

(iii)    On September 18, 2017, an Insured named PE was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that PE's vehicle was drivable following the accident. The police report further indicated that PE was not injured and did not complain of any pain. In keeping with the fact that PE was not seriously injured, PE did not visit any hospital emergency room following the accident. To the extent that PE experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, NJ Ortho and Adin purported to provide PE with a medically unnecessary epidural injection on May 23, 2018. The medically unnecessary injection was administered over eight months after PE's accident, long after any legitimate symptoms PE may have experienced as the result of the accident had resolved.

(iv)     On July 10, 2018, an Insured named OC was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that OC's vehicle was drivable following the accident. The police report further indicated that OC was not injured and did not complain of any pain. In keeping with the fact that OC was not seriously injured, OC did not visit any hospital emergency room following the accident. To the extent that OC experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, NJ Ortho and Adin purported to provide OC with a medically unnecessary epidural injection on October 3, 2018. The medically unnecessary injection was administered nearly three months after OC's accident, long after any legitimate symptoms OC may have experienced as the result of the accident had resolved.

(v)      On September 7, 2018, an Insured named ZR was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that ZR's vehicle was drivable following the accident. The police report further indicated that ZR was not injured and did not complain of any pain. In keeping with the fact that ZR was not seriously injured, ZR did not visit any hospital emergency room following the accident. To the extent that ZR experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, NJ Ortho and Adin purported to provide ZR with a medically unnecessary epidural injection on January 9, 2019. The medically unnecessary injection was administered over four months after ZR's accident, long after any legitimate symptoms ZR may have experienced as the result of the accident had resolved.

(vi)     On December 3, 2019, an Insured named YC was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that YC's vehicle was drivable following the accident. The police report further indicated that YC was not injured and did not complain of any pain. In keeping with the fact that YC was not seriously injured, YC did not visit any hospital emergency room following the accident. To the extent that YC experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, NJ Ortho and Adin purported to provide YC with medically unnecessary facet injections on June 17, 2020, and additional facet injections on July 29, 2020 and November 30, 2020. The medically unnecessary injections were administered over eleven months after YC's accident, long after any legitimate symptoms YC may have experienced as the result of the accident had resolved.

(vii)    On January 18, 2020, an Insured named MP was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-

speed, low-impact collision, and that MP's vehicle was drivable following the accident. The police report further indicated that MP was not injured and did not complain of any pain. In keeping with the fact that MP was not seriously injured, MP did not visit any hospital emergency room following the accident. To the extent that MP experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, NJ Ortho and Adin purported to provide MP with a medically unnecessary epidural injection on June 3, 2020, and additional facet injections on June 10, 2020. The medically unnecessary injections were administered nearly five months after MP's accident, long after any legitimate symptoms MP may have experienced as the result of the accident had resolved.

(viii)   On June 21, 2020, an Insured named MK was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MK's vehicle was drivable following the accident. The police report further indicated that MK was not injured and did not complain of any pain. In keeping with the fact that MK was not seriously injured, MK did not visit any hospital emergency room following the accident. To the extent that MK experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, NJ Ortho and Adin purported to provide MK with medically unnecessary epidural injections on August 12, 2020, and an additional epidural injection on August 26, 2020. The medically unnecessary injections were administered over two months after MK's accident, long after any legitimate symptoms MK may have experienced as the result of the accident had resolved.

(ix)   On July 19, 2020, an Insured named PS was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that PS's vehicle was drivable following the accident. The police report further indicated that PS was not injured and did not complain of any pain. In keeping with the fact that PS was not seriously injured, PS did not visit any hospital emergency room following the accident. To the extent that PS experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, NJ Ortho and Adin purported to provide PS with medically unnecessary epidural steroid injections on May 21, 2021, and additional facet injections on June 18, 2021. The medically unnecessary injections were administered over eight months after PS's accident, long after any legitimate symptoms PS may have experienced as the result of the accident had resolved.

(x)   On July 27, 2020, an Insured named JK was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JK's vehicle was drivable following the accident. The police report further indicated that JK was not injured and did not

complain of any pain. In keeping with the fact that JK was not seriously injured, JK did not visit any hospital emergency room following the accident. To the extent that JK experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, NJ Ortho and Adin purported to provide JK with a medically unnecessary epidural injection on October 19, 2020, and an additional epidural injection on October 27, 2020. The medically unnecessary injections were administered three months after JK's accident, long after any legitimate symptoms JK may have experienced as the result of the accident had resolved.

284. These are only representative examples. In the claims for pain management injections identified in Exhibit "1", NJ Ortho and Adin routinely purported to provide medically unnecessary pain management injections to Insureds, despite the fact that the Insureds had not suffered any injuries in their accidents that would warrant the injections.

285. NJ Ortho and Adin's pre-determined treatment protocol, including subjecting patients to medically unwarranted pain management injections, was designed and employed by NJ Ortho and Adin solely to maximize the potential charges that they could submit, and cause to be submitted, to GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to the injections.

## H. The Fraudulent Charges for Chiropractic, Physical Therapy, and Acupuncture Services by Sam Chang Chiro, Tom Rhee LAC, and Jonathan Wang PT

286. As set forth above, to the extent that the Insureds in the claims identified in Exhibits "3" – "5" suffered any healthcare problems at all as the result of their minor automobile accidents, the problems virtually always were limited to ordinary soft tissue injuries such as sprains and strains.

287. The vast majority of soft tissue injuries such as sprains and strains resolve after a short course of conservative treatment, or no treatment at all.

288. Accordingly, Sam Chang Chiro, Chang, Tom Rhee LAC, Rhee, Jonathan Wang

PT, and Wang knew that – unless they could create a false basis to provide long-term, medically unnecessary chiropractic, physical therapy, and acupuncture services to the Insureds in the claims identified in Exhibits "3" – "5" – their ability to provide such long-term, medically unnecessary chiropractic, physical therapy, and acupuncture services would be limited, inasmuch as they would not be able to demonstrate that the Insureds required additional chiropractic, physical therapy, and/or acupuncture services beyond an initial short course of conservative treatment.

289.    Accordingly, and as set forth above, Sam Chang Chiro, Tom Rhee LAC, and Jonathan Wang PT entered into a secret agreement with NY Spine and Adin, whereby:

(i)    Sam Chang Chiro, Tom Rhee LAC, and/or Jonathan Wang PT would cause Insureds to be referred to NY Spine and Adin for expensive and medically unnecessary/excessive examinations and EDX tests despite the Insureds' lack of any genuine presenting problems that would warrant those services; and

(ii)    as compensation for the medically unnecessary referrals, NY Spine and Adin would – among other things – cause the Insureds to be falsely diagnosed with continuing pain and related symptoms, to provide a false justification for the medically unnecessary chiropractic, physical therapy, and acupuncture services that Sam Chang Chiro, Jonathan Wang PT, and Tom Rhee LAC already had provided, and a false justification for Sam Chang Chiro, Tom Rhee LAC, and Jonathan Wang PT to provide many more weeks or months of continued, medically unnecessary chiropractic, physical therapy, and/or acupuncture services.

290.    As set forth above, in keeping with the fact that the return referrals from NY Spine and Adin to Sam Chang Chiro, Tom Rhee LAC, and Jonathan Wang PT were not predicated on medical necessity, and instead were illegal compensation for the initial referrals, the Defendants' own records indicated that the Sam Chang Chiro, Jonathan Wang PT, and Tom Rhee LAC's prior chiropractic, physical therapy, and acupuncture services had not been effective in treating the Insureds' supposed complaints.

291.    Even so, in the claims identified in Exhibits "3" – "5", Sam Chang Chiro, Jonathan Wang PT, and Tom Rhee LAC routinely used the return referrals from NY Spine and Adin as a

false basis to bill GEICO for months of medically unnecessary chiropractic, physical therapy, and acupuncture services.

292.    Sam Chang Chiro, Chang, Jonathan Wang PT, Wang, Tom Rhee LAC, and Rhee typically billed the putative chiropractic, physical therapy, and acupuncture services to GEICO under CPT codes 97010, 97014, 97026, 97035, 97110, 97124, 97140, 97810, 97811, 97813, 97814, 98940, 98941.

293.    Like the charges for the other Fraudulent Services, the charges for the chiropractic, physical therapy, and acupuncture services were fraudulent in that the services were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the Defendants' pre-determined treatment protocol in order to maximize the potential charges they could submit to GEICO, not to treat or otherwise benefit the Insureds who were subjected to them.

294.    Further, in the claims for chiropractic, physical therapy, and acupuncture services identified in Exhibits "3" – "5", the charges for the chiropractic, physical therapy, and acupuncture services were fraudulent in that they misrepresented Sam Chang Chiro, Jonathan Wang PT, and Tom Rhee LAC's eligibility to collect PIP Benefits in the first instance.

295.    In fact, Sam Chang Chiro, Jonathan Wang PT, and Tom Rhee LAC were never eligible to collect PIP Benefits in connection with the claims identified in Exhibits "3" – "5", because, as a result of the fraudulent scheme described herein, neither Sam Chang Chiro, Jonathan Wang PT, Tom Rhee LAC nor the treatments were in compliance with relevant laws and regulations governing healthcare practice and/or licensing laws.

296.    What is more, and as set forth above, many of the Insureds in the claims identified in Exhibits "3" – "5" were involved in relatively minor accidents, thus, to the extent that the Insureds suffered any healthcare problems at all as the result of their minor automobile accidents,

the problems virtually always were limited to ordinary soft tissue injuries such as sprains and strains.

297.    The vast majority of soft tissue injuries such as sprains and strains resolve after a short course of conservative treatment, or no treatment at all.

298.    Nonetheless, in many of the claims for chiropractic, physical therapy, and acupuncture treatments identified in Exhibits "3" – "5", Sam Chang Chiro, Jonathan Wang PT, and Tom Rhee LAC routinely purported to provide medically unnecessary chiropractic, physical therapy, and acupuncture treatments to Insureds who had been involved in relatively minor automobile accidents – and who had not suffered any injury more serious than a sprain, strain, or similar soft tissue injury – for months after the underlying accidents, and long after any attendant soft tissue pain or other symptoms attendant to the automobile accidents would have resolved.

299.    For example:

(i)    On September 13, 2016, an Insured named YJ was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that YJ's vehicle was drivable following the accident. The police report further indicated that YJ was not injured, did not complain of any pain, and further was able to pursue and stop the operator of the other vehicle involved in the accident after the driver of said vehicle purportedly attempted to flee the scene. In keeping with the fact that YJ was not seriously injured, YJ did not visit any hospital emergency room following the accident. To the extent that YJ experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, improved over time, and they did not require eight months of physical therapy services. Even so, between April 2017 and December 2017, Jonathan Wang PT and Wang purported to provide YJ with eight months of purported physical therapy "treatment" at Jonathan Wang PT.

(ii)    On September 18, 2017, an Insured named PE was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that PE's vehicle was drivable following the accident. The police report further indicated that that PE was not injured and did not complain of any pain. In keeping with the fact that PE was not seriously injured, PE did not visit any hospital emergency room following the accident. To the extent that PE experienced any health problems at all as the result of the accident, they

were of low or minimal severity at the outset, improved over time, and they did not require fourteen months of chiropractic services. Even so, between September 2017 and November 2018, Sam Chang Chiro and Chang purported to provide PE with fourteen months of purported chiropractic "treatment" at Sam Chang Chiro.

(iii)    On September 18, 2017, an Insured named PE was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that PE's vehicle was drivable following the accident. The police report further indicated that that PE was not injured and did not complain of any pain. In keeping with the fact that PE was not seriously injured, PE did not visit any hospital emergency room following the accident. To the extent that PE experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, improved over time, and they did not require fourteen months of acupuncture services. Even so, between September 2017 and November 2018, Tom Rhee LAC and Rhee purported to provide PE with fourteen months of purported acupuncture "treatment" at Tom Rhee LAC.

(iv)    On September 18, 2017, an Insured named LC was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that LC's vehicle was drivable following the accident. The police report further indicated that that LC was not injured and did not complain of any pain. In keeping with the fact that LC was not seriously injured, LC did not visit any hospital emergency room following the accident. To the extent that LC experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, improved over time, and they did not require six months of chiropractic services. Even so, between September 2017 and March 2018, Sam Chang Chiro and Chang purported to provide LC with six months of purported chiropractic "treatment" at Sam Chang Chiro.

(v)    On September 18, 2017, an Insured named LC was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that LC's vehicle was drivable following the accident. The police report further indicated that that LC was not injured and did not complain of any pain. In keeping with the fact that LC was not seriously injured, LC did not visit any hospital emergency room following the accident. To the extent that LC experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, improved over time, and they did not require six months of acupuncture services. Even so, between September 2017 and March 2018, Tom Rhee LAC and Rhee purported to provide LC with six months of purported acupuncture "treatment" at Tom Rhee LAC.

(vi)    On September 27, 2017, an Insured named XZ was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that XZ's vehicle was drivable following the accident. The police report further indicated that XZ was not injured and did not complain of any pain. In keeping with the fact that XZ was not seriously injured,

XZ did not visit any hospital emergency room following the accident. To the extent that XZ experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, improved over time, and they did not require six months of chiropractic services. Even so, between September 2017 and March 2018, Sam Chang Chiro and Chang purported to provide XZ with six months of purported chiropractic "treatment" at Sam Chang Chiro.

(vii)     On September 27, 2017, an Insured named XZ was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that XZ's vehicle was drivable following the accident. The police report further indicated that that XZ was not injured and did not complain of any pain. In keeping with the fact that XZ was not seriously injured, XZ did not visit any hospital emergency room following the accident. To the extent that XZ experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, improved over time, and they did not require six months of acupuncture services. Even so, between September 2017 and March 2018, Tom Rhee LAC and Rhee purported to provide XZ with six months of purported acupuncture "treatment" at Tom Rhee LAC.

(viii)    On December 3, 2019, an Insured named YC was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that YC's vehicle was drivable following the accident. The police report further indicated that that YC was not injured and did not complain of any pain. In keeping with the fact that YC was not seriously injured, YC did not visit any hospital emergency room following the accident. To the extent that YC experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, improved over time, and they did not require seventeen months of physical therapy services. Even so, between February 2020 and July 2021, Jonathan Wang PT and Wang purported to provide YC with eight months of purported physical therapy "treatment" at Jonathan Wang PT.

(ix)      On December 3, 2019, an Insured named YC was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that YC's vehicle was drivable following the accident. The police report further indicated that that YC was not injured and did not complain of any pain. In keeping with the fact that YC was not seriously injured, YC did not visit any hospital emergency room following the accident. To the extent that YC experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, improved over time, and they did not require seventeen months of chiropractic services. Even so, between February 2020 and July 2021, Sam Chang Chiro and Chang purported to provide YC with seventeen months of purported chiropractic "treatment" at Sam Chang Chiro.

(x)       On December 3, 2019, an Insured named YC was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that YC's vehicle was drivable following the

accident. The police report further indicated that that YC was not injured and did not complain of any pain. In keeping with the fact that YC was not seriously injured, YC did not visit any hospital emergency room following the accident. To the extent that YC experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, improved over time, and they did not require nine months of acupuncture services. Even so, between October 2020 and July 2021, Tom Rhee LAC and Rhee purported to provide YC with nine months of purported acupuncture "treatment" at Tom Rhee LAC.

(xi)   On January 18, 2020, an Insured named MP was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MP's vehicle was drivable following the accident. The police report further indicated that MP was not injured and did not complain of any pain. In keeping with the fact that MP was not seriously injured, MP did not visit any hospital emergency room following the accident. To the extent that MP experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, improved over time, and they did not require ten months of physical therapy services. Even so, between February 2020 and December 2020, Jonathan Wang PT and Wang purported to provide MP with ten months of purported physical therapy "treatment" at Jonathan Wang PT.

(xii)  On January 18, 2020, an Insured named MP was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MP's vehicle was drivable following the accident. The police report further indicated that MP was not injured and did not complain of any pain. In keeping with the fact that MP was not seriously injured, MP did not visit any hospital emergency room following the accident. To the extent that MP experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, improved over time, and they did not require eleven months of chiropractic services. Even so, between January 2020 and December 2020, Sam Chang Chiro and Chang purported to provide MP with eleven months of purported chiropractic "treatment" at Sam Chang Chiro.

(xiii) On July 27, 2020, an Insured named JK was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JK's vehicle was drivable following the accident. The police report further indicated that that JK was not injured and did not complain of any pain. In keeping with the fact that JK was not seriously injured, JK did not visit any hospital emergency room following the accident. To the extent that JK experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, improved over time, and they did not require twelve months of physical therapy services. Even so, between August 2020 and August 2021, Jonathan Wang PT and Wang purported to provide JK with twelve months of purported physical therapy "treatment" at Jonathan Wang PT.

(xiv)    On July 27, 2020, an Insured named JK was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JK's vehicle was drivable following the accident. The police report further indicated that that JK was not injured and did not complain of any pain. In keeping with the fact that JK was not seriously injured, JK did not visit any hospital emergency room following the accident. To the extent that JK experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, improved over time, and they did not require fifteen months of acupuncture services. Even so, between October 2020 and January 2022, Tom Rhee LAC and Rhee purported to provide JK with fifteen months of purported acupuncture "treatment" at Tom Rhee LAC.

(xv)    On January 16, 2021, an Insured named RG was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that RG's vehicle was drivable following the accident. The police report further indicated that that RG was not injured and did not complain of any pain. In keeping with the fact that RG was not seriously injured, RG did not visit any hospital emergency room following the accident. To the extent that RG experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, improved over time, and they did not require seven months of physical therapy services. Even so, between January 2021 and August 2021, Jonathan Wang PT and Wang purported to provide RG with seven months of purported physical therapy "treatment" at Jonathan Wang PT.

300.    These are only representative examples. In the claims that are identified in Exhibits "3" – "5", Sam Chang Chiro, Chang, Jonathan Wang PT, Wang, Tom Rhee LAC, and Rhee frequently recommended and purported to provide medically unnecessary chiropractic, physical therapy, and acupuncture treatment to Insureds who had been involved in relatively minor accidents – and who had not suffered any injury more serious than a sprain, strain, or similar soft tissue injury – for months after the underlying accidents, and long after any attendant soft tissue pain or other symptoms attendant to the automobile accidents would have resolved.

## I.    NY Spine, NJ Ortho, and Adin's Illegal Self Referrals for Pain Management Injections

301.    Not only did NJ Ortho fraudulently submit inflated charges for medically unnecessary services, but many of NJ Ortho's charges were the product of illegal self-referrals between and among Adin, NY Spine and/or NJ Ortho and Health East ASC.

302.    As set forth above, the Codey Law provides – in substance – that a "practitioner" may not refer a patient to a "healthcare service" in which the practitioner has a "significant beneficial interest". See N.J.S.A. 45:9-22.5.

303.    However – and again, as set forth above – the Codey Law's restrictions on patient referrals do not apply to:

> medical treatment or a procedure that is provided at the practitioner's medical office and for which a bill is issued directly in the name of the practitioner or the practitioner's medical office ….

See id.

304.    What is more, pursuant to the ASC Exception described above, the Codey Law's restrictions on patient referrals also do not apply to "ambulatory surgery or procedures requiring [or involving the use of] anesthesia performed at … an ambulatory care facility licensed by the Department of Health to perform surgical and related services", provided that – among other things – the practitioner who provided the referral "personally performs the procedure". See id.

305.    In the context of the Codey Law, Adin – who is a licensed physician – was a "practitioner[]". See N.J.S.A. 45:9-22.4.

306.    In the context of the Codey Law, NY Spine, NJ Ortho, and Health East ASC were "healthcare services", in that they were "business entit[ies] which provide[d] on an inpatient or outpatient basis: … diagnosis or treatment of human disease or dysfunction …." Id.

307.   In the context of the Codey Law, Adin – who owned NY Spine, NJ Ortho, and Health East ASC – had a "significant beneficial interest" in all three of NY Spine, NJ Ortho, and Health East ASC. Id.

308.   In the context of the Codey Law, Health East ASC was an "ambulatory care facility licensed by the Department of Health to perform surgical and related services".

309.   Additionally, as set forth above, New York law prohibits licensed healthcare services providers, including physicians, from referring patients to healthcare practices in which they have an ownership or investment interest unless: (i) the ownership or investment interest is disclosed to the patient; and (ii) the disclosure informs the patient of his or her "right to utilize a specifically identified alternative health care provider if any such alternative is reasonably available". See New York Public Health Law § 238-d.

310.   In the context of the New York Public Health Law, Adin – who owned NY Spine, NJ Ortho, and Health East ASC – had an "ownership or investment interest" in all three of NY Spine, NJ Ortho, and Health East ASC. Id.

311.   Further, in the context of the New York Public Health Law, NY Spine, NJ Ortho, and Health East ASC were "health care practices." Id.

**1.   The Illegal Self-Referrals for Pain Management Injections**

312.   Notwithstanding his respective significant beneficial/ownership interests in NY Spine, NJ Ortho, and Health East ASC, Adin routinely self-referred – or directed his employees to self-refer – Insureds from NY Spine to NJ Ortho for medically unnecessary pain management injections, which in many cases were performed at Adin's ambulatory surgery center, Health East ACS.

313. These self-referrals violated the Codey Law, inasmuch as none of the exceptions to the Codey Law applied to these self-referrals.

314. The exception in the Codey Law, for "medical treatment or a procedure that is provided at the practitioner's medical office", did not apply to the self-referrals for these injections because – as set forth above – virtually all of the pain management injections billed through NJ Ortho in the claims identified in Exhibit "1" purportedly were performed at ambulatory surgery centers, which in most cases were located in New Jersey, including Health East ASC in Englewood, New Jersey. These ambulatory surgery centers were not Adin's medical office.

315. Nor did the ASC Exception apply to these self-referrals, because the pain management injections did not legitimately qualify as ambulatory surgery or procedures requiring or involving the use of anesthesia. To the contrary, all of the anesthesia services attendant to NJ Ortho's pain management injections -- i.e., sedation -- were medically unnecessary.

316. For example, in a legitimate clinical setting, pain management injections such as epidural injections and facet joint injections generally do not require anesthesia.

317. Indeed, according to a review of the literature published in Pain Physician, the official journal of the American Society of Interventional Pain Physicians, "[m]ost practice guidelines discourage the routine use of sedation for interventional pain procedures." See Smith, Howard, M.D., Evaluation of Intravenous Sedation on Diagnostic Spinal Injection Procedures, Pain Physician 2013.

318. Along similar lines, the American Society of Anesthesiologists has specified that "the majority of minor pain procedures, under most routine circumstances, do not require anesthesia care other than local anesthesia. Such procedures include epidural steroid injections, epidural blood patch, trigger point injections, sacroiliac joint injections, bursal injections, and

occipital nerve block and facet joint injections." See American Society of Anesthesiologists, "Statement on Anesthetic Care during Interventional Pain Procedures for Adults", October 20, 2010.

319.    Sedation generally is unwarranted in the context of interventional pain procedures such as pain management injections because the risk attendant to sedation outweighs any prospective benefit to the patient.

320.    Not only can sedation itself induce adverse events, including death, but patients receiving pain management injections should remain awake and alert to warn the treating physician of adverse events relating to the underlying injections.

321.    What is more, the ASC Exception often did not apply to these self-referrals, because the resulting procedures often were performed by someone other than the practitioner who made the referrals.

322.    These self-referrals also violated the New York Public Health Law, inasmuch as none of the applicable disclosure requirements were made to the Insureds who were subject to these self-referrals.

323.    Adin did not disclose his ownership interest in NJ Ortho and Health East ASC when referring the Insureds to receive pain management injections from NJ Ortho and Health East ASC.

324.    Nor did Adin inform the Insureds of his or her "right to utilize a specifically identified alternative health care provider…" which most certainly was available.

325.    For example, the majority of the Insureds referred to NJ Ortho and Health East ASC in the claims identified in Exhibit "1" resided and worked in New York, a substantial distance away from Health East ASC, which was the location at which many of the pain management injections were purportedly performed.

326.    There was no legitimate reason why Insureds who resided in New York would require pain management referrals to a facility such as NJ Ortho, which was inconveniently located far from the Insureds' homes and workplaces.

327.    In fact, there were numerous pain management practices and surgery centers located in New York, which were much closer to the Insureds' homes, and which were far more established and reputable than NJ Ortho and Health East ASC.

328.    Nonetheless, Adin routinely referred GEICO New York Insureds from NY Spine to NJ Ortho and Health East ASC to receive pain management injections.

329.    For example:

(i)     On or about November 20, 2017, Miguel Coba, M.D., purported to conduct an initial examination of an Insured named PM at NY Spine. Billing for PM's examination was submitted to GEICO through NY Spine. At the conclusion of PM's examination – and at Adin's direction – Coba self–referred PM to NJ Ortho and Health East ASC for facet block injections that did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injections were performed by Adin on December 27, 2017, at Health East ASC, Adin's ambulatory surgery center, rather than at Adin, NY Spine, or NJ Ortho's medical office. The self–referral violated the Codey Law because: (a) the resulting injections did not qualify as "ambulatory surgery or procedures requiring anesthesia"; (b) the injections were performed at Health East ASC, rather than at Adin and NJ Ortho's medical office; and (c) the practitioner who made the referral did not personally perform the resulting procedure. In addition to violating the Codey Law, the self–referrals also violated New York law insofar as none of the disclosures required by New York Public Health Law 238-D were ever provided to the Insured. For example, Adin never disclosed his ownership interest in NY Spine, NJ Ortho, and Health East ASC to the Insured, nor did Adin inform the Insured of their "right to utilize a specifically identified alternative health care provider…." Even so, NJ Ortho, Health East ASC, and Adin billed GEICO for the injections, which were the product of an unlawful self–referral.

(ii)    On or about February 15, 2018, Adin purported to conduct a follow-up examination of an Insured named VV at NY Spine. Billing for VV's examination was submitted to GEICO through NY Spine. At the conclusion of VV's examination, Adin self–referred VV to NJ Ortho and Health East ASC for facet block injections that did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injections were performed by Adin on February 21, 2018, at Health East ASC, Adin's ambulatory surgery center, rather than at Adin or NJ

Ortho's medical office. The self-referral violated the Codey Law because: (a) the resulting injections did not qualify as "ambulatory surgery or procedures requiring anesthesia"; and (b) the injections were performed at Health East ASC, rather than at Adin, NY Spine, or NJ Ortho's medical office. In addition to violating the Codey Law, the self-referrals also violated New York law insofar as none of the disclosures required by New York Public Health Law 238-D were ever provided to the Insureds. For example, Adin never disclosed his ownership interest in NY Spine, NJ Ortho, and Health East ASC to the Insureds, nor did Adin inform the Insureds of their "right to utilize a specifically identified alternative health care provider…." Even so, NJ Ortho, Health East ASC, and Adin billed GEICO for the injections, which were the product of an unlawful self–referral.

(iii)    On or about February 15, 2018, Adin purported to conduct a follow-up examination of an Insured named SV at NY Spine. Billing for SV's examination was submitted to GEICO through NY Spine. At the conclusion of SV's examination, Adin self–referred SV to NJ Ortho and Health East ASC for facet block injections that did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injections were performed by Adin on February 21, 2018, at Health East ASC, Adin's New Jersey ambulatory surgery center, rather than at Adin, NY Spine, or NJ Ortho's medical office. The self-referral violated the Codey Law because: (a) the resulting injections did not qualify as "ambulatory surgery or procedures requiring anesthesia"; and (b) the injections were performed at Health East ASC, rather than at Adin and NJ Ortho's medical office. In addition to violating the Codey Law, the self-referrals also violated New York law insofar as none of the disclosures required by New York Public Health Law 238-D were ever provided to the Insureds. For example, Adin never disclosed his ownership interest in NY Spine, NJ Ortho, and Health East ASC to the Insureds, nor did Adin inform the Insureds of their "right to utilize a specifically identified alternative health care provider…." Even so, NJ Ortho, Health East ASC, and Adin billed GEICO for the injections, which were the product of an unlawful self–referral.

(iv)    On or about August 23, 2018, Adin purported to conduct an initial examination of an Insured named OC at NY Spine. Billing for OC's examination was submitted to GEICO through NY Spine. At the conclusion of OC's examination, Adin self–referred OC to NJ Ortho and Health East ASC for epidural injections that did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injections were performed by Adin on October 3, 2018, at Health East ASC, Adin's ambulatory surgery center, rather than at Adin or NJ Ortho's medical office. The self-referral violated the Codey Law because: (a) the resulting injections did not qualify as "ambulatory surgery or procedures requiring anesthesia"; and (b) the injections were performed at Health East ASC, rather than at Adin, NY Spine, or NJ Ortho's medical office. In addition to violating the Codey Law, the self-referrals also violated New York law insofar as none of the disclosures required by New York Public Health Law 238-D were ever provided to the Insureds. For example, Adin never disclosed his ownership interest in NY Spine, NJ Ortho, and Health East ASC to the Insureds, nor did Adin inform the Insureds of their "right to utilize

a specifically identified alternative health care provider…." Even so, NJ Ortho, Health East ASC, and Adin billed GEICO for the injections, which were the product of an unlawful self–referral.

(v) On or about January 3, 2019, Adin purported to conduct a follow-up examination of an Insured named ZR at NY Spine. Billing for ZR's examination was submitted to GEICO through NY Spine. At the conclusion of ZR's examination, Adin self– referred ZR to NJ Ortho and Health East ASC for epidural injections that did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injections were performed by Adin on January 9, 2019, at Health East ASC, Adin's ambulatory surgery center, rather than at Adin, NY Spine, or NJ Ortho's medical office. The self-referral violated the Codey Law because: (a) the resulting injections did not qualify as "ambulatory surgery or procedures requiring anesthesia"; and (b) the injections were performed at Health East ASC, rather than at Adin and NJ Ortho's medical office. In addition to violating the Codey Law, the self-referrals also violated New York law insofar as none of the disclosures required by New York Public Health Law 238-D were ever provided to the Insureds. For example, Adin never disclosed his ownership interest in NY Spine, NJ Ortho, and Health East ASC to the Insureds, nor did Adin inform the Insureds of their "right to utilize a specifically identified alternative health care provider…." Even so, NJ Ortho, Health East ASC, and Adin billed GEICO for the injections, which were the product of an unlawful self–referral.

(vi) On or about March 6, 2020, Adin purported to conduct an initial examination of an Insured named MP at NY Spine. Billing for MP's examination was submitted to GEICO through NY Spine. At the conclusion of MP's examination, Adin self– referred MP to NJ Ortho and Health East ASC for epidural injections that did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injections were performed by Adin on June 3, 2020, at Health East ASC, Adin's ambulatory surgery center, rather than at Adin, NY Spine, or NJ Ortho's medical office. The self-referral violated the Codey Law because: (a) the resulting injections did not qualify as "ambulatory surgery or procedures requiring anesthesia"; and (b) the injections were performed at Health East ASC, rather than at Adin and NJ Ortho's medical office. In addition to violating the Codey Law, the self-referrals also violated New York law insofar as none of the disclosures required by New York Public Health Law 238-D were ever provided to the Insureds. For example, Adin never disclosed his ownership interest in NY Spine, NJ Ortho, and Health East ASC to the Insureds, nor did Adin inform the Insureds of their "right to utilize a specifically identified alternative health care provider…." Even so, NJ Ortho, Health East ASC, and Adin billed GEICO for the injections, which were the product of an unlawful self–referral.

(vii) On or about July 9, 2020, Adin purported to conduct an initial examination of an Insured named CL at NY Spine. Billing for CL's examination was submitted to GEICO through NY Spine. At the conclusion of CL's examination, Adin self– referred CL to NJ Ortho and Health East ASC for facet block injections that did not

legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injections were performed by Adin on August 12, 2020, at Health East ASC, Adin's ambulatory surgery center, rather than at Adin, NY Spine, or NJ Ortho's medical office. The self-referral violated the Codey Law because: (a) the resulting injections did not qualify as "ambulatory surgery or procedures requiring anesthesia"; and (b) the injections were performed at Health East ASC, rather than at Adin and NJ Ortho's medical office. In addition to violating the Codey Law, the self-referrals also violated New York law insofar as none of the disclosures required by New York Public Health Law 238-D were ever provided to the Insureds. For example, Adin never disclosed his ownership interest in NY Spine, NJ Ortho, and Health East ASC to the Insureds, nor did Adin inform the Insureds of their "right to utilize a specifically identified alternative health care provider…." Even so, NJ Ortho, Health East ASC, and Adin billed GEICO for the injections, which were the product of an unlawful self–referral.

(viii)    On or about July 20, 2020, Adin purported to conduct a follow-up examination of an Insured named LQ at NY Spine. Billing for LQ's examination was submitted to GEICO through NY Spine. At the conclusion of LQ's examination, Adin self–referred LQ to NJ Ortho and Health East ASC for epidural injections that did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injections were performed by Adin on August 19, 2020, at Health East ASC, Adin's ambulatory surgery center, rather than at Adin, NY Spine, or NJ Ortho's medical office. The self-referral violated the Codey Law because: (a) the resulting injections did not qualify as "ambulatory surgery or procedures requiring anesthesia"; and (b) the injections were performed at Health East ASC, rather than at Adin and NJ Ortho's medical office. In addition to violating the Codey Law, the self-referrals also violated New York law insofar as none of the disclosures required by New York Public Health Law 238-D were ever provided to the Insureds. For example, Adin never disclosed his ownership interest in NY Spine, NJ Ortho, and Health East ASC to the Insureds, nor did Adin inform the Insureds of their "right to utilize a specifically identified alternative health care provider…." Even so, NJ Ortho, Health East ASC, and Adin billed GEICO for the injections, which were the product of an unlawful self–referral.

(ix)    On or about August 13, 2020, Adin purported to conduct an initial examination of an Insured named MK at NY Spine. Billing for MK's examination was submitted to GEICO through NY Spine. At the conclusion of MK's examination, Adin self–referred MK to NJ Ortho and Health East ASC for epidural injections that did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injections were performed by Adin on August 26, 2020, at Health East ASC, Adin's ambulatory surgery center, rather than at Adin or NJ Ortho's medical office. The self-referral violated the Codey Law because: (a) the resulting injections did not qualify as "ambulatory surgery or procedures requiring anesthesia"; and (b) the injections were performed at Health East ASC, rather than at Adin, NY Spine, or NJ Ortho's medical office. In addition to violating the Codey Law, the self-referrals also violated New York law insofar as none of the disclosures required by New

York Public Health Law 238-D were ever provided to the Insureds. For example, Adin never disclosed his ownership interest in NY Spine, NJ Ortho, and Health East ASC to the Insureds, nor did Adin inform the Insureds of their "right to utilize a specifically identified alternative health care provider…." Even so, NJ Ortho, Health East ASC, and Adin billed GEICO for the injections, which were the product of an unlawful self–referral.

(x)     On or about May 2, 2020, Adin purported to conduct a follow-up examination of an Insured named SM at NY Spine. Billing for SM's examination was submitted to GEICO through NY Spine. At the conclusion of SM's examination, Adin self–referred SM to NJ Ortho and Health East ASC for facet injections that did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injections were performed by Adin on September 16, 2020, at Health East ASC, Adin's ambulatory surgery center, rather than at Adin, NY Spine, or NJ Ortho's medical office. The self-referral violated the Codey Law because: (a) the resulting injections did not qualify as "ambulatory surgery or procedures requiring anesthesia"; and (b) the injections were performed at Health East ASC, rather than at Adin and NJ Ortho's medical office. In addition to violating the Codey Law, the self-referrals also violated New York law insofar as none of the disclosures required by New York Public Health Law 238-D were ever provided to the Insureds. For example, Adin never disclosed his ownership interest in NY Spine, NJ Ortho, and Health East ASC to the Insureds, nor did Adin inform the Insureds of their "right to utilize a specifically identified alternative health care provider…." Even so, NJ Ortho, Health East ASC, and Adin billed GEICO for the injections, which were the product of an unlawful self–referral.

330.    These are only representative examples of NY Spine, NJ Ortho, Health East ASC, and Adin's illegal self-referrals for pain management injections. The pain management injections, as well as the surgical facility fees attendant to them, in the claims identified in Exhibits "1" – "2" were routinely the product of illegal self-referrals, inasmuch as none of the referrals qualified for the ASC Exception or any other exception to the Codey Law, nor were any of the disclosures required by New York Public Health Law 238-D satisfied.

331.    Following a substantial majority of these self-referrals, GEICO received two separate bills from Adin and his entities: a bill from NJ Ortho for the pain management injections themselves and a bill for a facility fee from the ambulatory surgery center – often Health East ASC – where the injections were provided.

## III.    The Fraudulent Billing Submitted to GEICO

332.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of bills and treatment reports through NY Spine, NJ Ortho, Sam Chang Chiro, Tom Rhee LAC, and Jonathan Wang PT, containing thousands of fraudulent charges, seeking payment for the Fraudulent Services for which they were not entitled to receive payment.

333.    The bills and treatment reports were false and misleading in the following material respects:

(i)    The bills and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Defendants were in compliance with all significant statutory and regulatory requirements governing healthcare practice and/or licensing laws, and therefore were eligible to receive PIP reimbursement. In fact, the Defendants were not in compliance with all significant statutory and regulatory requirements governing healthcare practice in New York and New Jersey and/or licensing laws, and therefore were not eligible to receive PIP reimbursement because: (a) the Defendants paid and received unlawful compensation in exchange for patient referrals; (b) the Defendants engaged in an unlawful self-referral scheme; and (c) the Defendants purported to provide, and billed for, the medically unnecessary and in some cases illusory Fraudulent Services.

(ii)    The bills and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were provided in compliance with all significant statutory and regulatory requirements governing healthcare practice in New York and New Jersey and/or licensing laws, and therefore were eligible for PIP reimbursement. In fact, the Fraudulent Services were not provided in compliance with all significant statutory and regulatory requirements governing healthcare practice in New York and New Jersey and/or licensing laws, and therefore were not eligible for PIP reimbursement, because: (a) the Fraudulent Services were provided pursuant to an unlawful referral/self-referral scheme; and (b) the Fraudulent Services were medically unnecessary and, in many cases, illusory.

(iii)    The bills and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed in the first instance. In fact, the Fraudulent Services frequently were not performed at all and, to the extent that they

were performed, they were not medically necessary and were performed as part of a pre–determined fraudulent treatment, referral, and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to it.

(iv)     The bills and treatment reports submitted or caused to be submitted by the Defendants misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, and the reimbursable amounts for the Fraudulent Services.

## IV.     The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

334.     The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

335.     To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

336.     For instance, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to a fraudulent, pre–determined protocol designed to maximize the charges that could be submitted, not to benefit the Insureds who supposedly were subjected to it.

337.     Likewise, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services frequently were never performed in the first instance.

338.     In addition, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were performed, to the extent that they are performed at all, pursuant to an illegal referral scheme.

339.     The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time–consuming arbitrations against GEICO and other insurers if the charges were not promptly paid in full.

340.     GEICO is under statutory and contractual obligations to promptly and fairly process claims. The facially–valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and omissions described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $4,750,000.00.

341.     Based upon the Defendants' material misrepresentations, omissions, and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## FIRST CAUSE OF ACTION
### Against NY Spine, NJ Ortho, Sam Chang Chiro, Tom Rhee LAC, and Jonathan Wang PT
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

342.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 341 above.

343.     There is an actual case in controversy between GEICO and NY Spine, NJ Ortho, Sam Chang Chiro, Tom Rhee LAC, and Jonathan Wang PT regarding more than $75,000.00 in unpaid billing for the Fraudulent Services that has been submitted to GEICO through NY Spine, NJ Ortho, Sam Chang Chiro, Tom Rhee LAC, and Jonathan Wang PT.

344.     NY Spine, NJ Ortho, Sam Chang Chiro, Tom Rhee LAC, and Jonathan Wang PT have no right to receive payment for any pending bills submitted to GEICO because of the fraudulent and unlawful activities described herein.

345.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that NY Spine, NJ Ortho, Sam Chang Chiro, Tom Rhee LAC, and Jonathan Wang PT have no right to receive payment for any pending bills submitted to GEICO.

### SECOND CAUSE OF ACTION
**Against Adin**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

346.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 341 above.

347.    NY Spine is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

348.    Adin knowingly conducted and/or participated, directly or indirectly, in the conduct of NY Spine's affairs through a pattern of racketeering activities consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over five years seeking payments that NY Spine was not entitled to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre–determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the Defendants were engaged in an unlawful referral scheme; (iv) the billed-for services, in many cases, were not performed at all; (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (vi) neither NY Spine nor the underlying services were in compliance with applicable law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering

activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

349.    NY Spine's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Adin has operated NY Spine, inasmuch as NY Spine is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for NY Spine to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Adin continues to submit fraudulent billing to GEICO, and continues to attempt collection on the fraudulent billing submitted through NY Spine to the present day.

350.    NY Spine is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by NY Spine in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

351.    GEICO has been injured in its business and property by reason of the above–described conduct in that it has paid at least $350,000.00 pursuant to the fraudulent bills submitted through NY Spine.

352.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## THIRD CAUSE OF ACTION
### Against Adin, NJ Ortho, Chang, Sam Chang Chiro, Wang, Jonathan Wang PT, Rhee, and Tom Rhee LAC
### (Violation of RICO, 18 U.S.C. § 1962(d))

353.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 341 above.

354.    NY Spine is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

355.    Adin, NJ Ortho, Chang, Sam Chang Chiro, Wang, Jonathan Wang PT, Rhee, and Tom Rhee LAC are employed by and/or associated with the NY Spine enterprise.

356.    Adin, NJ Ortho, Chang, Sam Chang Chiro, Wang, Jonathan Wang PT, Rhee, and Tom Rhee LAC knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the NY Spine enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for more than five years seeking payments that NY Spine was not entitled to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre–determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the Defendants were engaged in an unlawful referral scheme; (iv) the billed-for services, in many cases, were not performed at all; (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (vi) neither NY Spine nor the underlying services were in compliance with applicable law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint

are described, in part, in the chart annexed hereto as Exhibit "2". Each such mailing was made in furtherance of the mail fraud scheme.

357.    Adin, NJ Ortho, Chang, Sam Chang Chiro, Wang, Jonathan Wang PT, Rhee, Tom Rhee LAC, and NY Spine knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

358.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $350,000.00 pursuant to the fraudulent bills submitted through NY Spine.

359.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## FOURTH CAUSE OF ACTION
### Against NY Spine and Adin
### (Common Law Fraud)

360.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 341 above.

361.    NY Spine and Adin intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

362.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim identified in Exhibit "2" the representation that NY Spine and Adin were in compliance with all significant laws and regulations governing healthcare practice, when in fact they were not; (ii) in every claim identified in Exhibit "2", the representation

that NY Spine and Adin were eligible to receive PIP Benefits, when in fact they were not; (iii) in every claim identified in Exhibit "1", concealment of the Defendants' illegal kickback and referral scheme; (iv) in every claim identified in Exhibit "2", the representation that the Fraudulent Services were medically necessary, and in some cases actually performed, when in fact the Fraudulent Services were not medically necessary, in some cases were not performed at all, and were performed – to the extent that they were performed at all – as part of a pre-determined fraudulent treatment and billing protocol designed to financially enrich NY Spine and Adin, not to benefit the Insureds who supposedly were subjected to them; and (v) in every claim identified in Exhibit "2", the representation that the Fraudulent Services were provided in compliance with the laws and regulations governing healthcare practice, and were eligible for PIP reimbursement, when in fact they were not.

363.    NY Spine and Adin intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through NY Spine that were not compensable.

364.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $350,000.00 pursuant to the fraudulent bills submitted by the Defendants through NY Spine.

365.    NY Spine and Adin's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages

366.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### FIFTH CAUSE OF ACTION
**Against Chang, Sam Chang Chiro, Rhee,**
**Tom Rhee LAC, Wang, Jonathan Wang PT**
**(Aiding and Abetting Fraud)**

367.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 341 above.

368.    Chang, Sam Chang Chiro, Rhee, Tom Rhee LAC, Wang, Jonathan Wang PT knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by NY Spine and Adin.

369.    The acts of Chang, Sam Chang Chiro, Rhee, Tom Rhee LAC, Wang, Jonathan Wang PT in furtherance of the fraudulent scheme involve referring Insureds to NY Spine and Adin for medically unnecessary services in exchange for unlawful compensation from NY Spine and Adin.

370.    The conduct of Chang, Sam Chang Chiro, Rhee, Tom Rhee LAC, Wang, Jonathan Wang PT was significant and material. The conduct of Chang, Sam Chang Chiro, Rhee, Tom Rhee LAC, Wang, Jonathan Wang PT was a necessary part of and was critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for NY Spine and Adin to obtain payment from GEICO and from other insurers.

371.    Chang, Sam Chang Chiro, Rhee, Tom Rhee LAC, Wang, Jonathan Wang PT aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to NY Spine for non-reimbursable and medically unnecessary Fraudulent Services, because they sought to continue profiting through the fraudulent scheme.

372.    The conduct of Chang, Sam Chang Chiro, Rhee, Tom Rhee LAC, Wang, Jonathan Wang PT caused GEICO to pay more than $350,000.00 pursuant to the fraudulent bills submitted or caused to be submitted through NY Spine.

373.    Chang, Sam Chang Chiro, Rhee, Tom Rhee LAC, Wang, Jonathan Wang PT's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

374.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**SIXTH CAUSE OF ACTION**
**Against NY Spine and Adin**
**(Unjust Enrichment)**

375.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 341 above.

376.    As set forth above, NY Spine and Adin have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

377.    When GEICO paid the bills and charges submitted or caused to be submitted by NY Spine and Adin through NY Spine for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

378.    NY Spine and Adin have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

379.    NY Spine and Adin's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

380.    By reason of the above, NY Spine and Adin have been unjustly enriched in an amount to be determined at trial, but in no event less than $350,000.00.

## SEVENTH CAUSE OF ACTION
### Against Adin
### (Violation of RICO, 18 U.S.C. § 1962(c))

381.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 341 above.

382.    NJ Ortho is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

383.    Adin knowingly conducted and/or participated, directly or indirectly, in the conduct of NJ Ortho's affairs through a pattern of racketeering activities consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over four years seeking payments that NJ Ortho was not entitled to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre–determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the Defendants were engaged in an unlawful referral scheme; and (iv) neither NJ Ortho nor the underlying services were in compliance with applicable law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

384.    NJ Ortho's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Adin has operated NJ Ortho, inasmuch as NJ Ortho is not engaged in a legitimate chiropractic practice, and acts of mail fraud therefore are essential in order for NJ Ortho to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts

of mail fraud implies a threat of continued criminal activity, as does the fact that Adin continues to submit fraudulent billing to GEICO, and continues to attempt collection on the fraudulent billing submitted through NJ Ortho to the present day.

385.    NJ Ortho is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by NJ Ortho in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

386.    GEICO has been injured in its business and property by reason of the above–described conduct in that it has paid at least $2,000,000.00 pursuant to the fraudulent bills submitted through NJ Ortho.

387.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## EIGHTH CAUSE OF ACTION
### Against Adin and NY Spine
### (Violation of RICO, 18 U.S.C. § 1962(d))

388.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 341 above.

389.    NJ Ortho is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

390.    Adin and NY Spine are employed by and/or associated with the NJ Ortho enterprise.

391.    Adin and NY Spine knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the NJ Ortho enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute,

18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for more than four years seeking payments that NJ Ortho was not entitled to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre–determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the Defendants were engaged in an unlawful referral scheme; and (iv) neither NJ Ortho nor the underlying services were in compliance with applicable law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

392.    Adin and NY Spine knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

393.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,000,000.00 pursuant to the fraudulent bills submitted through NJ Ortho.

394.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## NINTH CAUSE OF ACTION
### Against NJ Ortho and Adin
### (Common Law Fraud)

395.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 341 above.

396.    NJ Ortho and Adin intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

397.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim identified in Exhibit "1" the representation that NJ Ortho and Adin were in compliance with all significant laws and regulations governing healthcare practice, when in fact they were not; (ii) in every claim identified in Exhibit "1", the representation that NJ Ortho and Adin were eligible to receive PIP Benefits, when in fact they were not; (iii) in every claim identified in Exhibit "1", concealment of the Defendants' illegal kickback and referral scheme; (iv) in every claim identified in Exhibit "1", the representation that the Fraudulent Services were medically necessary, and in some cases actually performed, when in fact the Fraudulent Services were not medically necessary, in some cases were not performed at all, and were performed – to the extent that they were performed at all – as part of a pre-determined fraudulent treatment and billing protocol designed to financially enrich NJ Ortho and Adin, not to benefit the Insureds who supposedly were subjected to them; and (v) in every claim identified in Exhibit "1", the representation that the Fraudulent Services were provided in compliance with the laws and regulations governing healthcare practice, and were eligible for PIP reimbursement, when in fact they were not.

398.    NJ Ortho and Adin intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through NJ Ortho that were not compensable.

399.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $2,000,000.00 pursuant to the fraudulent bills submitted by the Defendants through NJ Ortho.

400.    NJ Ortho and Adin's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages

401.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## TENTH CAUSE OF ACTION
### Against NY Spine
### (Aiding and Abetting Fraud)

402.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 341 above.

403.    NY Spine knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by NJ Ortho and Adin.

404.    The acts of NY Spine in furtherance of the fraudulent scheme involve participating in the referral of Insureds from NY Spine to NJ Ortho for medically unnecessary services.

405.    The conduct of NY Spine was significant and material. The conduct of NY Spine and Adin was a necessary part of and was critical to the success of the fraudulent scheme because

without their actions, there would be no opportunity for NJ Ortho and Adin to obtain payment from GEICO and from other insurers.

406.    NY Spine aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to NJ Ortho for non-reimbursable and medically unnecessary Fraudulent Services, because it sought to continue profiting through the fraudulent scheme.

407.    The conduct of NY Spine caused GEICO to pay more than $2,000,000.00 pursuant to the fraudulent bills submitted or caused to be submitted through NJ Ortho.

408.    NY Spine's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

409.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## ELEVENTH CAUSE OF ACTION
### Against NJ Ortho and Adin
### (Unjust Enrichment)

410.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 341 above.

411.    As set forth above, NJ Ortho and Adin have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

412.    When GEICO paid the bills and charges submitted or caused to be submitted by NJ Ortho and Adin through NJ Ortho for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

413.    NJ Ortho and Adin have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

414.    NJ Ortho and Adin's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

415.    By reason of the above, NJ Ortho and Adin have been unjustly enriched in an amount to be determined at trial, but in no event less than $2,000,000.00.

### THIRTEENTH CAUSE OF ACTION
**Against Chang**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

416.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 341 above.

417.    Sam Chang Chiro is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce. Chang knowingly conducted and/or participated, directly or indirectly, in the conduct of Sam Chang Chiro's affairs through a pattern of racketeering activities consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over four years seeking payments that Sam Chang Chiro was not entitled to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre–determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the Defendants were engaged in an unlawful referral scheme; and (iv) neither Sam Chang Chiro nor the underlying services were in compliance with applicable law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the

pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3".

418.    Sam Chang Chiro's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Chang has operated Sam Chang Chiro, inasmuch as Sam Chang Chiro is not engaged in a legitimate chiropractic practice, and acts of mail fraud therefore are essential in order for Sam Chang Chiro to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Chang continues to submit fraudulent billing to GEICO, and continues to attempt collection on the fraudulent billing submitted through Sam Chang Chiro to the present day.

419.    Sam Chang Chiro is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Sam Chang Chiro in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

420.    GEICO has been injured in its business and property by reason of the above–described conduct in that it has paid at least $650,000.00 pursuant to the fraudulent bills submitted through Sam Chang Chiro.

421.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## THIRTEENTH CAUSE OF ACTION
### Against Adin, NY Spine, and Chang
### (Violation of RICO, 18 U.S.C. § 1962(d))

422.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 341 above.

423.    Sam Chang Chiro is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

424.    Chang, Adin, and NY Spine are employed by and/or associated with the Sam Chang Chiro enterprise.

425.    Chang, Adin, and NY Spine knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Sam Chang Chiro enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for more than four years seeking payments that Sam Chang Chiro was not entitled to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre–determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the Defendants were engaged in an unlawful referral scheme; and (iv) neither Sam Chang Chiro nor the underlying services were in compliance with applicable law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3". Each such mailing was made in furtherance of the mail fraud scheme.

426.    Chang, Adin, and NY Spine knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

427.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $650,000.00 pursuant to the fraudulent bills submitted through Sam Chang Chiro.

428.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**FOURTEENTH CAUSE OF ACTION**
**Against Sam Chang Chiro and Chang**
**(Common Law Fraud)**

429.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 341 above.

430.    Sam Chang Chiro and Chang intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

431.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim identified in Exhibit "3" the representation that Sam Chang Chiro and Chang were in compliance with all significant laws and regulations governing healthcare practice, when in fact they were not; (ii) in every claim identified in Exhibit "3", the representation that Sam Chang Chiro and Chang were eligible to receive PIP Benefits, when in fact they were not; (iii) in every claim identified in Exhibit "3", concealment of the Defendants' illegal kickback

and referral scheme; (iv) in every claim identified in Exhibit "3", the representation that the Fraudulent Services were medically necessary, and in some cases actually performed, when in fact the Fraudulent Services were not medically necessary, in some cases were not performed at all, and were performed – to the extent that they were performed at all – as part of a pre-determined fraudulent treatment and billing protocol designed to financially enrich Sam Chang Chiro and Chang, not to benefit the Insureds who supposedly were subjected to them; and (v) in every claim identified in Exhibit "3", the representation that the Fraudulent Services were provided in compliance with the laws and regulations governing healthcare practice, and were eligible for PIP reimbursement, when in fact they were not.

432.    Sam Chang Chiro and Chang intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Sam Chang Chiro that were not compensable under New Jersey's No-Fault Laws.

433.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $650,000.00 pursuant to the fraudulent bills submitted by the Defendants through Sam Chang Chiro.

434.    Sam Chang Chiro and Chang's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages

435.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FIFTEENTH CAUSE OF ACTION
### Against Adin and NY Spine
### (Aiding and Abetting Fraud)

436.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 341 above.

437.    NY Spine and Adin knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Sam Chang Chiro and Chang.

438.    The acts of NY Spine and Adin in furtherance of the fraudulent scheme involve referring Insureds to Sam Chang Chiro and Chang for medically unnecessary services in exchange for unlawful compensation from Sam Chang Chiro and Chang.

439.    The conduct of NY Spine and Adin was significant and material. The conduct of NY Spine and Adin was a necessary part of and was critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Sam Chang Chiro and Chang to obtain payment from GEICO and from other insurers.

440.    NY Spine and Adin aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Sam Chang Chiro for non-reimbursable and medically unnecessary Fraudulent Services, because they sought to continue profiting through the fraudulent scheme.

441.    The conduct of NY Spine and Adin caused GEICO to pay more than $650,000.00 pursuant to the fraudulent bills submitted or caused to be submitted through Sam Chang Chiro.

442.    NY Spine and Adin's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

443.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## SIXTEENTH CAUSE OF ACTION
**Against Sam Chang Chiro and Chang**
**(Unjust Enrichment)**

444.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 341 above.

445.    As set forth above, Sam Chang Chiro and Chang have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

446.    When GEICO paid the bills and charges submitted or caused to be submitted by Sam Chang Chiro and Chang through Sam Chang Chiro for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

447.    Sam Chang Chiro and Chang have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

448.    Sam Chang Chiro and Chang's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

449.    By reason of the above, Sam Chang Chiro and Chang have been unjustly enriched in an amount to be determined at trial, but in no event less than $650,000.00.

## SEVENTEENTH CAUSE OF ACTION
### Against Rhee
### (Violation of RICO, 18 U.S.C. § 1962(c))

450.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 341 above.

451.    Tom Rhee LAC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce. Rhee knowingly conducted and/or participated, directly or indirectly, in the conduct of Tom Rhee LAC's affairs through a pattern of racketeering activities consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over four years seeking payments that Tom Rhee LAC was not entitled to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre–determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the Defendants were engaged in an unlawful referral scheme; and (iv) neither Tom Rhee LAC nor the underlying services were in compliance with applicable law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4".

452.    Tom Rhee LAC's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Rhee has operated Tom Rhee LAC, inasmuch as Tom Rhee LAC is not engaged in a legitimate chiropractic practice, and acts of mail fraud therefore are essential in order for Tom Rhee LAC to function. Furthermore, the intricate planning required to carry out and

conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Rhee continues to submit fraudulent billing to GEICO, and continues to attempt collection on the fraudulent billing submitted through Tom Rhee LAC to the present day.

453.    Tom Rhee LAC is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Tom Rhee LAC in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

454.    GEICO has been injured in its business and property by reason of the above–described conduct in that it has paid at least $700,000.00 pursuant to the fraudulent bills submitted through Tom Rhee LAC.

455.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**EIGHTEENTH CAUSE OF ACTION**
**Against Adin, NY Spine, and Rhee**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

456.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 341 above.

457.    Tom Rhee LAC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

458.    Rhee, Adin, and NY Spine are employed by and/or associated with the Tom Rhee LAC enterprise.

459.    Rhee, Adin, and NY Spine knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Tom Rhee LAC enterprise's

affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for more than four years seeking payments that Tom Rhee LAC was not entitled to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre–determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the Defendants were engaged in an unlawful referral scheme; and (iv) neither Tom Rhee LAC nor the underlying services were in compliance with applicable law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4". Each such mailing was made in furtherance of the mail fraud scheme.

460.    Rhee, Adin, and NY Spine knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

461.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $700,000.00 pursuant to the fraudulent bills submitted through Tom Rhee LAC.

462.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## NINETEENTH CAUSE OF ACTION
### Against Tom Rhee LAC and Rhee
### (Common Law Fraud)

463.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 341 above.

464.     Tom Rhee LAC and Rhee intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

465.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim identified in Exhibit "4" the representation that Tom Rhee LAC and Rhee were in compliance with all significant laws and regulations governing healthcare practice, when in fact they were not; (ii) in every claim identified in Exhibit "4", the representation that Tom Rhee LAC and Rhee were eligible to receive PIP Benefits, when in fact they were not; (iii) in every claim identified in Exhibit "4", concealment of the Defendants' illegal kickback and referral scheme; (iv) in every claim identified in Exhibit "4", the representation that the Fraudulent Services were medically necessary, and in some cases actually performed, when in fact the Fraudulent Services were not medically necessary, in some cases were not performed at all, and were performed – to the extent that they were performed at all – as part of a pre-determined fraudulent treatment and billing protocol designed to financially enrich Tom Rhee LAC and Rhee, not to benefit the Insureds who supposedly were subjected to them; and (v) in every claim identified in Exhibit "4", the representation that the Fraudulent Services were provided in compliance with the laws and regulations governing healthcare practice, and were eligible for PIP reimbursement, when in fact they were not.

466.    Tom Rhee LAC and Rhee intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Tom Rhee LAC that were not compensable under New Jersey's No-Fault Laws.

467.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $700,000.00 pursuant to the fraudulent bills submitted by the Defendants through Tom Rhee LAC.

468.    Tom Rhee LAC and Rhee's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages

469.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## TWENTIETH CAUSE OF ACTION
### Against Adin and NY Spine
### (Aiding and Abetting Fraud)

470.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 341 above.

471.    NY Spine and Adin knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Tom Rhee LAC and Rhee.

472.    The acts of NY Spine and Adin in furtherance of the fraudulent scheme involve referring Insureds to Tom Rhee LAC and Rhee for medically unnecessary services in exchange for unlawful compensation from Tom Rhee LAC and Rhee.

473.    The conduct of NY Spine and Adin was significant and material. The conduct of NY Spine and Adin was a necessary part of and was critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Tom Rhee LAC and Rhee to obtain payment from GEICO and from other insurers.

474.    NY Spine and Adin aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Tom Rhee LAC for non-reimbursable and medically unnecessary Fraudulent Services, because they sought to continue profiting through the fraudulent scheme.

475.    The conduct of NY Spine and Adin caused GEICO to pay more than $700,000.00 pursuant to the fraudulent bills submitted or caused to be submitted through Tom Rhee LAC.

476.    NY Spine and Adin's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

477.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## TWENTY FIRST CAUSE OF ACTION
### Against Tom Rhee LAC and Rhee
### (Unjust Enrichment)

478.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 341 above.

479.    As set forth above, Tom Rhee LAC and Rhee have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

480.    When GEICO paid the bills and charges submitted or caused to be submitted by Tom Rhee LAC and Rhee through Tom Rhee LAC for PIP Benefits, it reasonably believed that it

was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

481.     Tom Rhee LAC and Rhee have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

482.     Tom Rhee LAC and Rhee's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

483.     By reason of the above, Tom Rhee LAC and Rhee have been unjustly enriched in an amount to be determined at trial, but in no event less than $700,000.00.

**TWENTY SECOND CAUSE OF ACTION**
**Against Wang**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

484.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 341 above.

485.     Jonathan Wang PT is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce. Wang knowingly conducted and/or participated, directly or indirectly, in the conduct of Jonathan Wang PT's affairs through a pattern of racketeering activities consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over four years seeking payments that Jonathan Wang PT was not entitled to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre–determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the Defendants were engaged in an unlawful referral scheme; and (iv) neither

Jonathan Wang PT nor the underlying services were in compliance with applicable law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5".

486.    Jonathan Wang PT's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Wang has operated Jonathan Wang PT, inasmuch as Jonathan Wang PT is not engaged in a legitimate physical therapy practice, and acts of mail fraud therefore are essential in order for Jonathan Wang PT to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Wang continues to submit fraudulent billing to GEICO, and continues to attempt collection on the fraudulent billing submitted through Jonathan Wang PT to the present day.

487.    Jonathan Wang PT is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Jonathan Wang PT in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

488.    GEICO has been injured in its business and property by reason of the above–described conduct in that it has paid at least $1,000,000.00 pursuant to the fraudulent bills submitted through Jonathan Wang PT.

489.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### TWENTY THIRD CAUSE OF ACTION
**Against Adin, NY Spine, and Wang**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

490.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 341 above.

491.     Jonathan Wang PT is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

492.     Wang, Adin, and NY Spine are employed by and/or associated with the Jonathan Wang PT enterprise.

493.     Wang, Adin, and NY Spine knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Jonathan Wang PT enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for more than four years seeking payments that Jonathan Wang PT was not entitled to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre–determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the Defendants were engaged in an unlawful referral scheme; and (iv) neither Jonathan Wang PT nor the underlying services were in compliance with applicable law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of

this Complaint are described, in part, in the chart annexed hereto as Exhibit "5". Each such mailing was made in furtherance of the mail fraud scheme.

494. Wang, Adin, and NY Spine knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

495. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,000,000.00 pursuant to the fraudulent bills submitted through Jonathan Wang PT.

496. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## TWENTIETH FOURTH CAUSE OF ACTION
### Against Jonathan Wang PT and Wang
### (Common Law Fraud)

497. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 341 above.

498. Jonathan Wang PT and Wang intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

499. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim identified in Exhibit "5" the representation that Jonathan Wang PT and Wang were in compliance with all significant laws and regulations governing healthcare practice, when in fact they were not; (ii) in every claim identified in Exhibit "5", the

representation that Jonathan Wang PT and Wang were eligible to receive PIP Benefits, when in fact they were not; (iii) in every claim identified in Exhibit "5", concealment of the Defendants' illegal kickback and referral scheme; (iv) in every claim identified in Exhibit "5", the representation that the Fraudulent Services were medically necessary, and in some cases actually performed, when in fact the Fraudulent Services were not medically necessary, in some cases were not performed at all, and were performed – to the extent that they were performed at all – as part of a pre-determined fraudulent treatment and billing protocol designed to financially enrich Jonathan Wang PT and Wang, not to benefit the Insureds who supposedly were subjected to them; and (v) in every claim identified in Exhibit "5", the representation that the Fraudulent Services were provided in compliance with the laws and regulations governing healthcare practice, and were eligible for PIP reimbursement, when in fact they were not.

500.    Jonathan Wang PT and Wang intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Jonathan Wang PT that were not compensable under New Jersey's No-Fault Laws.

501.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $1,000,000.00 pursuant to the fraudulent bills submitted by the Defendants through Jonathan Wang PT.

502.    Jonathan Wang PT and Wang's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

503.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## TWENTY FIFTH CAUSE OF ACTION
### Against Adin and NY Spine
### (Aiding and Abetting Fraud)

504.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 341 above.

505.     NY Spine and Adin knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Jonathan Wang PT and Wang.

506.     The acts of NY Spine and Adin in furtherance of the fraudulent scheme involve referring Insureds to Jonathan Wang PT and Wang for medically unnecessary services in exchange for unlawful compensation from Jonathan Wang PT and Wang.

507.     The conduct of NY Spine and Adin was significant and material. The conduct of NY Spine and Adin was a necessary part of and was critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Jonathan Wang PT and Wang to obtain payment from GEICO and from other insurers.

508.     NY Spine and Adin aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Jonathan Wang PT for non-reimbursable and medically unnecessary Fraudulent Services, because they sought to continue profiting through the fraudulent scheme.

509.     The conduct of NY Spine and Adin caused GEICO to pay more than $1,000,000.00 pursuant to the fraudulent bills submitted or caused to be submitted through Jonathan Wang PT.

510.    NY Spine and Adin's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

511.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**TWENTY SIXTH CAUSE OF ACTION**
**Against Jonathan Wang PT and Wang**
**(Unjust Enrichment)**

512.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 341 above.

513.    As set forth above, Jonathan Wang PT and Rhee have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

514.    When GEICO paid the bills and charges submitted or caused to be submitted by Jonathan Wang PT and Wang through Jonathan Wang PT for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

515.    Jonathan Wang PT and Wang have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

516.    Jonathan Wang PT and Wang's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

517.    By reason of the above, Jonathan Wang PT and Wang have been unjustly enriched in an amount to be determined at trial, but in no event less than $1,000,000.00.

## JURY DEMAND

518.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against NY Spine, NJ Ortho, Sam Chang Chiro, Tom Rhee LAC, and Jonathan Wang PT, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that NY Spine, NJ Ortho, Sam Chang Chiro, Tom Rhee LAC, and Jonathan Wang PT have no right to receive payment for any pending bills submitted to GEICO;

B.    On the Second Cause of Action against Adin, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $350,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.    On the Third Cause of Action against Adin, NJ Ortho, Chang, Sam Chang Chiro, Wang, Jonathan Wang PT, Rhee, and Tom Rhee LAC, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $350,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;\

D.    On the Fourth Cause of Action against NY Spine and Adin, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $350,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.    On the Fifth Cause of Action against all Defendants, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $350,000.00, together with

punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

F.      On the Sixth Cause of Action against NY Spine and Adin, more than $350,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

G.      On the Seventh Cause of Action against Adin, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $2,000,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

H.      On the Eighth Cause of Action against Adin, and NY Spine, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $2,000,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

I.      On the Ninth Cause of Action against NJ Ortho and Adin, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $2,000,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

J.      On the Tenth Cause of Action against Adin and NY Spine, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $2,000,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

K.      On the Eleventh Cause of Action against NJ Ortho and Adin, more than $2,000,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

L.      On the Twelfth Cause of Action against Chang, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $650,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

M.      On the Thirteenth Cause of Action against Adin, NY Spine, and Chang, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $650,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

N.      On the Fourteenth Cause of Action against Sam Chang Chiro and Chang, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $650,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

O.      On the Fifteenth Cause of Action against Adin and NY Spine, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $650,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

P.      On the Sixteenth Cause of Action against Sam Chang Chiro and Chang, more than $650,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Q.      On the Seventeenth Cause of Action against Rhee, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $700,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

R.      On the Eighteenth Cause of Action against Adin, NY Spine, and Rhee, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of

$700,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

S.    On the Nineteenth Cause of Action against Tom Rhee LAC and Rhee, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $700,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

T.    On the Twentieth Cause of Action against Adin and NY Spine, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $700,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

U.    On the Twenty-First Cause of Action against Tom Rhee LAC and Rhee, more than $700,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

V.    On the Twenty-Second Cause of Action against Wang, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $1,000,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

W.    On the Twenty-Third Cause of Action against Adin, NY Spine, and Wang, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $1,000,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

X.    On the Twenty-Fourth Cause of Action against Jonathan Wang PT and Wang, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of

$1,000,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

Y.      On the Twenty-Fifth Cause of Action against Adin and NY Spine, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $1,000,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

Z.      On the Twenty-Sixth Cause of Action against Jonathan Wang PT and Wang, more than $1,000,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated: January 12, 2023

                                RIVKIN RADLER LLP

                    By:      _____/s/ Max Gershenoff_____
                             Barry I. Levy, Esq. (BL 2190)
                             Max Gershenoff, Esq. (MG 4648)
                             Qasim I. Haq, Esq. (QH 8906)
                             926 RXR Plaza
                             Uniondale, New York 11556
                             (516) 357-3000

                             *Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company*